## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| VESTTOO LTD., *et al.*[1] | Case No. 23-11160 (MFW) |
| Debtors. | (Joint Administration Requested) |

## MOTION FOR AN ORDER ENFORCING THE AUTOMATIC STAY AGAINST (I) WHITE ROCK INSURANCE (SAC) LTD. AND (II) THE PUTATIVE JOINT PROVISIONAL LIQUIDATORS OF THE DEBTORS' SEGREGATED ACCOUNTS

Vesttoo Ltd. and its affiliated debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**" or "**Vesttoo**"), by and through their proposed counsel, DLA Piper LLP (US) and their proposed conflicts counsel, Ballad Spahr LLP, hereby submit this motion (this "**Motion**") for an order enforcing the automatic stay against White Rock Insurance (SAC) Ltd. ("**White Rock**") and the putative joint provisional liquidators of segregated cells ("**JPLs**"). In support of this Motion, the Debtors rely upon and incorporate by reference the *Declaration of Ami Barlev in Support of Chapter 11 Petitions and First Day Motions* [D.I. 12] (the "**Barlev Declaration**"), filed on August 18, 2023, along with (i) the *Declaration of Hannah Tildesley in Support of Motion for Automatic Stay Against (I) White Rock Insurance (SAC) Ltd. and (II) the Putative Joint Provisional Liquidators of the Debtors' Segregated Accounts* (the "**Tildesley Declaration**"), (ii) the *Declaration of John Wasty in Support of Motion for Automatic Stay Against (I) White Rock Insurance (SAC) Ltd. and (II) the Putative Joint Provisional Liquidators of the Debtors' Segregated Accounts* (the "**Wasty Declaration**"), and (iii) the

---

[1]     Due to the large number of debtor entities in these chapter 11 cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent at https://dm.epiq11.com/vesttoo.

*Declaration of R. Craig Martin, Esq. in Support of Motion for Automatic Stay Against (I) White Rock Insurance (SAC) Ltd. and (II) the Putative Joint Provisional Liquidators of the Debtors' Segregated Accounts* (the "**Martin Declaration**"), each filed contemporaneously herewith, and respectfully state as follows:

## JURISDICTION AND VENUE

1.      The United States Bankruptcy Court for the District of Delaware (the "**Court**") has jurisdiction over these chapter 11 cases, the Debtors, property of the Debtors' estates, and this matter under 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated as of February 29, 2012.  This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A).

2.      Under Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"), the Debtors consent to the entry of a final judgment or order with respect to this motion if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

3.      Venue of these cases in this District is proper under 28 U.S.C. §§ 1408 and 1409.

4.      The statutory bases for the relief requested in this motion are sections 105, 345, and 363 of title 11 of the United States Code (the "**Bankruptcy Code**"), Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Local Rule 2015-2.

## PRELIMINARY STATEMENT

5.      The Debtors face a publicly reported crisis arising from allegations by various transaction counterparties that letters of credit posted as collateral to support the transactions were fraudulent.  A party to the transactions supported by these letters of credit, White Rock, is a

Bermudian company that sold the Debtors' beneficial interests in segregated cells. White Rock has aggressively sought to seize the Debtors' assets both before and after the commencement of these chapter 11 cases. In doing so, White Rock has violated the automatic stay.

6.     White Rock raced into a New York court and obtained an *ex parte* injunction against the Debtors in order to freeze their assets pending arbitration in Bermuda. When Debtors initiated these chapter 11 cases several days later, the New York court withdrew the injunction. White Rock then turned its attention offshore.

7.     White Rock's most recent violation of the stay occurred on Friday August 18, 2023, when it pressed forward with a secret hearing in Bermuda. When the Debtors' Bermudian counsel learned of and attempted to attend the hearing, she was excluded. White Rock's counsel then informed her that the matters had been "adjourned" until September 29, 2023, but hours later a government press release announced that White Rock "agreed for the Bermuda Supreme Court to appoint Charles Thresh and Michael Morrison of Teneo (Bermuda) Limited to act as Joint Provisional Liquidators ("**JPL**s") for White Rock Bermuda with respect to the impacted Vesttoo Cells." This announcement was all the more remarkable because Bermudian law does not permit appointment of JPLs for segregated accounts unless White Rock, the segregated account company, applies for winding up of its entire business.[2] There is no indication White Rock has made such an application.

8.     The Vesttoo Cells referenced in the press release are segregated accounts created under and governed by the Bermudian Segregated Accounts Companies Act. Under that act, and

---

[2]     As part of such application, White Rock would have to make a *prima facie* case that White Rock meets the test for winding up, namely, that it is either (i) insolvent, (ii) has breached the Bermudian Insurance Act, (iii) has failed to file the proper accounts under the Bermudian Insurance Act, or (iv) it is in the public interest for it to be wound up (the "just and equitable" test under Bermudian law). Additionally, where there are concerns regarding the management or solvency of particular segregated accounts under Bermudian law, the proper course of action dictates White Rock to have sought the appointment of receiver over those segregated accounts under the Bermudian Segregated Accounts Companies Act.

as a result of transactions with White Rock, Vesttoo is the statutorily-defined "account owner" of the segregated accounts, making them property of the Debtors' estates. White Rock's initiation and continuation of proceedings in Bermuda, resulting in the appointment of the JPLs to exercise control over the Debtors' assets, thus violates the automatic stay.

9. The Debtors are in the process of completing an investigation into the issues related to the issuance of letter of credits that were provided to the White Rock and other cells and intend to file a summary of that report with the Court (with appropriate protections to ensure legal privilege is preserved) so that cedents/insurers, creditors, government regulators, and transformer entities will know the outcome of this investigation. The Debtors also intend to include in this report a path forward in these cases to enable them to maximize the value of these estates, including negotiating with insurers, cedents, government regulators, and other stakeholders to remove any wrongdoers within Vesttoo or take appropriate legal action against any external wrongdoers. *See* Barlev Decl., ¶ 27. White Rock's continued actions jeopardize these plans. The appointment of JPLs will create confusion, duplication, and additional costs and expenses that are not necessary at this early stage in the cases—especially since it appears they were knowingly obtained in violation of U.S. and Bermudian law.

10. As will be made plain below, White Rock has proven itself incapable of complying with the automatic stay (even suggesting that they could violate it unless the Debtors articulated a theory that justified White Rock not complying with it) and the appointment of the JPLs was done in violation of the stay and is thus void. For these reasons, the Court should enter an appropriate order to enforce the stay against White Rock and the JPLs to allow the Debtors the necessary breathing space to complete their investigation and begin negotiating with parties in interest

regarding reorganizing Vesttoo in an orderly way that allows it to resume regular business operations and maximize value to creditors.

## BACKGROUND

11.     On August 14 and 15, 2023 (the "**Petition Date**"), the Debtors filed with this Court voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

12.     The Debtors remain in possession of their property, continue to operate their businesses, and manage their property as debtors in possession under sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner, or official committee of unsecured creditors has been appointed.  No date has been set for a meeting of creditors under section 341 of the Bankruptcy Code.

### A.     Overview of Operations

13.     Vesttoo and its subsidiaries and affiliates are engaged in the development and construction of unique technology in the field of risk management, which allows insurance and reinsurance companies (as "**cedents**" or "**retrocedents**") to transfer their insurance risks to capital market investors through a technological reinsurance transaction platform and reinsurance-related financial instruments.  *See* Barlev Decl., ¶ 6.

14.     Reinsurance is a transaction where an insurance company (called the "**reinsured**" or "**cedent**") cedes, "spreads" or transfers to another insurer (called the "**reinsurer**") a portion of the risk the cedent underwrote under certain of its policies, along with a portion of the premium. *Id*., ¶ 7.  The two insurers then share the financial exposure resulting from the risks the cedent underwrote.  *Id*.  This spreading of risk permits a cedent to, among other things, reduce the amount of reserves it must hold for the protection of policyholders, and thereby increases the cedent's

capacity to underwrite additional insurance. *Id*. In this case, the assumed insurance risks are placed into segregated accounts or protective cells created under Bermudian law. *Id*., ¶ 8.

15.     Vesttoo's business has always operated under the umbrella of an international regulatory structure designed to facilitate transactions and protect the parties who participate in them. *Id*. Vesttoo uses proprietary AI-based technology to provide risk modelling, structuring and performance monitoring for non-catastrophe insurance risks. *Id*., ¶ 9. For its cedent and retrocedent clients, the company aims to enhance risk transfer. *Id*. For its investor clients, the company enables institutional investors to invest in risk-remote, short-term, and non-catastrophe insurance risks through several structures. *Id*.

16.     An important part of Vesttoo's business is the use of a transformer company to which an insurance company cedes its risk as a cedent under a Reinsurance Agreement with a transformer entity. *Id*., ¶ 17. These transformer entities are regulated reinsurers that convert the insurance risk into an investible form of security or ownership interest. In this case, the transformer entity entered into agreements with one of the Debtor Vesttoo Bay limited partnerships (as defined below and listed in footnote 2), such as a Shareholder Agreement, a Cell Management Agreement, and a Subscription Agreement (collectively, the "**Transformer Agreements**"). *Id*. Under these Transformer Agreements, the Reinsurance Agreement (with its associated insurance risks, liabilities and assets) is transformed into an "insurance linked security" in a segregated account or protected cell created under the Bermuda Segregated Accounts Companies Act 2000 (the "**Segregated Accounts Act**"). *Id*.

17.     White Rock sells a participation equity security to the relevant Vesttoo Bay entity that becomes the account owner of the applicable segregated cell and the Vesttoo Bay entity obtains the beneficial interest in any funds held in an account for that segregated cell. *Id*. The Vesttoo Bay Funds are governed by a Limited Partnership Agreement, under which Vesttoo Holdings Ltd. is the general partner and identified investors in each limited partnership agreement are the limited partners. *Id*. The Limited Partner was generally obligated to contribute to the Vesttoo Bay Limited Partnership (a) an account for fees and expenses, and (b) a letter of credit to provide collateral security to the cedent. *Id*. The Letter of Credit obligation was then assigned to and assumed by the limited partner investor to support the insurance assumed from, and for the benefit of, the cedent. The way the parties transform insurance risk into a security is reflected in the following flow chart:



A.      **The Debtors' relationship with White Rock**

18.     White Rock served as a "transformer" with respect to certain of the reinsurance transactions it entered into with various parties.  Vesttoo, entered into other contracts with other transformer entities, but consummated about 45 deals with White Rock.  In these deals, a White Rock segregated cell acquired certain assumed insurance risks.  Vesttoo acquired all of the ownership interests in the White Rock segregated cell via one of 21 limited partnerships formed under Israeli law (collectively, "**Vesttoo Bay**").[3]  Vesttoo Bay then sold limited partnership interests to capital markets investors, giving them an indirect investment exposure to insurance-related risk or "insurance linked securities (ILS)".  White Rock's corporate brochure, excerpts of which are included below (and a full copy of which is attached as Exhibit A to the Martin Declaration) provides an overview of White Rock's approach to these types of transactions:

---

[3]      The Vesttoo Bay Debtors are: Vesttoo Bay One, LP (Case No. 23-11194-MFW), Vesttoo Bay X, LP (Case No. 23-11195-MFW), Vesttoo Bay XI, LP (Case No. 23-11196-MFW), Vesttoo Bay XII, LP (Case No. 23-11197-MFW), Vesttoo Bay XIII, LP (Case No. 23-11197-MFW), Vesttoo Bay XIV, LP (Case No. 23-111999-MFW), Vesttoo bay FIFTEEN, LP (Case No. 23-11190-MFW), Vesttoo Bay XVI, LP (Case No. 23-11201-MFW), Vesttoo Bay XVII, LP (Case No. 23-11202-MFW), Vesttoo Bay XVIII, LP (Case No. 23-11203-MFW), Vesttoo Bay XIX, LP (Case No. 23-11200), Vesttoo Bay XX, LP (Case No. 23-11204), Vesttoo Bay XXI, LP (Case No. 23-11205), Vesttoo Bay XXII, LP (Case No. 23-11206), Vesttoo Bay XXIII, LP (Case No. 23-11207-MFW), Vesttoo Bay XXIV, LP (Case No. 23-111208-MFW), Vesttoo Bay XXV, LP (Case No. 23-11209-MFW), Vesttoo Bay One Hundred, LP (Case No. 23-11193-MFW), Vesttoo Bay One Hundred One, LP (Case No. 23-11191-MFW), Vesttoo Bay One Hundred Two, LP (Case No. 23-11192-MFW), and Vesttoo Bay 103, LP  (Case No. 23-11189-MFW).





19.     White Rock's relationship with Vesttoo arose from the creation and management of the segregated account structure based on the Transformer Agreements, typically consisting of the following:

- **The Reinsurance Agreement**: An insurance company, the reinsured, contracts with White Rock, "acting in respect of its Segregated Account," as the reinsurer ("**Segregated Account**").  The reinsured cedes identified liability under certain identified insurance policies to the Segregated Account.

- **The Subscription Agreement**: This is a short agreement under which Vesttoo Bay agrees to buy all of the participating shares in the Segregated Account from White Rock.  The agreement contains limited but standard representations and warranties (e.g., the agreement

is valid, does not violate any law, and the signing parties have the authority to enter into the Subscription Agreement).

- **The Participating Shareholders Agreement**:  In this agreement, White Rock, for itself, and "acting in respect of its segregated account" and Vesttoo Bay, acting as the Shareholder, purchased all of the non-voting redeemable preferred shares linked to the Segregated Account (the "**Participating Shares**"). The Participating Shareholder Agreement entitles Vesttoo Bay to collect dividends or distributions from the Segregated Account, subject to Segregated Accounts Act and the Bermuda Insurance Act of 1978. This agreement also provides that Vesttoo Bay, as Shareholder, shall become the account owner (as defined in the Segregated Accounts Act) of the Segregated Account and shall have one hundred percent interest in the Segregated Account.

- **The Cell Management Agreement**:  The cell management agreement identifies Vesttoo Bay as the "cell owner" and defines each cell as the Segregated Account.  Under this agreement, Aon Insurance Managers (Bermuda) Ltd., is identified as the manager ("**Cell Manager**") appointed by White Rock (an Aon Group member) to provide identified services "subject to the overall supervision and control" of White Rock, who will then provide Vesttoo Bay with certain management, accounting, treasury, and regulatory services in connection with the Segregated Accounts.

20.    White Rock is a segregated account company regulated under Bermudian law and authorized to create segregated accounts to engage in reinsurance contracts.  *See* Wasty Decl., ¶ 9. The Segregated Accounts Act provides that "the establishment of a segregated account does not create a legal person distinct from the segregated accounts company."  Segregated Accounts Act, § 17(1).  Any assets in a Segregated Account are held as a separate fund that is "held exclusively for the benefit of the account owners of the segregated account . . ." and "only to meet the liabilities of the account owners and creditors of that segregated account[.]"  *Id*., § 17(2A)(a).  The complexity of these provisions and their legal import under Bermudian law is set out in detail in the Wasty Declaration.

21.    As used in this provision and the Segregated Accounts Act, "account owner" is defined to mean the registered holder of the shares issued by the segregated accounts company and linked to a segregated account or expressly identified in the governing instrument linked to the segregated account as being the account owner.  *Id*., § 2(1); Wasty Declaration, ¶ 21.  Based on

10

these provisions, as a matter of Bermudian law, the Segregated Accounts are intended to exclusively benefit the Vesttoo Bay limited partnerships who beneficially own any assets held on account of and linked to the Segregated Accounts.  *See* Wasty Decl., ¶ 27.

**A.  White Rock Files Suit with No Notice to Freeze Vesttoo's Assets Globally.**

22.    On August 10, 2023, White Rock filed a verified petition for a preliminary injunction (the "**Verified Petition**") in the United States District Court for the Southern District of New York against Vesttoo Ltd. and certain identified subsidiaries seeking to freeze Vesttoo's U.S. bank accounts while it pursues arbitration in Bermuda, and to compel Vesttoo to provide information about the nature and scope of alleged collateral fraud.  *See* Martin Decl., Ex. B.  White Rock did not give Vesttoo notice of the Verified Petition before presenting a request for a TRO. On that same day, White Rock requested arbitration with Vesttoo Bay in Bermuda,[4] in several similar requests.  In these requests for arbitration, White Rock sought a declaration that Vesttoo Bay was obligated to indemnify White Rock for any losses in the Segregated Accounts, specific performance that Vesttoo Bay provide acceptable security to the Segregated Accounts, and repayment of any advances, reimbursement for costs and expenses, and other monetary damages.

23.    Later that night, the court in New York entered an *ex parte* TRO, freezing Vesttoo's assets except for $1 million for payroll and other business expenses in the ordinary course [N.Y. Docket No. 27].  *Id.*, Ex. C.

24.    The TRO required Vesttoo to respond to the Verified Petition by noon on Monday, August 14, 2023, and scheduled a hearing to show cause as to why a preliminary injunction should

---

[4]    White Rock requested arbitration from Vesttoo Bay XV, Limited Partnership, Vesttoo Bay XIV, Limited Partnership, Vesttoo Bay XIX, Limited Partnership, Vesttoo Bay XVII, Limited Partnership, Vesttoo Bay XV, Limited Partnership, Vesttoo Bay XX, Limited Partnership, Vesttoo Bay XXII, Limited Partnership, Vesttoo Bay, XXIV, Limited Partnership, Vesttoo Bay One Hundred Two, Limited Partnership, Vesttoo Bay XXV, Limited Partnership, and Vesttoo Partners 103, Limited Partnership.

not be issued for Tuesday, August 15, 2023.  Thereafter, White Rock served discovery on Vesttoo and demanded to take depositions of a number of its U.S.-based employees.  Vesttoo timely responded to the Verified Petition on August 14, 2023.

25.     Prior to the hearing on the Verified Petition, on August 14 and August 15, 2023, Vesttoo and its debtor affiliates filed petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware.  Once the Debtors' commenced filing these cases, Vesttoo filed a suggestion of bankruptcy in the New York action on August 14, 2023, listing the first six debtor entities to file [N.Y. Docket No. 57].  *See id.*, Ex. D.

26.     On the morning of August 15, 2023, Vesttoo filed a supplemental suggestion of bankruptcy in the New York action listing all 48 Debtor entities that had filed chapter 11 petitions overnight [N.Y. Docket No. 58].  *See id.*, Ex. E.  On that same day, there were press reports that White Rock filed an action in Israel seeking to freeze the Debtors' assets in that country, but the Debtors were not served with any legal papers related to these reports and do not have any knowledge about these proceedings.  *See id.*, ¶ 4.

27.     After the filing of the suggestions of bankruptcy, on August 15, 2023, the New York court ordered that the hearing on the Verified Petition scheduled for that afternoon would proceed on the limited basis of clarifying whether the automatic stay applies to the entirety of the action, and if a portion of the action was not stayed, how that action would proceed, and whether some form of preliminary injunction remained appropriate.  [N.Y. Docket No. 59].  *See id.*, Ex. F.

28.     Vesttoo filed a letter in the New York proceeding clarifying that throughout the previous night, Vesttoo filed chapter 11 petitions for all the entities named as respondents in the Verified Petition, except for Vesttoo RT SPV LLC [NY Docket No 60].  *See id.*, Ex. G.  White Rock similarly filed a letter in the New York action noting that Vesttoo RT SPV LLC had not yet

filed a chapter 11 petition and asking the New York court to proceed with the requested expedited discovery against this non-debtor subsidiary [NY Docket No. 62]. *See id.*, Ex. H. White Rock's action, demanding discovery and pressing for a hearing to freeze the assets of a debtor subsidiary, irrespective of whether it had filed bankruptcy, violated the automatic stay, as Vesttoo's counsel informed White Rock's later that day. *See id.*, Ex. I.[5]

29.     The New York court held a hearing on the Verified Petition on the afternoon of August 15, 2023.  Before the hearing, Vesttoo RT SPV LLC also filed a chapter 11 petition, so all respondents to the Verified Petition were Debtors at the time of the hearing.  At the hearing, White Rock conceded that since all the respondent entities were in bankruptcy, they were now all subject to the automatic stay.  Following the hearing, on August 15, 2023, the New York court entered an order vacating the TRO and placing the matter on the court's suspense docket, which effectively stays the Verified Petition and all related discovery [NY Docket No. 64].  *See id.*, Ex. J.

**B. White Rock violates the automatic stay in Bermuda by agreeing to have JPLs appointed over the Segregated Accounts.**

30.     On August 11, 2023, the Debtors' proposed Bermudian counsel, Appleby, learned of a hearing scheduled for two and a half hours on Friday, August 18, 2023, in the Supreme Court

---

[5]     White Rock's counsel's response to this letter, arguing that they did not violate the stay, is incorrect.  *See* Martin Decl., Ex. I. Counsel's theory was that for the stay to apply, White Rock had to be informed of the debtor's theories about how the stay applied and that once their conditions were satisfied as to how the stay applied, White Rock backed down.  Counsel's requirements and conditions are irrelevant and do not absolve White Rock's stay violation.  *See id.* ("Your letter omits the fact that prior to sending it, neither you, your co-counsel, nor your client raised this issue with either me or the Court. Your letter further omits that neither you, your co-counsel, nor your client sought an adjournment of the hearing on the basis of the alleged ownership of the assets of Vesttoo RT SPV LLC. Finally, your letter also omits that until minutes before the hearing, your firm had neglected to file a chapter 11 petition on behalf of Vesttoo RT SPV LLC, or that once my firm was apprised that such a filing had been made, we notified the Court that we did not seek any further relief and did not object to the Court's decision to vacate the TRO.").  This, of course, is not the law, the automatic stay is automatic, and a debtor does not need to articulate the basis for the application of the automatic stay to counsel for a party to stand down in the face of that automatic stay.  Had White Rock stood down after this; the Debtors likely would not have taken the issue further; however, White Rock, in the face of this communication about the stay, which was also shared with Bermudian counsel, went forward and consented to the appointment of the JPLs, which shows White Rock acted intentionally to violate the automatic stay by trying to accomplish in Bermuda what the stay prevented them from accomplishing in New York and elsewhere around the world.

of Bermuda captioned "In the Matter of White Rock Insurance SAC Limited." *See* Tildesley Decl.,

¶ 5. Hannah Tildesley of Appleby inquired about the hearing with White Rock's Bermudian

Counsel, Carey Olsen Bermuda Ltd. ("**Carey Olsen**"), and was told the hearing was confidential.

*See id.*, ¶ 5. Because White Rock had so aggressively pursued its rights even after the automatic

stay applied, Debtors' counsel wrote to Carey Olsen advising them of these bankruptcy cases and

that Vesttoo Bay has an interest in the Segregated Accounts and any relief granted by a Bermudian

court with respect to these interests may have implications in these chapter 11 cases. *See id.*, Ex. C.

Additionally, counsel requested that Carey Olsen, in the context of an *ex parte* and confidential

hearing, inform the Bermudian court that Vesttoo is under the protection of chapter 11 in the

United States, that Vesttoo would be willing to participate in any hearing, and, should the

Bermudian Court make any rulings, findings, or enter any orders that purport to impact the chapter

11 Debtors' interests, including the interests in any of the Segregated Accounts, that Vesttoo be

made aware of those. *See id.* As of this filing, Carey Olsen has not informed Debtors' counsel of

any rulings or orders in Bermuda, other than to say that the Bermudian court was aware of these

chapter 11 cases. *See* Martin Decl., ¶ 5.

31.      While the underlying applications remain confidential and have not been made

available to the Debtors, the Debtors engaged Appleby to attend the hearing, which it attempted to

do. *See* Tildesley Decl., ¶ 8. At that hearing on Friday, August 18, 2023, a petition was presented

by the Bermuda Monetary Authority ("**BMA**"), represented by Conyers, in respect of White Rock

before the Supreme Court of Bermuda. The participants in the Bermuda Proceeding were White

Rock and the BMA. *Id.*, ¶ 10. Appleby, along with a number of Vesttoo policyholder-cedents

represented by counsel (e.g., the reinsureds that entered reinsurance agreements with the White

Rock on behalf of various Segregated Accounts), appeared at the Supreme Court of Bermuda and

sought to attend the hearing.  *Id*., ¶ 9.  The Bermudian court informed Appleby that the hearing was confidential, and Ms. Tildesley was excluded from the courtroom.  *Id*., ¶ 12.  At the conclusion of the hearing which lasted twenty (20) minutes (a very short time period given that both White Rock and the BMA appeared prepared for a lengthy battle, the hearing had been listed for 2.5 hours, and White Rock had flown in leading English counsel David Scorey, King's Counsel of Essex Court Chambers from London for the hearing), the excluded parties were informed by counsel for the BMA that the petition had been adjourned until September 29, 2023.  *Id*., ¶ 13.

32.     A few hours later, Appleby was surprised to see a press release on the BMA website at around 2:30 p.m. on the same day indicating that, far from simply being adjourned, JPLs, Michael Morrison and Charles Thresh of Teneo, had been appointed at the hearing over the Vesttoo cells.  *Id*., ¶ 15.  This press release says that the JPLs were appointed with White Rock's agreement and the appointment was only over the Segregated Accounts not any other aspect of White Rock's business.  *Id*., Ex. D.  As indicated in Mr. Wasty's Declaration, appointment of JPLs over individual segregated accounts is not permitted under the Segregated Accounts Act.  *See* Wasty Decl., ¶ 104.  And since the Debtors have not seen the order appointing the JPLs or any of the application documents filed prior to the hearing, they are unable to access the legal basis for anything that has purportedly happened in Bermuda on Friday.  *See* Tildesley Decl., ¶ 17; Wasty Decl., ¶ 116.

33.     Upon learning that the JPLs were appointed, Debtors' counsel wrote to the JPLs advising them that the Debtors assert an interest in the Segregated Cells and provided them notice that the automatic stay prohibits them from taking any action from exercising control over the Debtors' assets.  *See* Martin Decl., Ex. J.  In that correspondence, Debtors' counsel further requested that the JPLs confirm they intend to abide by the automatic stay.  As of the date of filing

this Motion, the JPLs have not responded to this correspondence.  In short, the actions White Rock has taken in Bermuda remain confidential, which is unusual, and gives the Debtors concern that the stay is being violated and they are not getting the full benefit of these chapter 11 cases.

## **RELIEF REQUESTED**

34.    The Debtors request entry of an order enforcing the automatic stay against White Rock and the JPLs under sections 105 and 362 of the Bankruptcy Code.  White Rock has violated the automatic stay by continuing litigation, seeking to exercise control over property of the Debtors' estates, and by agreeing to the appointment of JPLs in secret proceedings from which Vesttoo was excluded.  Considering the aggressive positions White Rock has taken over the last week, the Court should enter an order enforcing the stay against White Rock and reserving all rights of the Debtors.  Additionally, while the JPLs have been appointed because of White Rock's stay violation, that appointment is void, and the Court should enter an order enforcing the stay against the JPLs also to ensure they do not violate it post-appointment.

35.    The Debtors may proceed by motion because they are not seeking to obtain an injunction; rather, they seek to enforce an existing injunction—the automatic stay—against White Rock and the JPLs.  The Debtors thus do not need to file an adversary proceeding to obtain the relief sought in this Motion.  *See, e.g.*, *In re Cont'l Airlines, Inc.*, 236 B.R. 318, 327 (Bankr. D. Del. 1999), *aff'd sub nom. In re Cont'l Airlines*, No. 90-932, 2000 WL 1425751 (D. Del. Sept. 12, 2000), *aff'd sub nom. In re Cont'l Airlines, Inc.*, 279 F.3d 226 (3d Cir. 2002) ("In this case, Continental is not seeking an injunction, it is merely seeking to enforce an injunction already in place—that created by sections 1141 and 524 of the Bankruptcy Code and the express terms of the Confirmation Order.").  There is:

> very clear U.S. law that, while 'the courts of this country have been highly receptive to the recognition and enforcement of foreign insolvency proceedings,' and '[t]he Second Circuit has been particularly reluctant to allow the courts of this country to

issue anti-suit injunctions against foreign proceedings, holding that such remedies should be 'used sparingly,' and 'should be granted only with care and great restraint,' ... this Circuit, like others that have reached the issue, holds that a U.S. court should act 'in order to protect its own jurisdiction.'

*In re Cenargo Int'l, PLC*, 294 B.R. 571, 587 (Bankr. S.D.N.Y. 2003) (citing *Stonington Partners, Inc. v. Lernout & Hauspie Speech Prods. N.V.*, 310 F.3d 118 (3d Cir. 2002)).  Here, the Debtors do not seek to enjoin any proceedings in Bermuda because, as noted below, the appointment of the JPLs is void *ab initio*; instead, the Debtors seek an order enforcing the stay against the JPLs to prevent them from exercising any control over the Debtors' property interest—the Segregated Accounts.

## BASIS FOR RELIEF

**A.      White Rock intentionally violated the automatic stay when it voluntary agreed to the appointment of the JPLs over the Segregated Accounts owned by the Debtors.**

### a.   White Rock Violated the Automatic Stay in the New York Action

36.      On August 14 and August 15, 2023, the Debtors commenced these bankruptcy cases.  Vesttoo filed a suggestion of bankruptcy in the New York action on August 14, 2023, listing the first six debtor entities to file [N.Y. Docket No. 57].  *See id.*, Ex. D.  On the morning of August 15, 2023, Vesttoo filed a supplemental suggestion of bankruptcy in the New York action listing all 48 Debtor entities that had filed chapter 11 petitions overnight [N.Y. Docket No. 58].  *See id.*, Ex. E.  White Rock similarly filed a letter in the New York action noting that Vesttoo RT SPV LLC had not yet filed a chapter 11 petition and asking the New York court to proceed with the requested expedited discovery against this non-debtor entity [NY Docket No. 62].  *See id.*, Ex. H.

37.      White Rock's action, demanding discovery and pressing for a hearing to freeze the assets of a debtor subsidiary, irrespective of whether it  or its parent entity had filed bankruptcy, violated the automatic stay, as Vesttoo's counsel informed White Rock's later that day. *See* Martin Decl., Ex. G.

38.     Ultimately, by the time of the hearing on August 15, 2023, the New York court determined to suspend proceedings, preventing White Rock from acting in furtherance of its efforts to find a way around the automatic stay in its action before the New York court.  Had White Rock stood down after this, the Debtors likely would not have been compelled to file this Motion.

**b.  White Rock Has Violated the Automatic Stay in Bermuda and Israel**

39.     Apparently determined to continue its aggressive litigation strategy against the Debtors, White Rock has now moved its litigation campaign against the Debtors out of the United States and into foreign forums, namely Bermuda and, upon information and belief, Israel.

40.     Specifically, as announced in the BMA press release, during a hearing from which the Debtors' Bermudian lawyers were excluded, White Rock reached an agreement with the BMA to have the Supreme Court of Bermuda appoint Charles Thresh and Michael Morrison as joint provisional liquidators with respect to the Segregated Accounts owned by the Debtors. *See* Tildesley Decl., Ex. D.

41.     Further, according to press reports, in a separate proceeding in Israel commenced on August 14, 2023, White Rock requested that the Tel Aviv District Court freeze the Debtors' assets in all banks, insurance companies, and investment houses in Israel. Vesttoo has not be able to determine the nature or extent of this action and to date has not been served with any formal legal papers.

42.     White Rock's actions in Bermuda and Israel violated sections 362(a)(1) and (a)(3) of the Bankruptcy Code, which, respectively, prohibit "the commencement or continuation … of a judicial … proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title" and "any act to obtain possession of property of the estate or to exercise control over property of the estate."  11 U.S.C. § 362(a)(1) & (a)(3).

43.      Moreover, White Rock's actions in Bermuda, and possibly in Israel, constitute a willful violation of the automatic stay because counsel to the Debtors has repeatedly notified White Rock's counsel about the Debtors' bankruptcy cases and the effect of the automatic stay. White Rock acknowledged the filings and the effect of the automatic stay at the August 15, 2023 hearing in the New York court and did not object to entry of an order by the New York court vacating the TRO and placing White Rock's action against the Debtors on its suspense docket. This shows White Rock knew about these chapter 11 cases and the automatic stay before the hearing in Bermuda. *See* Martin Decl. Ex. I–L; *In re Denby-Peterson*, 941 F.3d 115, 123 (3d Cir. 2019) (quoting *In re Lansdale Family Rests., Inc.*, 977 F.2d 826, 829 (3d Cir. 1992)) (noting that a creditor willfully violates the automatic stay when it has knowledge that the bankruptcy petition has been filed. "Willfulness does not require that the creditor intend to violate the automatic stay provision, rather it requires that the acts which violate the stay be intentional.").

44.      After crossing over the line of an automatic stay violation in the New York court, White Rock apparently hopes that by taking its litigation campaign global, to foreign forums unfamiliar with the automatic stay, it will be able to use those forums to proceed in secret without the Debtors' participation and improve its recovery at the expense of the Debtors and their bankruptcy estates. Fortunately, the automatic stay is not so limited. Indeed, it is this very dismemberment of a debtor by individual creditors pursuing their own interests to the detriment of others that the automatic stay exists to prevent. *City of Chicago v. Fulton*, 141 S. Ct. 585, 589 (2021).

45.      White Rock's actions in Bermuda violate the automatic stay's prohibitions on continuing litigation on account of a prepetition claim and seeking to obtain possession or control

over property of the Debtors' bankruptcy estate.  This Court can and should enforce the automatic stay to stop White Rock's flagrant and willful violations, regardless of where the violations occur.

### c.  The Segregated Accounts are Indisputably Property of the Estate

46.     Section 541(a) of the Bankruptcy Code provides that the commencement of a case creates an estate comprising "all legal and equitable interests of the debtor in property as of the commencement of the case."  11 U.S.C. § 541(a); *In re NDEP Corp*., 193 B.R. 710, 712 (Bankr. D. Del. 1995) ("Under Section 541 of the Code, [debtor's] bankruptcy filing [] created an estate composed of all [debtor's] legal or equitable interests as of the commencement of the case wherever located and by whomever held.").  The term property of the estate has been broadly interpreted to include "all kinds of property, including causes of action, disputed, contingent or reversionary interests, and all other forms of property." *Feiler v. Sims* (*In re Feiler*), 218 F.3d 948, 956 (9th Cir. 2000).

47.     As described in detail above, White Rock's relationship with the Debtors related to the cells over which the Supreme Court of Bermuda appointed JPLs is governed by the Transformer Agreements.   Under these Transformer Agreements and Bermudian law, the Segregated Accounts are intended to exclusively benefit Vesttoo Bay who beneficially own any assets held on account of and linked to the Segregated Accounts. *See* Wasty Decl., ¶ 14.  The appointment of JPLs over the Segregated Accounts is not permitted by Bermudian law and has been conducted in a unique and confidential manner. *Id*., ¶¶ 82–88, 119–27.

48.     Thus, the Debtors own the Segregated Accounts over which White Rock apparently agreed to the appointment of the JPLs for the purpose of, according to the press release issued by the BMA, allowing the JPLs and the Board of Directors and management of White Rock to "bring their resources together to address" the alleged fraud involving the Debtor-owned cells. *See* Tildesley Decl., Ex. D.  By coordinating with the BMA to obtain the appointment of JPLs over the

cells, White Rock has violated the automatic stay and has declared its intent to continue to do so. Further, it appears from the press release that White Rock intends to continue its violations of the automatic stay by working with the JPLs to "address" the alleged fraud involving the Debtor-owned cells.

> **d. The Automatic Stay Applies Wherever the Debtors' Assets Are Located, Even to Foreign Assets.**

49.    It is also not a defense that the Segregated Accounts are located in Bermuda or established under Bermudian law, that White Rock sought or obtained the appointment of the liquidators over the cells in a Bermudian court, or that White Rock has sought relief from the Tel Aviv District Court in Israel.  As the court explained in *Nakash v. Zur* (*In re Nakash*), when reading section 541 of the Bankruptcy Code together with 28 U.S.C. 1334(e), which gives a district court and a bankruptcy court through 28 U.S.C. § 157(a) exclusive jurisdiction of all property of the debtor and its estate "wherever located" and legislative history, is clear that "Congress'[s] intent that 'wherever located' language be broadly construed to include property located in and outside of the U.S."  190 B.R. 763, 768 (Bankr. S.D.N.Y. 1996); *In re Deak & Co.*, 63 B.R. 422, 426–28 (Bankr. S.D.N.Y. 1986) (holding that the exercise of jurisdiction over shares of stock held outside U.S. was proper).

50.    The Third Circuit has explained, "since 1987, United States courts have uniformly upheld the extraterritorial application of the automatic stay."  *In re Nortel Networks*, 669 F.3d 128, 138 (quoting David P. Stromes, *Note, The Extraterritorial Reach of the Bankruptcy Code's Automatic Stay: Theory vs. Practice*, 33 BROOK J. INT'L. L. 277, 281 (2007)) (noting that "[i]n the absence of an exception, the plain language of the automatic stay covers Appellants' participation in the U.K. proceedings because the U.K. proceedings are an attempt to 'assess' a claim against the Debtors that arose pre-petition."); *see also Secs. Investor Prot. Corp. v. Bernard L. Madoff Inv.*

*Secs. LLC*, 474 B.R. 76, 81–82 (S.D.N.Y. May 4, 2012) (upholding extraterritorial enforcement of the automatic stay and injunction barring foreign creditor's lawsuit, explaining "[i]n Chapter 11 cases, the automatic stay must prohibit litigation to obtain possession or control of the estate's property 'regardless of where such litigation is commenced.'").

51.     Indeed, bankruptcy courts have repeatedly found that seeking relief under foreign insolvency laws or taking actions in foreign insolvency proceedings violates the automatic stay. *See, e.g.*, *In re Soundview Elite, Ltd*., 503 B.R. 571, 584 (Bankr. S.D.N.Y. 2014) (staying Cayman Islands proceeding); *Sec. Investor Prot. Corp*., 474 B.R. at 84 (holding that a proceeding initiated in the Cayman Islands by a transferee seeking a determination of whether the transferee was required to return certain transfers was an act "to exercise control over property of the estate in violation 11 U.S.C. § 362(a)(3)"); *In re Nakash*, 190 B.R. at 769 (holding that an Israeli receiver's filing of a motion requesting a Jerusalem Court to instruct the Israeli receiver to file a second involuntary petition against the debtor and then filing of a second involuntary petition in Israel after the chapter 11 petitions had been filed in the United States was a *prima facie* violation of the stay).

52.     For these reasons, White Rock's actions in Bermuda unquestionably violated the automatic stay.

**B.    The JPLs appointment violates the stay and absent a confirmation from them that they will not exercise control over the Debtors' assets, they should be ordered not to do so by this Court.**

53.     Vesttoo submits that it is the owner of the Segregated Accounts through its ownership of the participating shares.  Irrespective of the legal nature or existence of the Segregated Accounts, the Debtors have, at a minimum, a beneficial ownership interest in the

Segregated Accounts. *See* Wasty Decl., ¶ 26–27.[6] This means that the Segregated Accounts, and the assets allocated to, and on deposit in, them, are personal property of the Debtors' estates. Section 541(a)(1) of the Bankruptcy Code provides that a debtor's estate includes all property "wherever located and by whomever held" of, among other property, that in which the debtor has "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1).

54.     The automatic stay is one of the most fundamental protections provided by the Bankruptcy Code, giving the debtor a breathing spell from its creditors. *Cuffee v. Atlantic Bus. & Cmty. Dev. Corp.*, 901 F.2d 325, 327 (3rd Cir. 1990). The definition of estate property is broad because it is not just a debtor's property that comes into the estate as of the commencement of that case, but it is any interest in property that the debtor may have. *See U.S. Fid. & Guar. Co. v. Houska*, 184 B.R. 494, 500 (E.D. Va. 1995), *aff'd in part, rev'd in part sub nom. Am. Bankers Ins. Co. of Fla. v. Maness*, 101 F.3d 358 (4th Cir. 1996) ("'The commencement of a case [under the Bankruptcy Code] creates an estate … comprised of … all legal or equitable interests of the debtor in property as of the commencement of the case.' In addition to the fact that the determination of estate property is made 'as of the commencement of the case,' it is important to note that it is not the debtor's property itself which becomes property of estate but rather the debtor's interest in such property.'"); *In re THG Hldgs. LLC*, 604 B.R. 154, 160 (Bankr. D. Del. 2019) ("The scope of the automatic stay is very broad."). It is well settled law in the Third Circuit that section

---

[6]     Mr. Wasty's declaration is submitted to provide the court with evidence of a matter of foreign law identified in this Motion, namely the Debtors' ownership interest in the Segregated Accounts. *See* Fed. R. Bankr. Pro. 9014, incorporating and applying Fed. R. Civ. P. 44.1 to these cases. Federal Rule 44.1 provides:

> A party who intends to raise an issue about a foreign country's law must give notice by a pleading or other writing. In determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence. The court's determination must be treated as a ruling on a question of law.

541(a)(1) was intended to sweep broadly to include all property whether tangible, intangible, contingent, or postponed, because "the mere opportunity to receive an economic benefit in the future is property with value under the Bankruptcy Code." *The Majestic Star Casino, LLC v. Barden Dev., Inc.*, 716 F.3d 736, 750-51 (3rd Cir. 2013).

55.    And the automatic stay protects this interest by prohibiting any party from taking any act to exercise control over those assets.  11 U.S.C. § 362(a)(3).  "Clearly, the stay is designed to halt all collection efforts in order to allow the debtor time to reorganize." *In re THG Hldgs. LLC*, 604 B.R. at 161.  As the Debtors have noted, the purpose of these cases is to utilize the protection of the stay to obtain a breathing spell so that the Debtors can use that time to evaluate their business and negotiate with their stakeholders to reorganize. *See* Barlev Decl., ¶¶ 21 and 27.

56.    The Third Circuit has held that acts in violation of the automatic stay have no force or effect and can accord the party who has violated the automatic stay no additional property rights or interests that it did not enjoy prior to the commencement of the bankruptcy case. *In re Ward*, 837 F.2d 124, 126 (3d Cir.1988).  Thus, since the JPLs were appointed after the commencement of these case, their appointment is void *ab initio* because "post petition possessory activities violate[] the automatic stay of § 362(a) and are void *ab initio*." *In re Competrol Acquisition P'ship, L.P.*, 176 B.R. 723, 729 (Bankr. D. Del. 1994). The same is true for JPLs or appointments made by foreign courts after a chapter 11 petition is filed.

57.    One example arose in *In re Cenargo Int'l, PLC*, 294 B.R. 571 (Bankr. S.D.N.Y. 2003) where chapter 11 debtors' professionals moved for payment of their fees and expenses and one party objected on the ground that the board that had hired them had been displaced upon the appointment of English JPLs sought by a creditor in violation of the stay.  The Court awarded the fees.  The court reasoned that the initiation of *ex parte* proceedings that lead to the appointment of

JPLs was in violation of the automatic stay, their appointment was void *ab initio*, and thus the debtors' counsel was not displaced.  *Id*. at 597.  In so ruling, Judge Drain stated that "the automatic stay ensures that such decisions are considered in an orderly way, on notice, and with the presumption that parties who have violated the stay will not necessarily obtain the benefits of such violation and might, indeed, be punished for it.  The rationale for this process would not need to be stated in a routine chapter 11 case, so deeply ingrained is the principle that the automatic stay is the cornerstone of the Bankruptcy Code." *Id*.

58.    Judge Drain noted that the rationale underlying the automatic stay is equally, and perhaps more, important when a debtor has assets in different countries because "orderly cooperation among different courts is necessary to protect a transnational business as a whole for the creditors benefit." *Id*. ("The breathing spell provided by the automatic stay and similar stays under the laws of foreign jurisdictions must be preserved, even if it is, as here, relatively brief, if courts and the parties with the true economic stake in the matter are to make rational decisions about potentially competing insolvency proceedings and, if possible, proceed in a way that is respectful of each court's jurisdiction and maximizes distributable value.").  Absent respect of these principles, "a chapter 11 case could effectively be thrown into chaos by the mere initiation of one creditor of a foreign proceeding in which a trustee, liquidator or other third party was appointed." *Id*. (noting that this would also assume the invalidity of the debtor in possession construct).

59.    Judge Lifland, an early judicial pioneer and leader in the development of U.S. law on cross border insolvency, similarly recognized this principle when he wrote that "the stay exists to protect the estate from 'a chaotic and uncontrolled scramble for the Debtor's assets in a variety of uncoordinated proceedings in different courts.'  This serves to protect and preserve the estate

for the benefit of all creditors.  The stay also serves to protect and preserve the jurisdiction of the bankruptcy court so that the court can administer the debtor's estate in an orderly fashion."  *In re Nakash*, 190 B.R. 763, 768 (Bankr. S.D.N.Y. 1996); *see also In re Soundview Elite, Ltd.*, 503 B.R. 571, (Bankr. S.D.N.Y. 2014) (discussing similar principles and noting that the consent and support of an offshore regulator—the Cayman Islands Monetary Authority—for the appointment of liquidators did not trigger the police power exception to the application of the stay because a private party's—like White Rock's—involvement in the application rendered the appointment void).

60.    This Court recently held that the automatic stay does prevent JPLs in a foreign, offshore proceeding from seeking resolutions and rulings on various issues.  In *In re FTX Trading Ltd.*, Case No. 22-11068 (JTD) [D.I. 1192], court-appointed JPLs from the Bahamas (the "**FTX JPLs**") had been appointed the day before FTX Digital filed chapter 11.[7]  The main factual difference between the FTX case and this case is that the FTX JPLs were appointed ***before*** the chapter 11 cases were filed and here the JPLs were appointed ***after*** the chapter 11 cases were filed. As such, there is a threshold issue—whether the JPLs can even act at all.  The situation has been exacerbated by the confidential and uncertain nature of the proceedings in Bermuda because White Rock has refused to provide any information about them, even though as noted in Ms. Tildesley's Declaration the Debtors have sought this information.  The Proposed Order simply seeks to prevent the JPLs from taking any action against the Debtors' property interests.

---

[7]    The Debtors' reserve their right to object to any application the JPLs might file under Chapter 15 to have their proceedings from Bermuda recognized in the United States.  *See In re Gold & Honey, Ltd.*, 410 B.R. 357 (Bankr. E.D.N.Y. 2009) (refusing to recognize a foreign proceeding commenced after a chapter 11 was filed because the foreign proceeding was initiated in violation of the automatic stay and thus manifestly violated the fundamental public policy of the United States).

61.     If, however, the Court were to consider the JPLs duly authorized to act contrary to the points made in the Wasty Declaration, then, following the approach in the FTX cases, White Rock should bear the burden and the JPLs should come before this Court with a proper motion and evidence, to which the Debtors can respond in a way that would be of use and assistance to this Court.

62.     The FTX JPLs, for example, filed for recognition of their Bahamian proceeding under Chapter 15, which relief was granted.  *See In re FTX Digital Markets Ltd.*, Case No. 22-11217 [D.I. 129].  The FTX JPLs then filed a motion in the chapter 11 case in which they sought a declaration that the automatic stay did not apply to an application to identify the account holders, customers, and creditors of, and their relationship with, FTX Digital and to recover assets of FTX Digital to distribute under Bahamian Law.  Judge Dorsey denied the FTX JPLs' motion because the FTX JPLs were actually seeking "substantive relief" from the Bahamian court on several matters going to the core of the ongoing dispute between the U.S. debtors and FTX Digital Marketing over ownership of the assets of the FTX.com international exchange, substantially all of which are currently housed in the U.S. debtors' estates. The court concluded that lifting the stay to allow those matters to be addressed in the Bahamas in addition to Delaware would unduly harm all FTX customers.  Judge Dorsey also repeatedly emphasized that his paramount consideration was what was in the best interests of customers.

63.     The same is true here.  Namely, the Vesttoo business involves the ceding of risk by insurers, many of whom are located in the United States.  *See* Barlev Decl., ¶ 11 (stating that Vesttoo's business involves "reinsurance transactions through various entities organized and resident here in the US.").   The Vesttoo Bay limited partnerships were involved in these transactions and took an interest in the Segregated Accounts.   The Debtors' preliminary

27

investigation suggests that the cash in the Segregated Accounts is held in a U.S. bank account—HSBC Bank USA, N.A.—and the banking documents for these accounts are delivered to Vesttoo. Additionally, White Rock itself has acknowledged that the Debtors accounts are in the United States. *See* Verified Pet. ¶¶ 8 & 18 ("Upon information and belief, Vesttoo Limited Partners ("LP") retain bank accounts in New York in connection with their investments in Vesttoo" and "Vesttoo's LPs have active United States bank accounts with Truist Bank. On more than twenty occasions, White Rock wired advances of funds to these accounts at Vesttoo's request, relying on LOCs which have since been identified as fraudulent."). White Rock has further alleged that New York banks issued these letters of credit. *See id.*, ¶ 8 ("On information and belief, Vesttoo communicated and facilitated with New York bank branches to obtain letters of credit, including but not limited to China Construction Bank New York Branch, Banco Santander, and Standard Chartered Bank, USA.").

64.     The issues in these chapter 11 cases are still developing and the Debtors sought a breathing spell to organize their affairs, complete an investigation into the types of allegations parties like White Rock have made, and to evaluate their businesses for the purpose of reorganizing their affairs. Allowing the JPLs, appointed in violation of the stay, to begin to act within the United States to seize Debtor assets is contrary to the automatic stay and would interfere with this Court's jurisdiction to the detriment of the various parties in interest. Certainly, the Debtors can disclose the status of the various Segregated Accounts under the highly transparent provisions related to submitting schedules and statements. Indeed, in their Cash Management Motion [D.I. 11], the Debtors have proposed a form of order that would require them to keep track of all their transfers of property and to accurately account for any cash moved in or out of any Segregated Accounts, which will be disclosed on the Debtors' monthly operating reports.

65.     For these reasons, the Court should grant this Motion and ensure that the JPLs are aware of and subject to the automatic stay and do not take any action that would violate the automatic stay in these cases.

### REQUEST FOR WAIVER OF BANKRUPTCY RULES 6004(a) and (h)

66.     To implement the foregoing successfully and given the nature of the relief requested in this Motion, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the fourteen-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h), to the extent applicable.  As explained above and in the Barlev Declaration, the relief requested in this motion is necessary to avoid immediate and irreparable harm to the Debtors.  Accordingly, ample cause exists to justify the waiver of the notice requirements under Bankruptcy Rule 6004(a) and the fourteen-day stay imposed by Bankruptcy Rule 6004(h), to the extent such notice requirements and such stay apply.

### RESERVATION OF RIGHTS

67.     Nothing contained in this Motion is intended to nor shall be construed as (a) an admission as to the validity of any claim against the Debtors, including, but not limited to, any that might be asserted by White Rock or the JPLs; (b) impair, prejudice, waive or otherwise affect the rights of the Debtors or their estates to dispute the amount of, basis for, nature, validity or priority of any claim against the Debtors; (c) impair, prejudice, waive or otherwise affect the rights of the Debtors or their estates with respect to any and all claims or causes of action which may exist against any third party, including White Rock or the JPLs; (d) be construed as an approval, assumption, adoption, or rejection of any agreement, contract, lease, program, or policy between any Debtor and any third party under section 365 of the Bankruptcy Code; or (e) create any rights in favor of, or enhance the status or nature of any claim held by, any person.

## **NOTICE**

68.     Notice of this Motion will be provided to: (a) White Rock and its counsel; (b) the JPLs; (c) the Office of the United States Trustee for Region 3 (Attn: Timothy Fox, Esq. (Timothy.Fox@usdoj.gov)); (d) the Office of the United States Attorney for the District of Delaware; (e) each of the parties included on the Debtors' consolidated top 30 creditors list; (f) the Internal Revenue Service; (g) the attorney general for each state in which the Debtors operate; (h) any party that has requested notice pursuant to Bankruptcy Rule 2002; and (i) any other party entitled to notice under Local Rule 9013-1.  Because this motion seeks "first day" relief, notice of this motion and any order entered in connection with this Motion will be served on all parties required by Local Rule 9013-1(m).  The Debtors respectfully submit that such notice is sufficient and no other or further notice of this motion is required.

*[Remainder of Page Intentionally Left Blank]*

**WHEREFORE**, the Debtors respectfully request that the Court enter an order, substantially in the form of the Proposed Order, granting the relief requested in this Motion, and granting such other and further relief to the Debtors as the Court may deem just and proper.

Dated: August 21, 2023
          Wilmington, Delaware

**DLA PIPER LLP (US)**

/s/ R. Craig Martin
R. Craig Martin (DE 5032)
Stuart M. Brown (DE 4050)
Matthew Sarna (DE 6578)
1201 N. Market Street, Suite 2100
Wilmington, Delaware 19801
Telephone: (302) 468-5700
Facsimile: (302) 394-2341
Email: craig.martin@us.dlapiper.com
          stuart.brown@us.dlapiper.com
          matthew.sarna@us.dlapiper.com

*Proposed Counsel for the Debtors*

-and-

**BALLARD SPAHR LLP**

Matthew G. Summers (DE 5533)
Laurel D. Roglen (DE 5759)
Margaret A. Vesper (DE 6995)
919 N. Market Street, 11th Floor
Wilmington, Delaware 19801
Telephone: (302) 252-4428
Facsimile: (302) 252-4466
E-mail: summersm@ballardspahr.com
          roglenl@ballardspahr.com
          vesperm@ballardspahr.com

*Proposed Conflicts Counsel to the Debtors*