## **Exhibit B**

**Verified Petition**

**UNITED STATES DISTRICT COURT**
**THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| WHITE ROCK INSURANCE (SAC) LTD., | Civil Action No. |
| Petitioner, | |
| v. | |
| VESTTOO LTD. and its subsidiaries,[1] | |
| Respondents. | |

**VERIFIED PETITION FOR INJUNCTIVE RELIEF**
**IN AID OF FOREIGN ARBITRATION**

Petitioner White Rock Insurance (SAC) Ltd. ("**White Rock**"), by and through its undersigned counsel Quinn Emanuel Urquhart & Sullivan, LLP, alleges as follows for its Verified Petition.

## NATURE OF THE ACTION

1. This is a special proceeding seeking expedited injunctive relief in aid of arbitration, pursuant to Federal Rules of Civil Procedure 64 and 65 and Section 7502(c) of the New York Civil Practice Law and Rules (the "**CPLR**"). White Rock seeks an injunction freezing the assets of Respondents Vesttoo Ltd. and its subsidiaries[2] listed in Exhibit 1 (Vesttoo Ltd. and its subsidiaries, collectively, "**Vesttoo**") pending arbitrations of White Rock's claims against Vesttoo, stemming from an apparent large-scale fraud scheme surrounding letters of credit ("**LOC**") provided by Vesttoo to collateralize reinsurance transactions facilitated by White Rock on behalf of its insurer clients. Although primarily a middle man, with the goal of protecting its clients White Rock is exercising its contractual rights against Vesttoo to recover funds and obtain acceptable security for

---

[1]   A list of Vesttoo Ltd.'s subsidiaries is attached hereto as Exhibit 1.
[2]   Vesttoo Reinsurance Intermediary Services Inc is licensed by the New York State Department of Financial Services.

the benefit of its clients. Without immediate injunctive relief from this Court, Vesttoo may empty its bank account prior to any adjudication in the forthcoming arbitrations, rendering ineffectual the anticipated relief in the arbitration.

2. White Rock, an indirect wholly-owned subsidiary of Aon Plc ("**Aon**"), offers reinsurance solutions through the utilization of "cell" or "segregated account" facilities. As a company registered under the Bermuda Segregated Accounts Act 2000, White Rock is empowered by Bermudian law to operate separate cells wherein the assets and liabilities of each "cell" are segregated from each other and from the general assets and liabilities of the company. White Rock uses these cell structures as "transformers" for its clients to access third-party capital through entities like Vesttoo where those parties have already agreed to the general terms of the reinsurance transaction, such as premiums to be paid, terms, etc.[3] White Rock then holds collateral for a particular reinsurance solution in a specific cell and at all times, the financial obligations under the reinsurance contract are limited to the value of the assets in the segregated account.

3. Vesttoo is an Israeli privately-held startup that purported to facilitate capital market transactions for insurance-linked securities investors, whereby those investors would fund reinsurance obligations via letters of credit. For most transactions at issue, Aon insurance and reinsurance brokers partnered with certain lender clients who wished to consider investments in start-up companies or other firms with significant intellectual property ("**IP**") assets who needed funding to support their growth. Recognizing that the value of IP assets may be fluid, Aon's client lenders would obtain collateral protection insurance, which was subsequently reinsured by capital arranged by Vesttoo and through a segregated account created by White Rock to facilitate reinsurance transactions agreed to between client insurers and Vesttoo. Vesttoo's role was to

---

[3]    In accordance with Bermudan regulations, White Rock commits only third-party investor capital to its cells and does not put up any money or bear any risk itself.

contract with investors for investment capital as collateral—in the form of letters of credit ("**LOCs**")—to secure the reinsurance obligations and provide recovery to insurers in the event of default (and subsequent claim under the collateral protection insurance). Accordingly, under this structure, reinsurance coverage for an insurance provider is secured entirely by an ability to draw down on the LOCs presented by Vesttoo.

4.      But Vesttoo now admits that, unbeknownst to White Rock or Aon, an unknown number of the LOCs Vesttoo presented to White Rock and its clients were fraudulent. On information and belief, the fraudulent Vesttoo LOCs could total in the billions of dollars.[4] Given the imminent collapse of Vesttoo expected to flow from this discovery, on information and belief, Vesttoo intends to remove all or substantially all funds from its United States bank accounts and dissipate the funds making them near impossible to recover.

5.      By presenting fraudulent LOCs to White Rock and its clients, Vesttoo breached its obligations under its agreements with White Rock. Most fundamentally, as discussed in further detail below, Vesttoo breached its obligation to provide White Rock with acceptable security. In addition to immediately providing White Rock with acceptable security, the agreements between the parties mandate that Vesttoo immediately indemnify White Rock and return to it all the distributions paid under the relevant agreements in the event the assets were insufficient to meet obligations.[5]

6.      White Rock's agreements with Vesttoo contain an arbitration provision stating that any dispute arising out of or relating to the agreements shall be resolved in binding arbitration in

---

[4]    *See, e.g.*, DBRS Morningstar, *Commentary: Vesttoo's Issues With Allegedly Fraudulent Letters of Credit Highlight the Importance of Sound Counterparty Risk Practices for Insurers* (July 27, 2023), www.dbrsmorningstar.com/research/417719 (stating that "we estimate the total size of outstanding transactions to be between $5 billion and $10 billion based on the Company's total revenue of approximately $200 million in 2022.").
[5]    Exhibit 2, PSA § 5.

Bermuda. White Rock intends imminently to file demands for arbitration against its Vesttoo counterparties in order to enforce its rights under the agreements.[6] But those arbitration proceedings will be futile absent injunctive relief from this Court preventing Vesttoo—a privately held foreign company involved in apparent fraud—from concealing or dissipating its assets.

## THE PARTIES

7.      Petitioner White Rock is a Bermuda exempted segregated accounts company registered under the Bermuda Segregated Accounts Company Act of 2000, with its registered office in Victoria Place, 5th Floor, 31 Victoria Street, Hamilton, HM10, Bermuda. White Rock is an indirect wholly-owned subsidiary of Aon Plc, a global professional services firm providing a broad range of risk, health, and wealth solutions.

8.      Respondent Vesttoo is a privately-held company registered under the laws of Israel, with registered offices in 510 Madison Avenue, 24th Floor, New York, NY 10022. Vesttoo's subsidiary, Vesttoo Reinsurance Intermediary Services Inc, is licensed by the New York State Department of Financial Services. Many of Vesttoo's directors and employees reside in New York including, but not limited to, Gaurav Wadhwa, Chief Financial Officer; David Schonbrun, Chief Legal Officer; Lauren Smith, Interim Chief Legal Officer; Oran Barkai, VP Global Revenue and Growth; Minas Kalachian, Head of Structuring; Daniel Goldfried, Deputy Chief Legal Officer; and Ron Adiel, VC of US Operations. On information and belief, Vesttoo communicated and facilitated with New York bank branches to obtain letters of credit, including but not limited to China Construction Bank New York Branch, Banco Santander, and Standard Chartered Bank, USA. Upon information and belief, Vesttoo Limited Partners ("**LP**") retain bank accounts in New York in connection with their investments in Vesttoo. Upon information and belief, non-resident

---

[6]   White Rock intendeds to pursue its rights in other jurisdiction.

company founders and c-suite executives visited the state in the course of doing business for Vesttoo.

9.      Respondent Vesttoo's subsidiaries Vesttoo Bay XIV, LP., Vesttoo Bay XV, LP., Vesttoo Bay XVII, LP., Vesttoo Bay XIX, LP., Vesttoo Bay XX, LP., Vesttoo Bay XXI, LP., Vesttoo Bay XXII, LP., Vesttoo Bay XXIV, LP., Vesttoo Bay XXV, LP., Vesttoo Bay 101, LP., Vesttoo Bay 102, LP., and Vesttoo Partners 103, LP. are privately-held entities registered under the laws of Israel with registered offices in 1 Maharal Street, Tel-Aviv Israel.

10.     Respondent Vesttoo's subsidiaries Vesttoo Asset Management LLC, Vesttoo Reinsurance Intermediary Services Inc., Vesttoo RT SPV LLC, Vesttoo SPV Holdings LLC, and Vesttoo US Inc. are privately-held entities registered in the state of Delaware with registered agent Business Filings Incorporated, 108 West 13th St, Wilmington, DE, 19801.  Respondent Vesttoo's subsidiary Vesttoo Securities (USA) LLC is also a privately-held entity registered in the state of Delaware with registered agent The Corporation Trust Company, Corporation Trust Center 1209 Orange St, Wilmington, DE 19801.

11.     Respondent Vesttoo's subsidiary Vesttoo Reinsurance Intermediary Services Inc. is a privately-held entity registered in the State of New York with registered agent The Corporation, 187 Wolf Road, Suite 101, Albany County, Albany, NY 12205.

## JURISDICTION AND VENUE

12.     By this Petition, White Rock seeks relief in aid of its forthcoming arbitrations in Bermuda to redress Vesttoo's breaches of its agreements with White Rock, including by presenting fraudulent LOCs.

13.     The forthcoming arbitration proceedings are governed by the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "**New York Convention**") because they will be seated in Bermuda, which has acceded to the New York Convention.

14.     The Court has subject matter jurisdiction over this action pursuant to 9 U.S.C. § 202, which provides, in relevant part: "[a]n arbitration agreement or arbitral award arising out of a legal relationship, whether contractual or not, which is considered as commercial, including a transaction, contract, or agreement described in section 2 of this title, falls under the Convention" as long as it does not "aris[e] out of such a relationship which is entirely between citizens of the United States."  9 U.S.C. § 202.

15.     Furthermore, 9 U.S.C. § 203 provides that: "[a]n action or proceeding falling under the Convention shall be deemed to arise under the laws and treaties of the United States.  The district courts of the United States (including the courts enumerated in section 460 of title 28) shall have original jurisdiction over such an action or proceeding, regardless of the amount in controversy."  9 U.S.C. § 203.

16.     Here, the underlying arbitrations relate to a legal commercial relationship and the parties are foreign entities.  It therefore meets the criteria of 9 U.S.C. §§ 202-203.  *See Endurance Specialty Ins. Ltd. v. Horseshoe Re Ltd. on behalf of Separate Accts. HS0083 & HS0084*, No. 23-CV-1831 (JGK), 2023 WL 4346605, at *4 (S.D.N.Y. July 5, 2023) (Bermuda arbitration fell under New York Convention because the parties were "legal parties to two commercial contracts containing…arbitration agreements[.]"); *Kenney, Becker LLP v. Kenney*, 494 F. Supp. 2d 252, 254 (S.D.N.Y. 2007) ("Whether an agreement 'falls under' the [New York] Convention depends on the commercial nature of the parties' relationship—not the specific dispute[.]").

17.     Vesttoo was operating out of its New York branch when it procured the fraudulent LOCs.  On information and belief, Vesttoo's New York employees were responsible for contacting White Rock concerning the contested LOCs and participated in their procurement.

18.     Vesttoo's LPs have active United States bank accounts with Truist Bank.  On more than twenty occasions, White Rock wired advances of funds to these accounts at Vesttoo's request, relying on LOCs which have since been identified as fraudulent.

## FACTUAL BACKGROUND

19.     This matter arises from Vesttoo's presentation of fraudulent LOCs to White Rock and its clients in violation of Vesttoo's agreements with White Rock.

**Vesttoo Raises $110 Million And Reaches $1 Billion Valuation.**

20.     Founded in 2018 by Yaniv Bertele, Ben Zickel and Alon Lifshitz, each of whom owns about 24% of the company's shares,[7] Vesttoo is a privately-held company that purports to use a digital platform for assessing risk in insurance investments, claiming to enable insurance companies to obtain reinsurance coverage at a lower cost from investors through the capital markets.  Vesttoo's subsidiary, Vesttoo Reinsurance Intermediary Services Inc., is licensed by the New York State Department of Financial Services.

21.     Vesttoo defines itself as a "leading technology-driven global insurance risk transfer platform," claiming it utilizes "AI-powered technology with expertise in data science, insurance, and finance" so that "insurers have the capital they need" and "investors have opportunities to diversify with uncorrelated, low-volatility insurance-linked assets."[8]  Vesttoo had raised $110 million from investors since its founding and, in October 2022, it reported that its valuation had reached $1 billion.

---

[7]  Meir Orbach, Tomer Ganon, Azar Almog, *Vesttoo investigation reveals $4 billion fraud involving fake letters of credit* (July 19, 2023) https://www.calcalistech.com/ctechnews/article/rjpbxmhc2.
[8]   *Vesttoo Closes $80 Million Series C Financing Round, Increasing Valuation to $1 Billion*, (Oct. 25, 2022) https://vesttoo.com/pr/vesttoo-closes-80-million-series-c-financing-round-increasing-valuation-to-1-billion/.

**Vesttoo's Collaboration With Aon And White Rock On Collateral Protection Insurance.**

22.     Near the end of 2021, Aon and its clients began collaborating with Vesttoo in a variety of different transactions, based on Vesttoo's representations and assurances to Aon and its insurer clients regarding its ability to procure acceptable collateral. This collaboration began with IP owners seeking loans against their IP. The lenders in those transactions would then seek collateral protection insurance, which was subsequently reinsured by capital arranged by Vesttoo and transformed into reinsurance through a segregated account held by White Rock. A typical collateral protection insurance transaction chain often took the following form:

- Company contracts with Lender for IP-backed loan;
- Lender, in turn, contracts with Insurance Provider for collateral protection insurance in the event of a default on the loan;
- Insurance Provider and Vesttoo arrange for reinsurance, and negotiate associated terms, using White Rock as a contractual counterparty and transformer which issued the policy and accepted the premium to be paid to Vesttoo; and
- Vesttoo contracts with investors for investment capital; investors provide letters of credit issued by banks as collateral to secure White Rock's obligations with Insurance Provider as beneficiary to the LOC and provides Insurance Provider access to funds in the event of default.

<u>Collateral Protection Insurance Overview</u>



**The Participating Shareholder Agreements Between Vesttoo And White Rock And Their Arbitration Provision.**

23.     In each instance where it issued an reinsurance policy to cedents through these cell arrangements, White Rock entered into a Participating Shareholder Agreement with a Vesttoo

entity (such agreements, collectively, the "**PSA**").[9]  Parties to each PSA included White Rock,

White Rock acting in respect of one of its segregated accounts, and a unique Vesttoo subsidiary

organized for the purpose of that transaction (*see* Exhibit 2).  Under the PSAs, White Rock agreed

to make the Vesttoo entity (*i.e.*, the Shareholder) the owner of each segregated account with 100%

interest in its proceeds (less losses, expenses, and fees).

24.     Under each PSA, Vesttoo agreed, among other things, to provide "Acceptable

Security" to White Rock to secure both an indemnity obligation to White Rock and the liability

and collateral requirements set forth in White Rock's reinsurance certificate with the applicable

cedent, as negotiated between the insurer and Vesttoo.  As to security, the PSAs state that

> [Vesttoo] agrees to provide Acceptable Security to or for the benefit of the [White
> Rock] Segregated Account, separately to enable the [White Rock] Segregated
> Account to meet any and all liabilities and any and all collateral requirements
> arising pursuant to the terms of the Reinsurance Agreement. [Vesttoo] further
> agrees to indemnify the [White Rock] Segregated Account in the event the assets
> of the Segregated Account are insufficient to meet the obligations of the [White
> Rock] Segregated Account.[10]

25.     As to the definition of the term "Acceptable Security," the PSAs provide that

> [Vesttoo] shall provide [White Rock] and/or the [White Rock] Segregated Account
> with security, in a form acceptable to [White Rock], for [Vesttoo's] obligations, as
> shall be determined from time to time by the [White Rock] and [Vesttoo]
> ("Acceptable Security"). [Vesttoo] ***will also provide a Letter of Credit to be issued
> on behalf of the [White Rock] Segregated Account, for the benefit of the
> Insured***.[11]

26.     Next, in Clause 4 of the PSAs, Vesttoo agreed to indemnify White Rock "to the

extent the balance of the profits and losses allocated . . . less cumulative dividends paid, are less

---

[9]     A form PSA was used in each instance.  A true and correct copy of a representative executed PSA is attached
hereto as Exhibit 2.
[10]    Exhibit 2 § 5.  For each reinsurance transaction, White Rock, a Vesttoo subsidiary, and Aon Insurance Managers
(Bermuda) Ltd. ("**Aon IMB**") also entered into a Cell Management Agreement, which stated that neither Aon IMB
nor White Rock can be held responsible or liable to Vesttoo or any other party for certain failures by Vesttoo to
properly perform its obligations.  *See* Form of Cell Management Agreement, § 9.  A true and correct copy of the
Form of Cell Management Agreement is attached hereto as Exhibit 3.
[11]    Exhibit 2, Schedule B (emphasis added).

than zero at any point in time as calculated by [White Rock]." In that event, Vesttoo "agree[d] that it shall pay to [White Rock] the amount by which such balance of the profits and losses less dividends is less than zero within ten days of receiving written notice of such negative balance." Vesttoo further agreed to "indemnify the [White Rock] Segregated Account in the event the assets of the [White Rock] Segregated Account are insufficient to meet the obligations of the [White Rock] Segregated Account."[12]

27.     Each PSA between White Rock and the Vesttoo entity chooses Bermuda law and includes an arbitration provision stating that "[a]ny disputes arising out of or relating to this Agreement or the breach, termination or validity hereof, shall be referred to and settled by final binding arbitration in Hamilton, Bermuda by a panel of three arbitrators."[13]

**The Vesttoo Fraudulent Letters Of Credit Are Revealed.**

28.     On information and belief, on or about July 14, 2023, an insurer demanded payment in full under one of the LOCs procured by Vesttoo, issued by China Construction Bank ("**CCB**"). The insurer's request for payment was denied, and CCB informed the insurer's counsel that the LOC was not issued by CCB and appeared to be fraudulent. On information and belief, CCB subsequently reviewed the LOC and confirmed that CCB took the position that the LOC was not valid.

29.     The discovery that CCB would not honor the LOC shocked the marketplace. It created grave concerns as to the integrity of the other LOCs procured by Vesttoo. These events unleashed numerous reports in media outlets worldwide, forcing Vesttoo to admit publicly that its procedures were circumvented, leading to the apparent fraud.[14] Certain rating agencies have

---

[12]  Exhibit 2, §§ 4-5.
[13]  Exhibit 2, § 10.
[14]  Meir Orbach, Tomer Ganon, Almog Azar, *Vesttoo investigation reveals $4 billion fraud involving fake letters of credit* CALCALIST (July 23, 2019),

opined on the matter as well and issued commentaries, one of which estimating that the total size of affected transactions is "between $5 billion and $10 billion."[15]

30.    The discovery of the fraud led to an exodus of Vesttoo's top leadership.[16]  On information and belief, the following executives resigned from Vesttoo immediately after the fraud was revealed: the Chief Financial Officer, Chief Commercial Officer, the Chief Legal Officer, and the  Deputy-Chief Legal Officer.  A number of other high-ranking employees have reportedly resigned, too, leaving Vesttoo without appropriate management.

**White Rock Sends A Demand Letter To Vesttoo.**

31.    On July 27, 2023, upon learning of the allegations of fraud surrounding the LOCs, White Rock's undersigned counsel sent a letter to Vesttoo's counsel to provide notice of Vesttoo's breach of the PSAs.[17]  White Rock's counsel stated that White Rock "now understands that the banks identified in the Letters of Credit provided by Vesttoo have taken the position that the Letters of Credit are fraudulent.    Indeed, Vesttoo has stated publicly that its procedures were circumvented, leading to the apparent fraud.[18]  White Rock's counsel put Vesttoo on notice that "Vesttoo is in breach of its obligations under the PSAs, including, but not limited to, its obligation to provide Acceptable Security[,]" demanding that "Vesttoo immediately return all distributions

---

https://www.calcalistech.com/ctechnews/article/rjpbxmhc2#:~:text=The%20allegedly%20fake%20letters%20of%20credit%20%28LOCs%29%20provided,appears%20to%20have%20been%20unaware%20of%20the%20situation; Jean Eaglesham, *Israeli AI Startup Vesttoo Sparks a Global Insurance Scandal*, WALL STREET JOURNAL (Aug. 4, 2023) https://www.wsj.com/articles/israeli-ai-startup-vesttoo-sparks-a-global-insurance-scandal-cdeb5fee; Steve Evans, *FBI investigating LOC fraud allegations linked to Vesttoo collateral*, ARTEMIS (Aug. 1, 2023), https://www.artemis.bm/news/fbi-investigating-loc-fraud-allegations-linked-to-vesttoo-collateral/.

[15]    DBRS Morningstar, *Commentary: Vesttoo's Issues With Allegedly Fraudulent Letters of Credit Highlight the Importance of Sound Counterparty Risk Practices for Insurers* (July 27, 2023) (stating that "we estimate the total size of outstanding transactions to be between $5 billion and $10 billion based on the Company's total revenue of approximately $200 million in 2022.") (*available at*: www.dbrsmorningstar.com/research/417719).

[16] Meir Orbach, *Vesttoo's top legal and financial executives leave the company amid alleged fraud scandal*, CALCALIST (July 19, 2023), https://www.calcalistech.com/ctechnews/article/hjfha00b5n?utm_source=taboola&utm_medium=referral&utm_content=internal.

[17]    A true and correct copy of White Rock's July 27, 2023 letter is attached hereto as Exhibit 4.

[18]    *Id.*

11

made from the Segregated Accounts and comply with its obligations under the PSAs, including (but not limited to) Clauses 3, 4 and 5 of the PSAs."[19]

32.     Vesttoo responded in a letter the next day, ignoring White Rock's demands, but again admitting that "fraudulent letters of credit" had been provided.  Vesttoo also admitted that "there is still much that is unknown" to Vesttoo.[20]

33.     On August 2, 2023, White Rock's counsel emailed Vesttoo to inquire about information Vesttoo offered to provide.  To date, Vesttoo had not responded to White Rock's subsequent requests for information.

**Vesttoo Spirals Into Crisis.**

34.     After news of the LOC fraud scandal broke, Vesttoo was catapulted into crisis, causing it to lay off over 75% of its employees.  CEO and co-founder Yaniv Bertele wrote, "The only way to give the company a fighting chance of survival and getting back to a path of sustainable growth is to keep on a small core of people that represent bare operational necessity."[21]  This "small core of people" apparently did not include Bertele himself.  On or about August 2, 2023, Vesttoo's Board of Directors placed Bertele, and Chief Financial Engineer and co-founder Alon Lifshitz on paid leave, stating they could not return to the company until further notice, effectively terminating them.[22]  The removal of Messrs. Bertele and Lifshitz reportedly resulted from a conclusion by the committee that examined the alleged fraud that current management did not regularly report to the board of directors and concealed information leading up to the fraud's exposure.[23]  This same month, Vesttoo also announced its plans to close its Tokyo, Hong Kong,

---

[19]  *Id.*

[20]  A true and correct copy of Vesttoo's July 28, 2023 letter is attached hereto as Exhibit 5.

[21]  Meir Orbach, *Vesttoo laying off 75% of employees amid fraud scandal,* CALCALIST (Jan. 8, 2023).

[22]  Almog Azar, *Vesttoo CEO pushed out of company after fake collateral scandal*, CALCALIST (Aug. 3, 2023) https://www.calcalistech.com/ctechnews/article/syjylb00i2; Jean Eaglesham, *Israeli AI Startup Vesttoo Sparks a Global Insurance Scandal*, WALL STREET JOURNAL (Aug. 4, 2023).

[23]  *Id.*

and Seoul offices.[24]  Vesttoo is now fighting for its survival with significantly less ammunition: no founders, a significantly diminished executive team, 25% of its work force, and nearly half of its offices.  Grabbing at any lifeline, Vesttoo may take measures to dissipate funds, including advances pulled from White Rock's insurer client premium payments, in order to survive, rendering any future relief in arbitration ineffectual.

**White Rock's Forthcoming Arbitrations.**

35.     White Rock intends imminently to file requests for arbitration against Vesttoo in Bermuda, in accordance with the PSAs' arbitration provisions (*see* PSA, § 10).[25]

36.     White Rock will request the arbitral tribunal to declare that Vesttoo is in breach of, among other things, its obligation to provide Acceptable Security under the PSAs as a result of the fraudulent LOCs it presented to White Rock and its clients.  White Rock will further request the arbitral tribunal to order Vesttoo to immediately return all distributions made from the White Rock Segregated Accounts, provide Acceptable Security for each White Rock Segregated Account, and indemnify White Rock in accordance with Vesttoo's obligations under the PSAs.

## CAUSE OF ACTION FOR INJUNCTIVE RELIEF IN AID OF ARBITRATION

37.     CPLR § 7502(c), made applicable herein through Rule 64 of the Federal Rules of Civil Procedure (the "**Rules**"), authorizes "a preliminary injunction in connection with an arbitration that is pending or that is to be commenced inside or outside [of New York] . . . [where] the award to which the applicant may be entitled may be rendered ineffectual without such provisional relief."  *See*, *e.g.*, *Alvenus Shipping Co. v. Delta Petroleum (U.S.A.) Ltd.*, *876 F. Supp. 482, 487* (S.D.N.Y. 1994), ("Section 7502(c) permits a court to order an attachment or an

---

[24]   *Fintech firm Vesttoo to lay off 75% staff, close some offices in Asia*, BFSI The Economic Times (Aug. 3, 2023) https://bfsi.economictimes.indiatimes.com/news/fintech/fintech-firm-vesttoo-to-lay-off-75-staff-close-some-offices-in-asia/102369883.
[25]   White Rock's request for arbitration will be filed within the 30-day period prescribed in CPLR § 7502(c).

injunction in aid of arbitration.")  This Court similarly has the power to issue injunctions in aid of

foreign arbitration pursuant to Rule 65.  *See*, *e.g.*, *Espiritu Santo Holdings, LP v. L1bero Partners,*

*LP*, No. 19 CIV. 3930 (CM), 2019 WL 2240204, at *16 (S.D.N.Y. May 14, 2019), *aff'd*, 789 F.

App'x 288 (2d Cir. 2020).

38.     White Rock intends imminently to commence arbitration proceedings against

Vesttoo in Bermuda, and certainly "within thirty days of the granting of the provisional relief" as

required under CPLR § 7502(c).

39.     As set forth in the Memorandum of Law in support of this Verified Petition (the

"**Memorandum of Law**"), White Rock satisfies the three traditional criteria for the granting of

temporary relief: (a) White Rock has a likelihood of success on the merits; (b) there is a danger of

irreparable harm in the absence of temporary injunctive relief; and (c) the balance of equities favors

granting the relief sought.  Moreover, arbitration awards to which White Rock may be entitled may

be rendered ineffectual without the requested provisional relief.

40.     As set forth more fully in the Memorandum of Law, and considering that this matter

involves a large-scale, global fraudulent scheme still under nascent investigation, if the relief

requested is not granted by the Court, there is substantial risk that Vesttoo's assets will be

concealed or dissipated, making it near impossible to recover these funds.

41.     Vesttoo has failed to provide assurance that it will meet its obligations to White

Rock under the PSAs or that it would preserve sufficient funds and assets for that purpose.  To

avoid any further harm and ensure that White Rock can obtain effective relief in the arbitrations,

White Rock requests injunctive relief in aid of arbitration preserving the status quo by freezing

Vesttoo's assets, subject to the ordinary course exceptions contained in the proposed order annexed

hereto.

42. White Rock requests that it be permitted to take expedited discovery in preparation for the preliminary injunction hearing. "Expedited discovery is often available in cases where preliminary relief is sought." *Advanced Portfolio Techs., Inc. v. Advanced Portfolio Techs., Ltd.*, 1994 WL 719696 at *3 (S.D.N.Y. Dec. 28, 1994), *disfavored on other grounds*.

43. No previous application has been made to this or to any other court for the relief sought herein and no other provisional remedy has been sought in this or any other Court. White Rock does intend to seek relief through the Israeli judicial system to freeze of Vesttoo's assets in Israel.

## PRAYER FOR RELIEF

WHEREFORE, Petitioner respectfully requests an order pending resolution of the forthcoming arbitration proceedings awarding the following relief:

1. Injunctive relief in aid of the forthcoming arbitrations enjoining Vesttoo from transferring, withdrawing, assigning, alienating, selling, pledging, encumbering, concealing, hypothecating, or disposing any of its assets, including funds in Vesttoo's bank accounts, held in bank accounts with Truist Bank, except for funds in the amount of $1,000,000, necessary to pay Vesttoo's employees, taxes, and existing subcontractors and suppliers essential to Vesttoo's ordinary course operations;

2. Leave to immediately commence document discovery and deposition discovery, commanding Vesttoo to respond to White Rock's document requests within 7 days of service, and commanding Truist Bank, Gaurav Wadhwa, Lauren Smith, Daniel Goldfried, David Schonbrun, Oran Barkai, Minas Kalachian, Ron Adiel, Nick Graham, and Joseph Havivto appear for deposition in the offices of White Rock's counsel, at a date to be noticed by White Rock's counsel 5 days prior to the deposition;

3. Attorney's fees and costs in relation to the instant proceeding; and

4.      Any other monetary, injunctive, or other relief that, in the interest of justice, the

Court deems necessary and proper.

DATED:    New York, New York
          August 10, 2023

**QUINN EMANUEL URQUHART &
SULLIVAN, LLP**

By: _____
     Renita Sharma
     Michael B. Carlinsky
     Katherine A. Lemire
     Jonathan Feder
     Yehuda Goor
     Jacqueline Stykes
     51 Madison Avenue, 22nd Floor
     New York, NY 10010
     Tel: (212) 849-7000
     Fax: (212) 849-7100

     *Attorneys for Petitioner White Rock
     Insurance (SAC) Ltd.*

## **VERIFICATION**

Pursuant to 28 U.S.C. § 1746, John English declares as follows:

I am the Chief Executive Officer of Aon Captive and Insurance Management, managers of White Rock Insurance (SAC) Ltd. I have read the foregoing Petition and am informed and do believe that the allegations contained therein are true and accurate to the best of my knowledge information and belief.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 10th day of August, 2023, at _Hamilton_

_____
John English

# Exhibit 1

**Exhibit 1**
Vesttoo Subsidiaries

Vesttoo Bay XIV, LP.

Vesttoo Bay XV, LP.

Vesttoo Bay XVII, LP.

Vesttoo Bay XIX, LP.

Vesttoo Bay XX, LP.

Vesttoo Bay XXI, LP.

Vesttoo Bay XXII, LP.

Vesttoo Bay XXIV, LP.

Vesttoo Bay XXV, LP.

Vesttoo Bay 101, LP.

Vesttoo Bay 102, LP.

Vesttoo Partners 103, LP.

Vesttoo Asset Management LLC

Vesttoo Reinsurance Intermediary Services Inc.

Vesttoo RT SPV LLC

Vesttoo Securities (USA) LLC

Vesttoo SPV Holdings LLC

Vesttoo US Inc.

Vesttoo Reinsurance Intermediary Services Inc.

Exhibit 2

DocuSign Envelope ID: A4D7BDF1-32CB-424A-A436-67B357B4388

White Rock Insurance (SAC) Ltd.
Registered under the Segregated Accounts Companies Act 2000.
Registered address: Victoria Place, 5th Floor, 31 Victoria Street, Hamilton, HM10,
Bermuda.

## PARTICIPATING SHAREHOLDER'S AGREEMENT
## SEGREGATED ACCOUNT T108 - Chaucer

THIS AGREEMENT is made and effective as of January 1, 2022 by and between:

(1)     WHITE ROCK INSURANCE (SAC) LTD., a Bermuda exempted segregated accounts company registered under the Segregated Accounts Company Act 2000 ("**Act**"), care of Victoria Place, 5th Floor, 31 Victoria Street, Hamilton, HM10, Bermuda (the "**Company**");

(2)     The Company acting in respect of its segregated account designated as "T108 - Chaucer" (the "**Segregated Account**"); and

(3)     Vesttoo Bay XXIV, LP., a company incorporated in Israel (No. **540313780** ) ("**Shareholder**").

<u>WITNESSETH:</u>

WHEREAS, the Shareholder has requested that the Company create the Segregated Account, to reinsure certain risks of the Shareholder ceded from Chaucer Syndicates Limited.  (the **"Reinsured"**); and

WHEREAS, at the instructions of the Shareholder the Company, on behalf, and for the benefit, of the Segregated Account will reinsure certain liabilities of the Reinsured pursuant to the terms of an reinsurance agreement to be entered into between the Reinsured and the Company, on behalf, and for the benefit, of the Segregated Account (the "**Reinsurance Agreement**") attached as Schedule A hereto. (the Segregated Account acting as the reinsurer under the **Reinsurance Agreement**, the "**Reinsurer**"); and

WHEREAS, the Shareholder wishes to participate in the underwriting results with respect to the risks which are insured by the Reinsurer pursuant to the Reinsurance Agreement, and in the investment earnings generated from the assets linked to the Segregated Account; and

WHEREAS, the Shareholder wishes to purchase 100 non-voting redeemable preference shares of par value US$1.00 each of the Company (the "**Participating Shares**") linked to the Segregated Account, at a price per Participating Share of US$1.00, pursuant to a Subscription Agreement to be agreed and completed by the parties and incorporated herein by reference, and the terms of this Agreement to facilitate its participation in such underwriting results and investment earnings; and

WHEREAS, to enable the Segregated Account to meet the terms and obligations of the Reinsurance Agreement, the Shareholder has agreed to provide Acceptable

Security (as defined herein) to or for the benefit of the Segregated Account, separately to enable the Segregated Account to meet any liabilities and any collateral requirements arising pursuant to the terms of the Reinsurance Agreement; and

WHEREAS, the Shareholder desires the co-operation of the Company in managing the assets of the Segregated Account and all earnings thereof for the benefit of the Shareholder, subject to the payments arising from Profit and Loss Allocation in Schedule B to be paid therefrom as provided in Paragraph 3 of this Agreement.

WHEREAS, the parties to this Agreement intend that this Agreement shall be a governing instrument and contract linked to the Segregated Account for the purposes of section 11(1) and (3) of the Act and the Shareholder shall be an account owner as defined in the Act.

NOW THEREFORE, the Parties agree as follows:

1.      The Shareholder and the Company agree that the portion of the risks described in Schedule B, which were insured under the Reinsurance Agreement, is hereby designated the "Participating Program Risks". It is agreed that the Shareholder shall become the account owner (as defined in the Act) of the Segregated Account on the execution of this Agreement and shall have a one hundred per cent interest in Segregated Account.

2.      The Company agrees to allocate to the Participating Shares, on its internal books and records, the profits, losses, costs and expenses attributable to the Participating Program Risks, all as determined by the Company in the manner set forth in Schedule B.

3.      The Company agrees to allow the Shareholder, in accordance with the requirements of the SAC Act, and the Insurance Act 1978 (the "Insurance Act"), to collect dividends or such other distribution mechanism as it may deem fit and in accordance with the SAC Act out of the Segregated Account from time to time from the profits and losses allocated to the Participating Shares with reference to Schedule B, in a manner consistent with the terms of the Reinsurance Agreement. The investment earnings will be net of all fees chargeable to the Segregated Account, as evidenced by written records, not otherwise deducted in the determination of the underwriting results. Notwithstanding any other provision of this Agreement or the SAC Act, a dividend shall not be declared or paid, or a distribution declared or made, in respect of the Participating Shares or other account holdings linked to the Segregated Account if there are reasonable grounds for believing that (a) the Segregated Account is not, or would after the payment not be, solvent (in the sense that it is able to pay its liabilities (excluding obligations to account owners of the Segregated Account in that capacity)); or (b) the realisable value of the assets of the Segregated Account would thereby be less than the aggregate of its liabilities and its issued share capital and share premium accounts. For the avoidance of doubt, dividends or distributions in respect of securities (defined in the SAC Act to include the Participating Share) linked to the Segregated Account shall be paid or made on or in respect of those securities by reference only to the assets and liabilities of the Segregated Account and not by reference to the general account of the Company or any

DocuSign Envelope ID: A4D7BDF1-32CB-421A-AA36-67B357B4398

other segregated account of the Company, and otherwise in accordance with the rights of such securities.

4.      The Shareholder agrees to indemnify the Company to the extent the balance of the profits and losses allocated to the Participating Shares, less cumulative dividends paid, are less than zero at any point in time as calculated by the Company in accordance with Schedule B, subject to any limitations as set forth in Schedule B. The Shareholder agrees that it shall pay to the Company the amount by which such balance of the profits and losses less dividends is less than zero within ten days of receiving written notice of such negative balance. As security for the Shareholder's obligation to indemnify the Company, the Shareholder further agrees to provide the Company with Acceptable Security in the amount and form set forth in Schedule B. The provisions of this Paragraph (4) shall survive the redemption of the Participating Shares, if any, and the termination of this Agreement.

5.      The Shareholder agrees to provide Acceptable Security to or for the benefit of the Segregated Account, separately to enable the Segregated Account to meet any and all liabilities and any and all collateral requirements arising pursuant to the terms of the Reinsurance Agreement. The Shareholder further agrees to indemnify the Segregated Account in the event the assets of the Segregated Account are insufficient to meet the obligations of the Segregated Account.

6.      The Shareholder agrees that the Company shall pay all consideration due to the Reinsurer promptly and in full. Any failure to pay such amounts to the Reinsurer promptly when due shall constitute a material breach of this Agreement. In addition to all other remedies which the Company and the Reinsurer may have from such non-payment or delay in payment, the Company may, but shall not be required to, pay such consideration to the Reinsurer on behalf of the Shareholder and, if the Company shall so elect, then the full amount of such payment, plus interest, shall be deducted from any dividends due to the Shareholder under this Agreement.

7.      The Company hereby represents, warrants, covenants and undertakes to the Shareholder as follows:

(a) that the only business to be conducted with respect to Segregated Account shall be the assumption of and the, exercise of rights or discharge of liabilities in respect of the Reinsurance Agreement and matters directly ancillary thereto in accordance with the Reinsurance Agreement and this Agreement (the "Agreed Business"). In particular (but without limitation) the only liabilities which will be undertaken (whether by the Company or by any agent or sub-contractor appointed by the Company or otherwise) with respect to the Segregated Account or any of its assets shall be in respect of the Agreed Business and the Company shall not enter into any other agreements or contracts with respect to Segregated Account.

(b) that it will not expressly or impliedly represent to any person (or, by omission, allow any such representation to subsist) that it has actual or ostensible authority to undertake with respect to Segregated Account any liabilities other than in respect of the Agreed Business.

(c) that it will not amend, vary, extend or terminate (or agree to amend, vary, extend or terminate) the Reinsurance Agreement or any of the

DocuSign Envelope ID: A4D7BDF1-32CB-424A-A436-67B367B4388

terms on which the Agreed Business without the Shareholder's prior consent.

(d) that it will at all times comply with the requirements of the SAC Act in relation to the administration of the Segregated Account and the Agreed Business.

(e) that it will not enter into, authorise or otherwise approve (or allow to be entered into, authorized or approved) any contract, governing instrument or other documents which do or might allow any person (other than the Shareholder or insurers in respect of any of the Reinsurance Agreement) to have recourse to or otherwise make any claim on the assets of the Segregated Account, including the issuance of shares or securities to any person other than to the Shareholder without the Shareholder's prior consent.

(f) that all funding and any other monies received by the Company from the Shareholder, the Reinsurer (or any other person) which relate to the Agreed Business shall promptly be credited to the assets of the Segregated Account and to no other segregated account without the Shareholder's prior consent.

(g) it shall pay all license and regulatory fees and file its accounts and regulatory returns in a timely manner, and otherwise make all necessary filings, in each case necessary to maintain in full force and effect all requisite licenses, consents and other regulatory approvals to carry out this Agreement, the Reinsurance Agreement with respect to the Segregated Account.

(h) it shall ensure that the Segregated Account is a segregated account within the meaning of The Segregated Accounts Companies Act 2000 ("SAC Act") that all assets linked to the Segregated Account are segregated, separate and separately identifiable from the assets linked to any other segregated account of the Company and the general accounts of the Company and that assets and liabilities linked to any segregated account shall not be transferred between accounts.

(i) It shall ensure that in all dealings, contracts, engagements and undertakings with third parties in relation to any segregated account and/or the assets or liabilities linked thereto that the relevant segregated account is properly identified and any contracts that are to bind such segregated account are executed by or on behalf of the Company for and on account of such segregated account and that the recourse of any creditor in respect of such segregated account is limited as a contractual matter to the assets linked to such segregated account.

(j) it has not taken nor will take any action to exclude or modify in any respect adverse to the interests of the Shareholder or the Reinsurer any provisions or interpretation of the SAC Act or any regulations thereunder that uphold the segregation of accounts (including, without

DocuSign Envelope ID: A4D7BDF1-32CB-421A-AA36-57B357P4388

limitation, provisions restricting the ability to seek recourse between accounts) in any dealings, contracts, engagements and undertakings with third parties in relation to any of its segregated accounts.

(k)  it shall comply with its constitutional and organisational documents and follow proper corporate formalities.

(l)  it shall notify the Shareholder in the event the Bermuda Monetary Authority issues a direction under section 32 of the Insurance Act 1978 of Bermuda having an adverse effect on the Company's business, operation and standing as a registered insurer of its class.

(m) it shall at all times ensure its records and books of account are consistent with the generally accepted accounting treatment and legal/regulatory treatment of its assets in Bermuda.

(n)  it shall not enter into a single transaction or a series of transactions (whether related or not) and whether voluntarily or involuntarily, to sell, transfer or otherwise dispose of the whole or any part of the assets of the Segregated Account and will not create or permit to subsist any security interest on any part of such assets or otherwise deal with any part of such assets without the Shareholder's consent.

(o)  it will co-operate and do all such other acts and things as may be necessary or desirable in order to effect or facilitate payments in discharge of its obligations under this Agreement and the Reinsurance Agreement.

(p)  it shall not remove, withdraw, sell or transfer assets of the Segregated Account other than in accordance with the terms of this Agreement and the Reinsurance Agreement.

(q)  if and to the extent that requirements imposed at any time on the Company as a segregated accounts company and/or registered insurer by any competent regulatory authority (including but not limited to the Bermuda Monetary Authority) directly or indirectly oblige it to make additional assets available to support its actual or potential insurance underwriting liabilities, then (save to the extent that those requirements arise solely and directly in respect of any of the Reinsurance Agreement), it shall procure that any such assets to be made promptly and effectively so available by the Company shall in no circumstances utilise the assets of the Segregated Account for such purpose nor shall the Shareholder be required to deposit any additional collateral or other assets into Segregated Account to support those liabilities.

(r)  save for this Agreement and the Reinsurance Agreement and ancillary bank account opening documents with HSBC Bank, it will not enter into, authorise or otherwise approve, with respect to the Segregated Account, any contract, governing instrument or other documents which do or might allow any person to have recourse to or

otherwise make any claim on assets linked to the Segregated Account including but not limited to any "creditor" or "account owner" within the meaning of the SAC Act, without the Reinsurer's prior written consent.

8.       The Shareholder acknowledges that the Company, the Reinsurer and their respective agents and representatives have not rendered any advice concerning tax, legal, accounting or other financial characteristics or consequences of the transactions entered into with the Reinsurer or the Company, including but not limited to the agreements referred to in this Agreement, or of the payments or other aspects of the Participating Program Risks, or tax, accounting or financial position of the Shareholder with respect to his or any other agreements entered into between the Shareholder and the Company or the Reinsurer. The Shareholder has relied solely on Shareholder's own advisors for this advice. If applicable, the Shareholder also acknowledges that it is aware that it may be subject to United States federal income tax on Subpart F income earned by the Company allocable to the Participating Shares, whether or not such income is distributed to the Shareholder.

9.       This Agreement may not be modified, amended or changed in any manner except in writing signed by each party hereto. It may, however, be terminated by written notice from either Party to the other at least sixty (60) days prior to the proposed termination date. In such event all existing obligations from each Party to the other or to third parties of the time of termination shall remain in force and the provisions of paragraph (4) and paragraphs (9) through (17) shall continue to apply notwithstanding such termination.

10.      Any disputes arising out of or relating to this Agreement or the breach, termination or validity hereof, shall be referred to and settled by final binding arbitration in Hamilton, Bermuda by a panel of three arbitrators. One arbitrator shall be chosen by the Company, one arbitrator shall be chosen by the Shareholder and an umpire shall be chosen by the two arbitrators. If either party fails to name its arbitrator within thirty (30) days after receiving the written request of the other party to do so, the latter shall name both arbitrators and they shall select an umpire. The arbitrators and umpire shall be disinterested active or retired executive officers of insurance or reinsurance companies. The arbitrators are relieved from all judicial formalities and may abstain from following the strict rules of law. If the arbitrators fail to agree in their selection of an umpire within thirty (30) days of their appointment, then each arbitrator shall nominate one umpire and the selection shall be made by drawing lots and the name of the party first drawn shall be the umpire. The decision of the majority of the arbitrators shall be final and binding upon both parties and judgment may be entered upon the award of the arbitrators in any court having jurisdiction. Each party shall bear the fees and expenses of its own arbitrator and shall jointly and equally bear with the other the fees and expenses of the umpire and of the arbitration. The arbitration shall take place in Hamilton, Bermuda, unless the parties mutually agreed to an alternative site.

11.      All notices, requests, demands or other communications provided for herein shall be in writing, shall be delivered by hand, by first-class mail postage prepaid or by internationally recognized overnight courier and shall be addressed to the parties hereto at their respective address listed below or to such other persons or addresses as the relevant party shall designate as to itself from time to time in a writing delivered in like manner.

If to the Company, to it at:

WHITE ROCK INSURANCE (SAC) LTD.
c/o Aon Insurance Managers (Bermuda) Ltd.
Point House
6 Front Street
Hamilton HM 11
Attn: William Luu

If to the Shareholder, to it at:

VESTTOO BAY XXIV LP.
c/o Vesttoo Ltd.
1 Maharal St.
Tel-Aviv
Israel
Attn: Legal Counsel

12.    This Agreement has been made and executed in Bermuda and shall be exclusively governed by, and construed in accordance with, the laws of Bermuda and any dispute concerning this Agreement, not capable of resolution by arbitration shall be resolved exclusively by the courts of Bermuda.

13.    All amounts referred to herein are expressed in United States Dollars and all payments shall be made in such dollars.

14.    This Agreement and the attached Schedule constitute the entire agreement between the parties and supersede and cancel any other agreement, representation or communication, whether oral or written, between the parties relating to the transactions contemplated herein or the subject matter hereof.

15.    The failure of either party hereto at any time to enforce any provision of this Agreement shall not be construed as a waiver of that provision and shall not affect the right of either party thereafter to enforce each and every provision of this Agreement in accordance with its terms.

16.    This Agreement shall inure to the benefit of and be binding on the Company and its successors and assigns and Shareholder and its successors and assigns. Neither this Agreement nor any right hereunder nor part hereof, however, may be assigned by either party hereto without the prior written consent of the other party.

17.    If any provision of this Agreement is held to be illegal, invalid, or unenforceable under any present or future law, and if the rights or obligation of either party under this Agreement will not be materially and adversely affected thereby, (a) such provision will be fully severable, (b) this Agreement will be construed and enforced as if such illegal, invalid, or unenforceable provision had never comprised a part hereof, (c) the remaining provisions of this Agreement will remain in full force and effect and will not be affected by the illegal, invalid or unenforceable provision or by its severance herefrom, and (d) in lieu of such illegal, invalid, or unenforceable provision or by its severance added automatically as a part of this Agreement, a legal, valid, and

enforceable provision as similar in terms to such illegal, invalid, or unenforceable provision as may be possible.

18.     This Agreement may be executed by the parties in separate counterparts, each of which when so executed and delivered shall be an original, but all such counterparts shall together constitute but one and the same instrument.

IN WITNESS WHEREOF, the Parties have set their hand, and executed this Agreement on this 1st day of January, at Hamilton, Bermuda.

WHITE ROCK INSURANCE (SAC) LTD.

By: _____
E91143E7CBC944F...

WHITE ROCK INSURANCE (SAC) LTD.

By: _____
C2E81D277C3E422...

Vesttoo Bay XXIV, LP

By: _____
1BA3C9BE6C0D402...

# SCHEDULE A

REINSURANCE AGREEMENT

**SCHEDULE B**

**THE FOLLOWING TERMS AND CONDITIONS SHALL APPLY**
**FOR THE UNDERWRITING PERIOD DESIGNATED BELOW,**
**EXCEPT AS OTHERWISE INDICATED**

REINSURANCE AGREEMENT

CLASS OF BUSINESS Reinsurance Policy:

LIMITED RECOURSE CLAUSE

**Segregated Account**
This Agreement is entered into by White Rock Insurance (SAC) Ltd. on behalf and in respect of the segregated account designated as "T108 - Chaucer" (the "Segregated Account") for the purposes of section 11(3) of the Segregated Accounts Companies Act 2000 of Bermuda (the "SAC Act"). Each party acknowledges that the Company is a segregated accounts company under the SAC Act and agrees that its rights and obligations under this Agreement are subject to the provisions of the SAC Act.

**Limited Recourse**
Except as expressly provided in this Agreement and in accordance with the provisions of sections 11(4) and 17(5) of the SAC Act, the parties agree that their right to claim or proceed against the Segregated Account in respect of this Agreement is confined to the assets linked to such Segregated Account and, where a claim, liability or obligation of the Company arises from or in connection with this Agreement, recourse shall be limited to the assets linked to such Segregated Account as evidenced in the books and records of Company. No such claim, liability or obligation shall extend, and no party shall have recourse, to any asset of the Company linked to any other segregated account established by Company pursuant to the SAC Act or to the general account (as defined in the SAC Act) of the Company or otherwise. In addition, no asset shall be transferred at any time from the general account of Company to any segregated account in connection with satisfying any such claim, liability or obligation unless otherwise expressly agreed in writing by the parties hereto in accordance with the requirements of the SAC Act."

**No Further Action**
If the assets linked to the Segregated Account are insufficient to meet the obligations of the Company under this Agreement, the Company's obligations shall be limited to such assets and the parties shall not be entitled to take any further steps against Company to recover any further sum and no debt shall be owed to the parties by Company.

**Governing Law**
The effect of this clause and the rights and obligations of any party pursuant to this clause shall be governed by the laws of Bermuda with reference to the SAC Act and, for such purpose only, the parties hereto irrevocably submit to the jurisdiction of the Supreme Court of Bermuda. Except as otherwise defined herein or unless the context otherwise requires, terms and expressions defined in this clause have the same

DocuSign Envelope ID: A4D7B9F1-32GB-431A-AA8G-579236794188

meanings given to them in the SAC Act. Each party agrees that, if there is an inconsistency between the provisions of this clause and any other provisions of this Agreement, this clause shall prevail.

<u>PARTICIPATING PROGRAM RISKS</u>

As described in the Reinsurance Agreement, between the Company and the Reinsurer, as set forth in pertinent provisions thereof, as well as the individual declarations pertaining to such agreement(s).

<u>PROFIT AND LOSS ALLOCATION</u>

The Company and the Shareholder agree that (i) the purchase price paid for the Participating Shares pursuant to the Subscription Agreement, (ii) the amount of any Acceptable Security, (iii) the Consideration (as defined below) and (iv) Investment Income (as defined below) shall be allocated to the Participating Shares on the Company's books and records, and pursuant to the Shareholder's election to utilize a segregated account pursuant to the Company's registration under the Act. Such amounts allocated to the Participating Shares will be reduced by (i) Incurred Losses (as defined below), (ii) Allocated Loss Adjustment Expenses (as defined below) and (iii) Expenses (as defined below).

The term "Consideration" as used in this Agreement shall mean the consideration paid to the Reinsurer.

The term "Investment Income" as used in this Agreement shall mean the investment income earned by the Company on the funds held with respect to the Participating Program Risks.

The term "Incurred Loss(es)" as used in this Agreement shall mean paid losses allocable to the Participating Program Risks, plus Current Period Outstanding Loss(es). Current Period Outstanding Losses shall include the change in case loss reserves and incurred but not reported loss reserves during any annual period hereunder.

The term "Allocated Loss Adjustment Expense(s)" as used in this Agreement shall mean all costs and expenditures incurred with respect to the Participating Program Risks which can be allocated to a specific claim in connection with the investigation, adjustment, defense and/or settlement of such claim, including, but not limited to: investigation costs; negotiation costs; declaratory judgment costs; court costs; costs for copies of any public records; costs of depositions and court-reported or recorded statements; costs and expenses of subrogation and any similar fee; prejudgment interest and interest on any judgment or award, only when such interest is not added to such judgment.

But "Allocated Loss Adjustment Expense(s)" shall not include the following expenses:

(1) the charges for the services provided under contract by third party administrators; or

(2)　the salaries or travelling expenses of the Reinsurer's claims department employees or overhead expenses.

The term "Expenses" as used in this Agreement shall mean the following attributable to the Participating Program Risks:

(a)　the Underwriting Fee (as defined below);
(b)　the Program Fee (as defined below);
(c)　the Ceding Commission (as defined below), if any;
(d)　the Investment Services Fee (as defined below); and
(e)　other recurring or incidental charges attributable to the Participating Program Risks, if any.

## *DIVIDENDS*

Subject to the sole discretion of its Board of Directors and on each Dividend Evaluation Date (as defined below) and the solvency test in section 15 of the SAC Act, the Company agrees to declare, as permitted by law and where applicable under the Act or any other applicable legislation, dividends with respect to the Participating Shares from the profits and losses allocated to the Participating Shares as set forth above. Such amounts paid as dividends shall be deducted from profits and losses allocated to the Participating Shares.

## ACCEPTABLE SECURITY

The Shareholder shall provide the Company and/or the Segregated Account with security, in a form acceptable to the Company, for the Shareholder's obligations, as shall be determined from time to time by the Company and the Shareholder ("Acceptable Security"). The Shareholder will also provide a Letter of Credit to be issued on behalf of the Segregated Account, for the benefit of the Insured.

## REDEMPTION/REPURCHASE

At the same time as the Company agrees to release the Acceptable Security provided by the Shareholder hereunder, the Company shall repurchase from the Shareholder all of the Participating Shares, upon presentation of the share certificate representing the Participating Shares duly endorsed for cancellation, for the price of One Hundred United States Dollars (US$100.00) by repaying the amount of cash paid by the Shareholder as the purchase price of the Participating Shares.

Without prejudice to the foregoing, if the Reinsurance Agreement is not executed within 45 days of the date of this Agreement, the Company shall repurchase from the Shareholder all of the Participating Shares for the amount of One Hundred United States Dollars (US$100) without any deduction and this Agreement shall terminate and expire without any claims for costs, expenses, fees in connection with this Agreement, the Reinsurance Agreement or the Cell Management Agreement referred to under "Program Fee" which shall be bourne by each individual party.

DIVIDEND EVALUATION DATE

Commencing on the 1st day of January, and annually thereafter on or about the 31st day of December of each succeeding year thereafter.

IN WITNESS WHEREOF, the undersigned has executed this agreement this 1st Day of January, 2022.

**Vesttoo Bay XXIV, LP**

DocuSigned by:
1BA3C9BE6C0D402...

Title : CEO

**WHITE ROCK INSURANCE (SAC) LTD.**

DocuSigned by:
E91143E7CBC944F...

Title : Authorized Signatory

**WHITE ROCK INSURANCE (SAC) LTD.**

DocuSigned by:
C2E81D277C3E422...

Title : Authorised Signatory

Exhibit 3

DocuSign Envelope ID: 292DF441-5330-45E6-A57E-9F6A0367BEB1

DATED December 29th, 2021

**(1) VESTTOO BAY XVII, LP.**

**- and -**

**(2)    WHITE ROCK INSURANCE (SAC) LTD.**

**- and -**

**(3) AON INSURANCE MANAGERS (BERMUDA) LTD.**

---

**CELL MANAGEMENT AGREEMENT**

---

**CONTENTS**

| No. | Clause | Page |
|-----|--------|------|
| 1. | Definitions | 2 |
| 2. | Appointment | 4 |
| 3. | Powers of the Manager | 5 |
| 4. | Accounts, Books and Records | 6 |
| 5. | Dividends | 6 |
| 6. | Taxation | 7 |
| 7. | Audit | 8 |
| 8. | Remuneration, Expenses and Indemnity | 8 |
| 9. | Limitation of Liability | 8 |
| 10. | Termination | 9 |
| 11. | Restrictive Covenant | 10 |
| 12. | Confidentiality | 11 |
| 13. | Data Protection | 11 |
| 14. | Intellectual Property | 12 |
| 15. | Ethical Guidelines | 13 |
| 16. | Notices | 13 |
| 17. | Non Exclusive Services | 14 |
| 18. | Status of the Company | 14 |
| 19. | Assignment | 14 |
| 20. | Waiver | 15 |
| 21. | Costs | 15 |
| 22. | Counterparts | 15 |
| 23. | Further Assurance | 15 |
| 24. | Severability | 15 |
| 25. | Amendment | 16 |
| 26. | Force Majeure | 16 |
| 27. | Disputes | 16 |
| 28. | Remedies | 16 |
| 29. | Entire Agreement | 16 |
| 30. | Governing Law | 17 |
| 31. | Global Trade Restrictions | 17 |
| Schedule 1 - Services | | 20 |

DocuSign Envelope ID: 292DF441-5330-45FG-A57F-97F9A367BFB1

**CELL MANAGEMENT AGREEMENT**

**THIS AGREEMENT** is made the 29th day of December 2021.

**BETWEEN:**

(1)     **VESTTOO BAY XVII, LP.** a company incorporated in Israel whose registered office is 1 Maharal St. Tel-Aviv 6248111, Israel (the "**Cell Owner**");

(2)     **WHITE ROCK INSURANCE (SAC) LTD.** (Registered No. 9714) a Bermuda exempted segregated accounts company registered under the Segregated Accounts Company Act 2000 ("SAC Act"), whose registered office is at Victoria Place, 5th Floor, 31 Victoria Street, Hamilton, HM10, Bermuda (the "**Company**"); and

(3)     **AON INSURANCE MANAGERS (BERMUDA) LTD.** a company incorporated in Bermuda whose registered office is at Victoria Place, 5th Floor, 31 Victoria Street, Hamilton, HM10, Bermuda (the "**Manager**").

**IT IS AGREED AS FOLLOWS:**

1.     **DEFINITIONS**

1.1     The following provisions shall have effect for the interpretation of this Agreement.

1.2     The following words and expressions shall, unless the context otherwise requires, have the following meanings:-

| | |
|---|---|
| "Act" | means the Insurance Act 1978 of Bermuda and related regulations as amended; |
| "Aon Group" | shall mean Aon plc and its affiliates, subsidiaries and their respective officers, directors, employees and agents (each an "Aon Group Member" and together the "Aon Group"); |
| "Agreement" | means this Management Agreement as may be amended from time to time by written agreement of the Parties; |

2

DocuSign Envelope ID: 292DF441-5330-45FC-A57E-9F62A367BEB1

| | |
|---|---|
| "applicable Bermuda Laws" | means the Act, the Companies Act and the SAC Act. |
| "Articles" | means the Memorandum of Association and Bye-laws of the Company in force from time to time and for the time being; |
| "Authority" | means the Bermuda Monetary Authority; |
| "Board" | means the board of directors of the Company at any time; |
| "Business" | means all that business of the Company which concerns the writing of insurance or reinsurance business in respect of the Cell and matters associated therewith; |
| "Cell" | means the segregated account of the Company established pursuant to the SAC Act for the purpose of conducting insurance business known as T96 – Homeowners ; |
| "Cell Governing Instrument" | means the Subscription Agreement and Participating Shareholders Agreement entered into between the Cell Owner and the Company in respect of the Cell, as may be amended from time to time; |
| "Companies Act" | means the Companies Act 1981, as amended; |
| "Effective Date" | means December 29th, 2021; |
| "Manager" | means the Manager acting pursuant to this Agreement as a licensed insurance manager (as defined in the Act); |
| "Parties" | means the parties to this Agreement; |
| "Insurance Agreement" | means the insurance agreement to be entered into |

|  |  |
|---|---|
|  | between various insureds and the Cell; |
| "Related Companies" | shall mean the Cell Owner's affiliates, subsidiaries and their respective directors, officers and employees; |
| "SAC Act" | means the Segregated Accounts Companies Act 2000, as amended; and |
| "Services" | means such services as are set out in Schedule 1 of this Agreement. |

1.3   Headings to Clauses are for information only and shall not form part of the operative provisions of this Agreement and shall be ignored in construing the same.

1.4   References to Clauses and Schedules are, unless the context otherwise requires, to clauses and schedules of this Agreement.

1.5   References to any statute or statutory provision, Ordinance, order or regulation made thereunder shall include that statute, provision, order in council, ordinance order or regulation as amended, modified, re-enacted or replaced from time to time whether before or after the date hereof.

1.6   References to persons shall include bodies corporate and unincorporated associations, partnerships and individuals.

1.7   Whenever the plural is used in this Agreement the same shall be understood as meaning the singular and vice versa where the context so requires.

## 2.   **<u>APPOINTMENT</u>**

2.1   With effect from the Effective Date, and subject to the execution and entry into the Insurance Agreement by the parties thereto the Company hereby appoints the Manager and the Manager agrees to provide the Services, subject to the overall supervision and control of the Company.

2.2   To enable the Manager to perform the Services the Company shall:

2.2.1   promptly give the Manager instructions if requested to do so by the Manager;

2.2.2    make available to the Manager such records or information as the Manager may reasonably require; and

2.2.3    render to the Manager such assistance as the Manager may reasonably require.

## 3.    POWERS OF THE MANAGER

3.1    The Manager shall have and is hereby granted the authority, power and right and as agent for and in the name of the Company but subject to the overall supervision and authority of the Board and to such lawful resolutions orders and directions given to it by the Board from time to time to:

3.1.1    sign any necessary letters or other documents for and on behalf of the Company in the performance of the Services;

3.1.2    enter into, make and perform all contracts, agreements and other undertakings as may in the opinion of the Manager be necessary or desirable or incidental to the carrying out of the Business;

3.1.3    make available to the Authority such information of and concerning the Company as may from time to time be required by the Authority pursuant to its powers under the Act; and

3.1.4    act for the Company and on the Company's behalf either itself or wholly or in part through its authorised agents or delegates in the same manner and with the same force and effect as the Company might or could do.

3.2    The Manager may sub-contract or employ agents in the performance of the Services. The Manager will act in good faith and with due diligence in the choice, supervision and use of any such sub-contractors or agents but subject thereto shall not be liable for the acts or omission of any such sub-contractors or agents.

3.3    Where communications between the Cell Owner and/or the Company and the Manager are by way of email, the Cell Owner and the Company agree to accept the inherent risks of email communication including the security risks of interception of or unauthorised access to such communications, the risks of corruption to such communications and the risk of viruses or other harmful devices.

3.4    The Manager shall retain absolute discretion as to the acceptance of risks and as to the terms of the underwriting and insurance of such risks on behalf of the Cell including the negotiation and conclusion of insurance for the Cell and the Manager shall act in accordance with such general or specific directions as the Board may provide in relation thereto from time to time.

## 4.    ACCOUNTS, BOOKS AND RECORDS

4.1    All books of accounts, insurance policies, reinsurance agreements, bank statements and cheques, loss information, minutes, correspondence and other documentation which relate to the Business are the sole and exclusive property of the Company and shall, in the event of termination of this Agreement by any party, be promptly turned over to the Company or its agent designated in writing and copies (in so far as the same relate exclusively to the Business) supplied to the Cell Owner, provided that all amounts payable by the Company to the Manager under the terms of this Agreement are first settled in full.

4.2    The management accounts prepared by the Manager in respect of the Business shall be in such common form as management accounts for the other businesses of the Company as the Company shall reasonably require and the Cell Owner shall not be entitled to any information concerning the performance of any other businesses of the Company associated with any other class shareholdings or cells other than the information contained in the management accounts for the Cell and such other information as the Cell Owner may reasonably require in order properly to determine the chargeable profits of the Company and the Cell and the appropriate proportion thereof attributable to the Cell Owner for the purposes of agreeing its liability to tax (if any) to any foreign revenue authority.

4.3    The books and records referred to in Clause 4.1 in so far as the same relate exclusively to the Business shall be open to inspection only by directors, officers and employees of the Manager and by the Company's and the Cell Owner's officers, directors and employees and their respective auditors and by any other person duly authorised in writing for such purpose by the Cell Owner.

4.4    Notwithstanding Clauses 4.1, 4.2 and 4.3 the Manager is authorised to make available and disclose to the Authority such information of and concerning the Company as the Authority may from time to time require.

## 5.    DIVIDENDS

The Cell Owner acknowledges and agrees that dividends may be declared by reference only to the assets attributable to the Cell and subject to and in accordance with the provisions of this Agreement, the Articles, the Cell Governing Instrument and all applicable Bermuda Laws. In particular the Cell Owner acknowledges

that no dividend will be recommended, declared or paid at any time if and to the extent that the assets of the Cell out of which the dividend would be paid are required to meet the margin of solvency for the time being required for the Cell or otherwise in respect of any regulatory requirement of the Authority from time to time and for the time being in force and that it has no right or entitlement to any other assets or profits of the Company other than to the assets and profits of the Cell.

6. **TAXATION**

6.1    The Cell Owner acknowledges and agrees that it is responsible for seeking its own independent tax and professional advice in respect of the Cell and the Company and the computation of profits thereof and to determine such liability as it may have to taxation thereon.  Subject thereto the Company shall procure at the request and expense of the Cell Owner that the Cell Owner shall be provided with such access to the Company's auditors in respect of the financial affairs of the Company as the Cell Owner may reasonably require as may be necessary to enable the Cell Owner to prepare its tax computations in respect of the profits of the Cell.

6.2    Foreign Account Tax Compliance Act ("FATCA")

   6.2.1    The Company's Responsibilities
      The Cell Owner is responsible for determining and discharging the Cell Owner Foreign Account Tax Compliance Act ("FATCA") obligations and for providing the Company with information and instruction on how to process any payments subject to FATCA on the Cell Owner's behalf where appropriate.  The Company do not provide withholding agent services and the Company will only undertake FATCA related activity on the Cell Owner's behalf if directly authorized and instructed by the Cell Owner.  The Company shall not be responsible for or liable to the Cell Owner for losses arising in relation to the Cell Owner's failure to comply with the Cell Owner FATCA obligations. If arising from the provision of the Services to the Cell Owner and from the Cell Owner's failure to comply with the Cell Owner FATCA obligations, the Company are deemed under any applicable law to act as a withholding agent under FATCA, the Cell Owner hereby agree to indemnify the Company and to keep the Company indemnified for any associated payments which the Company are obliged to make as withholding agent, including any associated costs, interest and penalties.

   6.2.2    The Cell Owner's Responsibilities
      Be solely responsible for tax matters including any FATCA obligations, where appropriate, notwithstanding any advice construed to have been given by the Company and to keep the Company apprised of the Cell Owner tax status;

7.  **AUDIT**

7.1  The Cell Owner shall be entitled to appoint an auditor to carry out an audit of the Cell at any time and the Manager shall make available to the Cell Owner upon request such accounts, books and records relating exclusively to the Cell as the Cell Owner may reasonably require.

7.2  The Cell Owner acknowledges and agrees that the costs, fees and expenses of any such audit carried out in respect of the Cell (including the costs of the provision by the Manager of such accounts, books and records as may be required) shall be at the expense of the Cell Owner.

8.  **REMUNERATION, EXPENSES AND INDEMNITY**

8.1  During the continuance of this Agreement it is hereby acknowledged that the Cell Owner shall pay to the Company for the Services under this Agreement a fee of UD $50,000 per annum, in advance.

8.2  The Company hereby undertakes to hold harmless and indemnify the Manager against all actions, proceedings, costs, claims, demands and expenses which may be brought against, suffered or incurred by the Manager in connection with the performance by it of its duties hereunder including all reasonable legal, professional and other expenses incurred except as shall arise from the fraud, wilful default or gross negligence of the Manager unless such fraud, wilful default or negligence arises as a result of actions taken under specific instructions given by the Company.

8.3  The Cell Owner hereby undertakes to hold harmless and indemnify the Company against any loss or expense it may suffer or incur to the Manager pursuant to Clause 8.2 to the extent that the assets of the Cell are insufficient or unavailable (for whatever reason) to meet the same.

9.  **LIMITATION OF LIABILITY**

9.1  To the extent permitted by law, and in no way derogating from the indemnity provided above, the Manager and the Aon Group will not be responsible or liable to the Cell Owner or any other party for:

9.1.1  any indirect, incidental, special, consequential, exemplary, punitive or reliance damages (including, without limitation, lost or anticipated revenues, lost business opportunities or lost sales or profits);

9.1.2  the supply, by the Cell Owner or others, of incorrect or incomplete information or the failure by the Cell Owner or others to supply appropriate, relevant or timely information;

9.1.3  any loss arising by reason of or arising out of an error or omission by the Cell Owner or one of its Related Companies;

9.1.4    the failure by the Cell Owner or others to act on the Manager's advice or to respond promptly to any communications from the Manager; or

9.1.5    the provision or failure to provide or advise on any services not specified in this Agreement.

9.2      To the fullest extent permitted by law, and except for damages resulting solely and directly from fraud or intentional misconduct by the Manager or the Company, as determined in a full and final adjudication by a court of competent jurisdiction, each of the Manager's and the Company's liability for all time to the Cell Owner for any and all damages, costs, and expenses (including but not limited to attorneys' fees), whether based on contract, tort (including negligence), or otherwise, in connection with or related to the services under this Agreement and the Cell Governing Instrument (including a failure to provide a service) shall be limited to US $100,000 (the "**Liability Limitation**").  This Liability Limitation applies in the aggregate to all services of whatever nature provided by the Aon Group to the Cell Owner and its Related Companies wherever located that seek to assert claims against any Aon Group Member arising out of or in relation to any activities undertaken by such Aon Group Member pursuant to this Agreement and the Cell Governing Instrument.  If the Cell Owner or any of its Related Companies asserts any claims or makes any demands against the Manager, the Company or any other Aon Group Member for a total amount in excess of the Liability Limitation, then the Cell Owner agrees to indemnify the Manager, the Company or such other Aon Group Member for any and all liabilities, costs, damages and expenses, including attorneys' fees, incurred by the Manager, the Company or such other Aon Group Member that exceeds this Liability Limitation.  For the avoidance of doubt, nothing in this Limitation of Liability section is intended, nor may it be construed to imply, that any Aon Group Member owes or accepts any duty or responsibility to the Cell Owner and its Related Companies.  As the Parties intend the Liability Limitation provisions to be enforceable, it is agreed that any over breadth in such provisions shall not itself render any of such provisions void, but rather, such provisions shall be interpreted and enforceable to the fullest extent permitted by applicable law.

## 10.    **TERMINATION**

10.1     This Agreement may be terminated at the request of the Company, the Cell Owner or the Manager by not less than 60 days prior notice in writing to the other Parties.

10.2     The Manager may terminate this Agreement forthwith by notice in writing to the Cell Owner and the Company upon:

10.2.1   the Cell Owner ceasing to beneficially own all of the shares in the Cell; or

10.2.2   the completion of the orderly winding up of the business of the Cell.

9

10.3    Either Party may terminate this Agreement forthwith by written notice in writing to the other Party if:

    10.3.1   the other has broken or is in breach of any of the terms of this Agreement (other than a breach which in the reasonable opinion of the other Party is of a trivial nature) and, if such breach is capable of remedy, shall not have remedied such breach within 30 days after service of notice requiring the same to be remedied; or

    10.3.2   the other has gone into liquidation or become insolvent, or compounds with its creditors or enters into a scheme of arrangement with its creditors or an order has been made or a resolution has been passed to put the other into liquidation (except a voluntary liquidation for the purpose of reconstruction) or to appoint an administrator or receiver or any other similar process; or

    10.3.3   for any reason the other ceases to hold any licence, authorisation or consent necessary for it to perform its obligations under this Agreement; or

    10.3.4   the other is prevented from performing its obligations under this Agreement for any reason for a period of 3 months.

10.4    For the purpose of Clause 10.3.1 a breach shall be considered capable of remedy if the Party in breach can comply with its obligation in question in all respects to the reasonable satisfaction of the other Party, other than as to the time of performance (provided that the time of performance is not of the essence).

10.5    Termination or expiry of this Agreement shall be without prejudice to the accrued rights and liabilities of the Parties at the date of such termination or expiry and the provisions of this Agreement which are expressly or impliedly intended to survive termination or expiry of this Agreement shall survive such termination or expiry, including, without limitation, Clauses 8 (Remuneration, Expenses and Indemnity), 9 (Limitation of Liability), 10 (Termination) 11 (Restrictive Covenant), 12 (Confidentiality), 13 (Data Protection), 14 (Intellectual Property), 21 (Costs) and 27 (Disputes).

## 11.    **RESTRICTIVE COVENANT**

11.1    The Company covenants with and undertakes to the Manager that neither the Company nor its Affiliates shall during the term of this Agreement and for a period of twelve months after its termination or expiry, solely or jointly with any other person induce solicit or endeavour to entice any current or future employees of the Manager or any of its Affiliates to leave the service or employment of the Manager for the purpose of conducting any Business and/or performing any of the Services.

11.2    The Company covenants with and undertakes to the Manager to pay to the Manager upon the occurrence of each and every breach of the covenant and undertaking set out in Clause 11.1 above an amount equal to 12 months gross salary of the particular employee of the Manager or any of its Affiliates (as applicable) that has been induced, solicited or enticed to leave the service or employment of the Manager or any of its Affiliates (as applicable) for the purpose of conducting any Business and/or performing any of the Services. The amount to be paid by the Company to the Manager pursuant to this Clause shall be calculated by reference to the gross salary of the particular employee on the date of termination of that employee's service or employment with the Manager or any of its Affiliates (as applicable).

11.3    Having regard to the training, experience and specialist nature of the skills of the persons through whom the Manager provides the Services, the Company acknowledges and confirms that:

11.3.1   the covenant contained in Clause 11.1 above is no greater than is reasonable or necessary for the protection of the interests of the Manager; and

11.3.2   the amount set out in Clause 11.2 to be payable by the Company to the Manager upon the occurrence of each and every breach of Clause 11.1 is a reasonable pre-estimate of the loss that will be suffered by the Manager upon the occurrence of such a breach.

12.    **CONFIDENTIALITY**

The Manager shall keep confidential and shall not either before or after the termination or expiration of this Agreement disclose to any person not authorised to receive the same any information relating to the Business save to the extent that disclosure of the same may be necessary or desirable to enable it to comply with its obligations hereunder or at law or to the Authority or other regulatory body and in particular in respect of any obligation to procure the preparation of or to prepare accounts of the Company or to procure the enforcement of any of the provisions of this Agreement or the preservation or maintenance of its rights hereunder or of any other agreement to which the Cell Owner and/or the Company is or may be party.

13.    **DATA PROTECTION**

13.1    Each of the Company, the Cell Owner and the Manager shall comply with their respective obligations under the Electronic Transactions Act 1999 (the "**Electronic Transactions Act**") in connection with the performance of their respective obligations under this Agreement.

13.2    The Company and the Cell Owner each agree that the Manager may transfer "personal data" (as such term is defined under the Electronic Transactions Act) which the Manager has received by virtue of the operation

of this Agreement to any country, including countries outside of Bermuda, which may not have comparable data protection laws, as may be required for the performance of the Services or for systems administration.

## 14.    <u>INTELLECTUAL PROPERTY</u>

14.1    All intellectual property rights including, without limitation, all patents, design rights, rights to inventions, utility models, copyright and related rights, trademarks, service marks, trade, business and domain names, rights in designs, rights in computer software, databases rights, moral rights, rights in confidential information (including know-how and trade secrets) and any other intellectual property rights whether registered or unregistered and including all applications for and renewals or extensions of such rights and similar or equivalent rights or forms of protection in any part of the world  in or arising out of or in connection with the provision of the Services shall be owned by the Manager.

14.2    The Company grants the Manager a non-assignable, royalty free, irrevocable, non exclusive licence to use the computer software of the Company where required by the Manager to enable it to provide the Services. Where the Company grants such licence to the Manager it will be for the sole purpose of providing the Services and such licence shall terminate following the termination of this Agreement.  The Manager is not permitted to reproduce the computer software of the Company, however the Manager is entitled to make single back-ups.

14.3    The Company warrants and undertakes that:

14.3.1   the computer software of the Company and the items furnished or used by the Manager in its performance of this Agreement and the provision and receipt of the Services under this Agreement will not be such as to infringe any intellectual property or other rights of any third party;

14.3.2   the Company has the authority to grant the licenses of the intellectual property rights referred to in Clause 14.2; and

14.3.3   the computer software of the Company will perform in accordance with any written specification therefore and is suitable for performing the functions for which it has been used prior to the date hereof by the Company in relation to the Services.

## 15.    <u>ETHICAL GUIDELINES</u>

In performing the Services, the Manager shall comply with all applicable anti-corruption laws and regulations and in particular shall not:

(i)     pay or receive bribes;

(ii)    make, channel or receive improper payments;

(iii)   act in a manner inconsistent with the spirit of the Manager's code of ethics or such other ethical guidelines as may be agreed between the Manager and the Company from time to time; or

(iv)    break or violate applicable anti-corruption laws and regulations.

## 16.    NOTICES

16.1    Any notice, request or other communication required or permitted to be given or made hereunder shall be in writing and shall be deemed properly given or made:

16.1.1   immediately, if delivered by hand to the address set out in Clause 16.3;

16.1.2   immediately, if sent by facsimile transmission to such number as may from time to time be notified in writing by any Party to the others for such purposes;

16.1.3   if posted within Bermuda and addressed to the address set out in Clause 16.3, seven days after being sent by registered post or pre-paid post;

16.1.4   if posted from outside Bermuda and addressed to the address set out in Clause 16.3, seven days after being sent by registered post pre-paid post; and

16.1.5   immediately, if sent in "electronic form" to an electronic address notified by any Party to the others for the purpose of receiving such communications.

16.2    In evidencing service by post it shall be sufficient to prove that an envelope containing the notice was duly addressed and sent by recorded delivery.

16.3    Any notice, request or other communication given under this Clause 16 shall be addressed as follows:

16.3.1   to the Cell Owner, for the attention of Legal Counsel, Vesttoo Ltd. 1 Maharl St. Tel-Aviv 6248111, Israel; or

16.3.2   to the Company, for the attention of William Luu, Point House, 6 Front Street, Hamilton, HM11, Bermuda;

13

16.3.3   to the Manager, Point House, 6 Front Street, Hamilton, HM11, Bermuda; or

16.3.4   in each case, to such other address as may be notified from time to time.

## 17.   <u>NON-EXCLUSIVE SERVICES</u>

The services of the Manager hereunder are not to be deemed exclusive and the Manager shall be free to render similar services to others so long as its services hereunder are not thereby impaired and the Manager shall not be deemed to be affected with notice of or be under any duty to disclose to the Company or the Cell Owner any fact or thing which may come to the notice of the Manager in the course of rendering similar services to others or in the course of its business in any other capacity.

## 18.   <u>STATUS OF THE COMPANY</u>

18.1   Each of the Cell Owner and the Manager hereby acknowledges that the Company is a segregated account company within the meaning of the SAC Act and that for the purposes of the transactions contemplated by and services to be provided under this Agreement such transactions are in respect of the Cell and the liability of the Company to the Manager and the Cell Owner in respect thereof shall be limited to the extent of the assets for the time being of the Cell and that neither the Manager nor the Cell Owner has or shall have any claim against the Company's core assets or cellular assets other than the assets of the Cell.

18.2   The Manager hereby undertakes to and covenants with the Company and each of its directors (the Company contracting as the trustee of each director for such purpose) that in the performance of its duties and exercise of its powers on behalf of the Company hereunder it shall at all times observe the provisions of the applicable Bermuda Laws and in particular in the conduct of the insurance business of the Cell and in all transactions entered into or effected by it for the account or on behalf of the Cell it shall inform and procure that all others acting on its behalf inform the persons with whom the Company transacts that the Company is a segregated account company and that for the purposes of each such transaction it shall properly identify the cell in respect of which that person is transacting and the Manager shall procure compliance with the provisions of this Clause by each of its officers, employees, agents, delegates and sub contractors and shall indemnify the Company and each of its directors on demand against any actions, proceedings, claims, accounts, costs, expenses and liabilities it or any of them may incur as a result of any breach by the Manager of this Clause.

## 19.   <u>ASSIGNMENT</u>

14

No Party shall be entitled to assign the benefit or burden of this Agreement or any interest herein without the prior written consent of the other Parties.

**20.** <u>**WAIVER**</u>

No waiver by either Party of any default by the other in the performance of or compliance with any provision, condition or requirement of this Agreement shall be deemed to be a waiver of performance of or compliance with any other provision, condition or requirement herein, nor to be a waiver of, or in any manner release such other Party from strict compliance with any provision, condition or requirement in the future nor shall any delay or omission of either Party to exercise any right hereunder in any manner impair the exercise of any such right or any like right accruing to it thereafter.

**21.** <u>**COSTS**</u>

Save as expressly provided in this Agreement, each of the Parties shall bear its own legal, accountancy and other costs charges and expenses connected with the negotiation, preparation and implementation of this Agreement and any other agreement incidental to or referred to in this Agreement.

**22.** <u>**COUNTERPARTS**</u>

This Agreement may be executed in one or more counterparts and by the Parties on separate counterparts each of which when so executed and exchanged shall be an original but which shall together constitute one and the same instrument.

**23.** <u>**FURTHER ASSURANCE**</u>

Each Party shall, from time to time at its own cost and on being required to do so by the other Party, perform or procure the performance of all such acts and/or execute or procure the execution of all such documents in a form satisfactory to the other Party to give full effect to this Agreement and to secure to the other Party the full benefit of the rights, powers and remedies conferred upon that Party by or pursuant to this Agreement.

**24.** <u>**SEVERABILITY**</u>

If any provision in this Agreement is deemed to be, or becomes invalid, illegal, void or unenforceable under applicable laws, such provision will be deemed amended to the extent (and to no greater extent than that) required to conform to applicable laws so as to be valid and enforceable, or if it cannot be so amended

without materially altering the intention of the Parties, it will be deleted, but the validity, legality and enforceability of the remaining provisions of this Agreement shall not be impaired or affected in any way.

## 25. AMENDMENT

This Agreement may be amended or modified in whole or in part at any time by an agreement in writing executed by or on behalf of the Parties.

## 26. FORCE MAJEURE

No Party to this Agreement shall be liable for any failure or delay in performing any of its obligations under or pursuant to this Agreement, and any such failure or delay in performing its obligations will not constitute a breach of this Agreement, if such failure or delay is due to any cause whatsoever outside its reasonable control and it shall be entitled to a reasonable extension of the time for performing such obligations as a result of such cause. Events outside a Party's reasonable control shall include without limitation: acts of God; any change to the law, order or regulation of a governmental, supranational or regulatory body; currency restrictions, devaluations and fluctuations; any act of terrorism; market conditions affecting the execution or settlement of transactions or the value of assets; failure or breakdown in communications not reasonably within the Party's control; and the failure of any relevant stock exchange, securities trading facility or clearing house and shall include any event or circumstance that the Party is unable, using reasonable skill and care, to avoid.

## 27. DISPUTES

In the event of any dispute, claim, question, or disagreement arising from or relating to this Agreement or the breach thereof, the Parties shall use their best efforts to settle the dispute, claim, question, or disagreement. To this effect, they shall consult and negotiate with each other in good faith and, recognising their mutual interests, attempt to reach a just and equitable solution satisfactory to both Parties.

## 28. REMEDIES

The rights, powers and remedies provided by this Agreement are cumulative and are not exclusive of any rights, powers and remedies provided by law.

## 29. ENTIRE AGREEMENT

This Agreement sets out the entire agreement and understanding between the Parties in relation to the services to be provided by the Manager to the Company. The Parties confirm that they have not entered into this Agreement on the basis of any representations that are not expressly incorporated in this Agreement. This Clause shall not exclude any liability for or remedy in respect of fraudulent misrepresentation.

## 30.  GOVERNING LAW

30.1  This Agreement shall be governed by and construed in accordance with the laws of Bermuda.

30.2  The Parties irrevocably agree for the sole benefit of the Manager that, subject as provided below, the courts of Bermuda shall have exclusive jurisdiction over any dispute or claim arising out of or in connection with this Agreement or its subject matter or formation (including non-contractual claims). Nothing in this Clause shall limit the right of the Manager to take proceedings against any other Party in any other court of competent jurisdiction, nor shall the taking of proceedings in any one or more jurisdictions preclude the taking of proceedings in any other jurisdictions, whether concurrently or not, to the extent permitted by the law of such other jurisdiction.

30.3  Each of the Cell Owner and the Company irrevocably waive (and irrevocably agrees not to raise) any objection which it may have now or hereafter to laying of the venue of any proceedings in any such court as is referred to in this Clause, any claim that any such proceedings have been brought in an inconvenient forum, and any right it may have to claim for itself or its assets immunity from suit, execution, attachment or other legal process.

## 31.  GLOBAL TRADE RESTRICTIONS

White Rock's parent ("Parent Company") is committed to complying with trade restriction laws and regulations applicable in all countries in which Parent Company operates. These laws and regulations restrict dealing with restricted countries and restricted persons. As an integral part of Parent Company, we are obliged to comply with Parent Company's Global Trade Restrictions Policy ("GTR Policy"). Our GTR Policy may change from time to time. In certain cases Parent Company's policy extends beyond strict compliance with the laws.

To ensure compliance with the GTR Policy we are required to carry out certain screening activities. Such screening may require us to share information about our clients and third parties with local regulatory authorities, our affiliates, and with third-party service providers acting on our behalf, as may be necessary to comply with applicable law and the trade restrictions screening policies of Parent Company.

You hereby agree that we may:

- conduct screening of your information to comply with Parent Company policies and applicable laws; and

- share such information gathered in the course of providing services to you (which may include personal and business data) together with other information held about you and your business with such of our affiliates, and with our third-party service providers acting on our behalf, as may be necessary to carry out such GTR screening and the Services contemplated under our Agreement with you.

If at any time, we become aware that the Services provided by Parent Company or any part thereof would or may constitute a breach of the GTR Policy or any other legal, regulatory or compliance requirement then we may disclose such information as may be necessary to local regulatory authorities, if such disclosure is requested or required by such authority(ies) or pursuant to applicable law or statute; and we are permitted to:

- perform those parts of the Services which do not constitute a breach of GTR Policy or other legal, regulatory or compliance requirement where the Services can reasonably be separated and Parent Company will not be in breach of this Agreement and will not incur any liability to you in respect of the non-performance of the remaining Services or, if this is not possible or practicable;

- not perform any of the Services, terminate the Agreement upon giving written notice to you (and we will discuss suitable transition arrangements with you) and Parent Company will not be in breach of this Agreement and will not incur any liability to you in respect of such non-performance of the Services or termination of the Agreement between us.

**AS WITNESS** whereof the Parties have caused this Agreement to be entered into the day and year first written above.

*[SIGNATURE PAGE FOLLOWS]*

18

**SIGNED** by _____

(duly authorised) for and on behalf of

**VESTTOO BAY XVII, LP.**

**SIGNED** by _____

(duly authorised) for and on behalf of

**WHITE ROCK INSURANCE (SAC) LTD.**

**SIGNED** by _____

(duly authorised) for and on behalf of

**WHITE ROCK INSURANCE (SAC) LTD.**

**SIGNED** by _____

(duly authorised) for and on behalf of

**AON INSURANCE MANAGERS (BERMUDA) LTD.**

DocuSign Envelope ID: 292DF441-5339-45F6-A57E-9F82A3C7BEB1

**SCHEDULE 1**

**Services**

I.  **Accounting Services**
- Establish and maintain proper accounting records as required by law.
- Prepare timely, error-free annual financial reports to the specification of the Cell owner including balance sheet, income statement, underwriting exhibits, and related supporting schedules.

II.  **Treasury Services**
- Maintain bank accounts in accordance with structure of the Cell.
- Handle cash disbursement and cash management functions.
- Monitor cash balances held in the bank accounts.

III.  **Regulatory Compliance Services**
- Monitor compliance with the Cell's business plan.
- Coordinate and facilitate operational and financial examinations conducted by the Bermuda Regulators.

Exhibit 4

**quinn emanuel** trial lawyers | new york

51 Madison Avenue, 22nd Floor, New York, New York 10010 | TEL (212) 849-7000 FAX (212) 849-7100

WRITER'S DIRECT DIAL NO.
**(212) 849-7150**

WRITER'S EMAIL ADDRESS
**michaelcarlinsky@quinnemanuel.com**

July 27, 2023

**<u>VIA EMAIL</u>**

Gina Parlovecchio
Mayer Brown
1221 Avenue of the Americas
New York, NY 10020-1001
gparlovecchio@mayerbrown.com

Re:     Participating Shareholder's Agreements between
White Rock Insurance (SAC) Ltd. and Vesttoo

Counsel,

We represent White Rock Insurance (SAC) Ltd. ("White Rock") regarding the obligations of Vesttoo Ltd. and its subsidiaries (collectively, "Vesttoo") under the Participating Shareholder's Agreements referenced in Schedule A (the "PSAs"). We write to provide notice of Vesttoo's breach of the PSAs. All capitalized terms used and not defined herein have the meanings provided in the PSAs.

Pursuant to Clause 5 and Schedule B of the PSAs, Vesttoo agreed to provide "the Company and/or the Segregated Account with security in a form acceptable to the Company, for the Shareholder's obligations" which was sufficient to "enable the Segregated Account to meet any and all liabilities and any and all collateral requirements arising pursuant to the terms of the [Reinsurance] Agreement."

Pursuant to Clause 4 of the PSAs, Vesttoo agreed to indemnify White Rock "to the extent the balance of the profits and losses allocated . . . less cumulative dividends paid, are less than zero at any point in time as calculated by [White Rock]." In that event, Vesttoo "agree[d] that it shall pay to [White Rock] the amount by which such balance of the profits and losses less dividends is less than zero within ten days of receiving written notice of such negative balance." Vesttoo further agreed to "indemnify the Segregated Account in the event the assets of the Segregated Account are insufficient to meet the obligations of the Segregated Account." (*See* Clause 5.)

**quinn emanuel urquhart & sullivan, llp**
ATLANTA | AUSTIN | BOSTON | BRUSSELS | CHICAGO | DOHA | HAMBURG | HONG KONG | HOUSTON | LONDON | LOS ANGELES | MANNHEIM |
MIAMI | MUNICH | NEUILLY-LA DEFENSE | NEW YORK | PARIS | PERTH | RIYADH | SALT LAKE CITY | SAN FRANCISCO | SEATTLE | SHANGHAI |
SILICON VALLEY | STUTTGART | SYDNEY | TOKYO | WASHINGTON, DC | ZURICH

In apparent satisfaction of its obligations under the PSAs, Vesttoo presented White Rock with Letters of Credit that purported to enable the PSAs' Segregated Accounts to meet any and all liabilities and any and all collateral requirements. In reliance on these Letters of Credit and Vesttoo's representations, White Rock made distributions from the Segregated Accounts to Vesttoo under clause 3 of the PSAs, totaling approximately $136.7 million. However, White Rock now understands that the banks identified in the Letters of Credit provided by Vesttoo have taken the position that the Letters of Credit are fraudulent. Indeed, Vesttoo has stated publicly that its procedures were circumvented, leading to the apparent fraud.

Vesttoo is in breach of its obligations under the PSAs, including, but not limited to, its obligation to provide Acceptable Security. White Rock demands that Vesttoo immediately return all distributions made from the Segregated Accounts and comply with its obligations under the PSAs, including (but not limited to) Clauses 3, 4 and 5 of the PSAs.

Please confirm by 5:00 pm Eastern Time on July 28, 2023 that Vesttoo will:

    (a) Return all distributions paid under the PSAs to White Rock.

    (b) Provide Acceptable Security for each Segregated Account, and

    (c) Indemnify White Rock pursuant to Clauses 4 and 5 of the PSAs.

In addition, please confirm that Vesttoo has taken all steps necessary to preserve all electronically stored information, copies and backup, as defined by Rule 34 of the Federal Rules of Civil Procedure, along with any paper files which Vesttoo maintains, relevant to these issues.

White Rock reserves all rights.


Sincerely,


Michael Carlinsky

**Schedule A**

1.    Participating Shareholder's Agreement for Segregated Account – T93 Vesttoo dated December 7, 2021

2.    Participating Shareholder's Agreement for Segregated Account T94 – Clear Blue dated December 29, 2021

3.    Participating Shareholder's Agreement for Segregated Account T95 – Beazley dated December 29, 2021

4.    Participating Shareholder's Agreement for Segregated Account T96 – Homeowners dated December 29, 2021

5.    Participating Shareholder's Agreement for Segregated Account – T100 Vesttoo dated March 4, 2022

6.    Participating Shareholder's Agreement for Segregated Account – T101 – iM3NY dated April 11, 2022

7.    Participating Shareholder's Agreement for Segregated Account T102 – At Bay dated June 1, 2022

8.    Participating Shareholder's Agreement for Segregated Account T105 – Convex dated June 30, 2022

9.    Participating Shareholder's Agreement for Segregated Account T107 – United Auto dated June 30, 2022

10.   Participating Shareholder's Agreement for Segregated Account T108 – Chaucer dated January 1, 2022

11.   Participating Shareholder's Agreement for Segregated Account T111 – SiriusPoint dated June 30, 2022

12.   Participating Shareholder's Agreement for Segregated Account T113 – Avant dated December 1, 2022

13.   Participating Shareholder's Agreement for Segregated Account T115 – Leia dated September 13, 2022

14.   Participating Shareholder's Agreement for Segregated Account T119 – Hyperice dated December 22, 2022

15.   Participating Shareholder's Agreement for Segregated Account T121 – Coherent Logix dated December 22, 2022

16.   Participating Shareholder's Agreement for Segregated Account T122- Skyward dated March 15, 2023

17.   Participating Shareholder's Agreement for Segregated Account T125 – Allianz Cyber dated February 8, 2023

18.   Participating Shareholder's Agreement for Segregated Account T126 – Beazley Cyber dated February 8, 2023

19.     Participating Shareholder's Agreement for Segregated Account T127 – Flux Syndicate dated February 8, 2023

20.     Participating Shareholder's Agreement for Segregated Account T131 – Soundhound dated March 29, 2023

21.     Participating Shareholder's Agreement for Segregated Account 135 – Clear Blue IP dated June 30, 2023

Exhibit 5

Mayer Brown LLP
1221 Avenue of the Americas
New York, NY 10020-1001
United States of America

T: +1 212 506 2500
F: +1 212 262 1910

mayerbrown.com

# MAYER | BROWN

**Gina M. Parlovecchio**
Partner
T: +1 (212) 506-2522
gparlovecchio@mayerbrown.com

July 28, 2023

BY EMAIL

Michael Carlinsky
Partner
Quinn Emanuel
51 Madison Avenue, 22nd Floor
New York, NY 10010

Re:     Participating Shareholder's Agreements between
        White Rock Insurance (SAC) Ltd. and Vesttoo

Dear Mr. Carlinsky:

We are in receipt of your July 27, 2023 Letter regarding the Participating Shareholder's Agreements between White Rock Insurance (SAC) Ltd. and Vesttoo, and purportedly invalid letters of credit.

Vesttoo is taking this matter very seriously. While there is still much that is unknown at this stage, the company is doing all it can to determine how and where the fraudulent letters of credit originated.

The Company is conducting a rigorous internal and external analysis of the events leading up to the first report of a fraudulent letter of credit. That process includes the engagement of an experienced investigations team. The Company will use the results of that analysis to take appropriate measures.  The Company is committed to understanding what happened.

In the meantime, Vesttoo is in the process of communicating with impacted parties – including investors, banks and cedents – and actively working with those who have been affected on potential solutions. The most important thing to Vesttoo right now is finding solutions for affected clients. We are pouring all of our energy into supporting the search for replacement of any collateral that has been impacted.

We will provide a further response to your inquiry in due course.

Mayer Brown is a global services provider comprising an association of legal practices that are separate entities including
Mayer Brown LLP (Illinois, USA), Mayer Brown International LLP (England & Wales), Mayer Brown (a Hong Kong partnership)
and Tauil & Chequer Advogados (a Brazilian law partnership).

Michael Carlinsky
July 28, 2023
Page 2

Sincerely,


**/s/ *Gina M. Parlovecchio***

Gina M. Parlovecchio
Partner

cc:    Jessica A. Masella, DLA Piper (jessica.masella@us.dlapiper.com)
       John M. Hillebrecht, DLA Piper (john.hillebrecht@us.dlapiper.com)
       Caryn G. Schechtman, DLA Piper (caryn.schechtman@us.dlapiper.com)