**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| VESTTOO LTD., *et al.*[1] | Case No. 23-11160 (MFW) |
| Debtors. | (Joint Administration Requested) |
| | **Re: D.I. 15** |

**DECLARATION OF JOHN WASTY**
**IN SUPPORT OF MOTION FOR AN ORDER ENFORCING**
**THE AUTOMATIC STAY AGAINST**
**(I) WHITE ROCK INSURANCE (SAC) LTD. AND**
**(II) THE PUTATIVE JOINT PROVISIONAL LIQUIDATORS**
**OF THE DEBTORS' SEGREGATED ACCOUNTS**

I, John Wasty, hereby declare under penalty of perjury that the following is true and correct:

1.      I am a partner in the Dispute Resolution department of Appleby (Bermuda) Limited ("Appleby") in Hamilton, Bermuda.  Appleby is part of the Appleby Global international full-service law firm with ten offices in offshore jurisdictions and Asia Pacific financial centers.  I lead our Bermuda Insolvency & Restructuring and Dispute Resolution teams, and the Insurance and Reinsurance Disputes practice globally.  I have a Juris Doctor from the University of British Columbia and a Master of Laws from Osgoode Hall.  I have been called to the bar in British Columbia (1989), Hong Kong (2002), and Bermuda (2008), admitted to the practice of law in New York (2010), and have been admitted as a solicitor in England and Wales (1992) and the Eastern Caribbean Supreme Court (British Virgin Islands) (2012).

2.      I have provided expert testimony on Bermuda commercial law disputes before courts in several jurisdictions, including New York, Ontario, and Singapore.  I have been recognized by Chambers Global (Band 1, 2009-2022), and have been repeatedly recommended by Legal 500 Caribbean and the Practical Law Company's Which Lawyer Guide as a leading commercial litigator, and insurance/reinsurance specialist.  I am also a Fellow of the Chartered Institute of Arbitrators.

3.      I specialize in commercial litigation, restructuring, insolvency litigation, funds litigation, regulatory, and insurance and reinsurance matters.  I have advised on various complex multi-jurisdictional restructurings, including Bermuda provisional liquidations accompanying Chapter 11 proceedings in the United States.  I have also been frequently involved in major international and local commercial disputes regarding shareholders and joint ventures, funds and fund managers, mergers and acquisitions, financial institutions, and regulatory proceedings.

---

[1]      Due to the large number of debtor entities in these chapter 11 cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent at https://dm.epiq11.com/vesttoo.

4.      I make this Declaration in support of the motion of Vesttoo Ltd for an order enforcing the automatic stay against (i) White Rock Insurance (SAC) Ltd (**White Rock**) and (ii) the putative joint provisional liquidators of the Debtors' segregated Accounts.

5.      I have been asked to provide legal context for the US bankruptcy court to assess recent developments in Bermuda court proceedings that appear to impact Vesttoo Ltd, the Debtor in a US Chapter 11 proceeding. On their face, these developments in the Bermuda court are difficult to reconcile with relevant Bermuda law principles. I have not had sight of the filings that led to the Bermuda court's action or the order that the Bermuda court made. I have however seen a press release relating to these developments published by the Bermuda Monetary Authority on 18 August 2023.

6.      White Rock is a Bermuda segregated account company. Vesttoo Ltd is the owner of segregated accounts within White Rock Insurance (SAC) Ltd. On 18 August 2023, I understand that White Rock and the Authority obtained an order appointing provisional liquidators over White Rock with particular reference segregated accounts owned by Vesttoo Ltd. In this declaration, I describe the nature of segregated accounts companies and what is meant by *ownership* of a segregated account. I then go on to describe the liquidation regime in Bermuda, the grounds for appointment of provisional liquidators and modifications to the liquidation regime in the case of (i) insurance companies and (ii) segregated account companies (White Rock is both). I conclude by discussing the legal principles relevant to certain questions that have arisen following the appointment of provisional liquidators over White Rock on 18 August 2023.

## An overview of the Segregated Accounts Companies Act 2000

7.      A segregated accounts company (**SAC**) is able to hold certain assets and liabilities in a separate accounts firewalled from the assets and liabilities of the SAC itself (the SAC's own account is usually referred to as the "general account") and the assets belonging to its other segregated accounts. Segregated accounts are sometimes referred to as "cells".

8.      In order for a company to achieve legal separation of its general account and its segregated account(s) it must be registered as an SAC with the Registrar of Companies (**ROC**) in Bermuda and comply with all relevant laws and regulations governing the operation of an SAC.

9.      SACs are commonly used in the insurance sector. SACs will often be licensed and registered insurance entities under the Insurance Act 1978 and thus regulated by the Bermuda regulator for insurance purposes, the Authority. In this matter I understand that White Rock was registered by the Authority as (i) a Class 3 insurer (effective 8th May 2000) and a Class C insurer (effective 15th August 2012) under the Insurance Act.

10.     The SAC Act is the principal legislation governing SACs. There are handful of Bermuda authorities considering the operation of the SAC Act. I refer to the following authorities in this declaration:

(a)    *UBS Fund Services (Cayman) Ltd & Tensor Endowment Limited v New Stream Capital Fund Limited* [2009] Bda LR 74, Bermuda Supreme Court, decision of Kawaley J (as he then was);

(b)    *BNY Ais Nominees Ltd et Al v New Stream Capital Fund Ltd*, May 2010, Bermuda Supreme Court, decision of Kawaley J (as he then was);

(c)    *Ivanishvili & Ors v Credit Suisse Life (Bermuda) Limited* [2022] SC (Bda) 56 Civ, Bermuda Supreme Court, decision of Hargun CJ; and

(d)    *In the Matter of Northstar Financial Services (Bermuda) Limited* [2023] SC (Bda) 57 Civ, Bermuda Supreme Court, decision of Hargun CJ.

Relationship between the SAC and its segregated accounts

11.    The assets linked to a segregated account are available only to meet liabilities to the account owners and creditors of that segregated account. They are not available, and may not be used, to meet the liabilities of the SAC itself. Accordingly, the assets of the general account of the SAC shall only be available to meet the liabilities of the SAC's general account that are not linked to a segregated account.

12.    The SAC Act therefore enables the statutory segregation of accounts within a single company that would otherwise require the incorporation of separate companies with all of the associated expense and potential licensing and registration requirements, or the creation of trusts.

13.    A segregated account is not a separate legal entity from the SAC itself. However, the effect of the SAC Act is to confer some of the attributes of separate legal personality on a segregated account. The separation of assets means that liabilities arising from a transaction or matter related to a particular segregated account may only be satisfied out of the assets linked to that segregated account. Creditors of that segregated account are only entitled to have recourse to the assets linked to that account and not other segregated accounts or the general account of the SAC. The property in each segregated account can be subject to orders of the Bermuda Supreme Court as if the segregated account were a legal person.

14.    This is set out in the SAC Act at section 17:

> **"Nature of segregated accounts, application of assets and liabilities**
>
> *(1) Notwithstanding any other provision of this Act, the establishment of a segregated account does not create a legal person distinct from the segregated accounts company.*
>
> *(2) Notwithstanding any enactment or rule of law to the contrary, but subject to this Act, any liability linked to a segregated account shall be a liability only of that account and not the liability of any other account and the rights of creditors in respect of such liabilities shall be rights only in respect of the relevant account and not of any other account.*

*(2A) For the purposes of subsection (2) and for the avoidance of doubt, any asset which is linked by a segregated accounts company to a segregated account—*

> *(a) shall be held by the segregated accounts company as a separate fund which is —*
>
> > *(i) not part of the general account and shall be held exclusively for the benefit of the account owners of the segregated account and any counterparty to a transaction linked to that segregated account; and*
> >
> > *(ii) available only to meet liabilities to the account owners and creditors of that segregated account; and*
>
> *(b) shall not be available or used to meet liabilities to, and shall be absolutely and for all purposes protected from, the general shareholders or general interest holders and from the creditors of the company who are not creditors with claims linked to segregated accounts.*"

15.     The SAC Act defines what it means for an asset/liability to be linked to a segregated account:

> ""*linked" means referable by means of—*
>
> > *(a) an instrument in writing including a governing instrument or contract;*
> >
> > *(b) an entry or other notation made in respect of a transaction in the records of a segregated accounts company; or*
> >
> > *(c) an unwritten but conclusive indication, which identifies an asset, right, contribution, liability or obligation as belonging or pertaining to a segregated account.*"

16.     The Court accepted in *Northstar* that:

> "*the touchstone for linkage is the identification of an asset or liability with a given segregated account (by writing or conclusive indication) rather than on the segregation of funds (for example by the maintenance of separate bank or securities account).*" [pa. 34, *Northstar*; see also pa. 63-64]

17.     Hargun CJ held in *Ivanishvili* that "*Section 17 is fundamental to the scheme and operation of segregated account companies*". He went on to set out the relevant text from the Explanatory Memorandum which accompanied the original Segregated Accounts Companies Bill in 2000:

> "*[Section 17 is] the crux of the Bill and sets out the operative law that effects the separation of accounts. The assets of the segregated account are held exclusively for the benefit of the beneficial owner or counterparty and can only be applied to the*

*liabilities of the account and a statutory "firewall" insulates those assets from the claims of other creditors."* [pa. 29, *Ivanishvili*]

18.     In *BNY* Kawaley J (as he then was) also emphasised the importance of the provisions at section 17:

> *"Section 17 contains the umbrella provision which requires each segregated account to have a separate fund of assets and liabilities, which assets are only available to the account owners and counterparties to transactions with such account."* [p. 80, *BNY*]

19.     The importance of the separation of the assets and liabilities belonging to each segregated account was stressed in *Ivanishvili*:

> *"A fundamental feature of a segregated accounts company is that assets linked to the segregated account may only be used to discharge liabilities which are linked to that segregated account… The requirement of an asset or liability being linked to the segregated account is central to the concept and functioning of a segregated accounts company".* [pa. 24-25, *Ivanishvili*]

20.     The Bermuda court in *BNY* described the segregated account as akin to "*a company within a company*" (the effect of section 17(1) is that a segregated account is not a separate legal entity). [p. 81, *BNY*]

**Ownership of a segregated account**

21.     The "account owners" of segregated accounts are the entities or individuals as defined under the SAC Act:

> *""account owner" in relation to a segregated account means any person who is—*
>
> > *(a) the registered holder of shares or any LLC interests which are—*
> >
> > > *(i) issued by the segregated accounts company, and*
> > >
> > > *(ii) linked to that segregated account;*
> >
> > *(b) expressly identified in the governing instrument linked to a segregated account as being an account owner for the purposes of this Act in respect of that segregated account; or*
> >
> > *(c) expressly designated in the records of the segregated accounts company as being an account owner in respect of that segregated account;*
>
> *and the interests of an account owner in any of the foregoing capacities in relation to any segregated account are referred to in this Act as "account holdings""*

22.    Various Vesttoo entities are the account owners in respect of segregated accounts held by White Rock.

23.    The SAC Act provides that the governing instrument of the segregated account shall set out the interests of the account owner:

> "***Governing instruments and contracts***
>
> *11(1) The rights, interests and obligations of account owners in a segregated account shall be evidenced in a governing instrument and the rights, interests and obligations of counterparties shall be evidenced in the form of contracts.*
>
> *(2) The governing instrument in relation to any segregated account shall be deemed to be governed by the laws of Bermuda and the parties thereto shall be deemed to submit to the jurisdiction of the courts of Bermuda and, in relation to such governing instrument—*
>
>> *(a) a person shall become an account owner and shall become bound by the governing instrument if such person complies with the conditions, if any, for becoming an account owner as set out in the governing instrument;*
>>
>> *(b) an account owner shall take such interest in a segregated account as may be stipulated in respect of him in accordance with the terms of the governing instrument and, absent such stipulation or other compelling indication (in the discretion of the directors or LLC managers, as the case may be, of the company, exercised reasonably), the extent of the interest of such account owner shall be nil;*
>>
>> *(c) if no other provision for management is specified in the governing instrument, the segregated accounts company shall manage the segregated account and may—*
>>
>>> *(i) appoint and supervise the officers, managers, employees and other persons who have management of the segregated account; and*
>>>
>>> *(ii) enter into financial arrangements for payment for services including the charging of fees, disbursements and other charges which the manager shall be authorized to withdraw from the segregated account;*
>>
>> *(d) unless otherwise provided in the governing instrument, the segregated accounts company may take any action, including—*
>>
>>> *(i) the amendment of the governing instrument;*
>>>
>>> *(ii) the appointment of one or more managers;*

> (iii) for the benefit of the segregated account only, the sale, lease, exchange, transfer, pledge or other disposition of all or any part of the assets of the segregated account, or the orderly winding-up of the affairs and termination of the segregated account,

> or may provide for the taking of any action to create under the provisions of the governing instrument a class, group or series of account holdings that was not previously outstanding, without the vote or approval of any particular manager or account owner, or class, group or series of managers or account owners;"

24.     "Governing instrument" is defined in the SAC Act as follows:

> ""*governing instrument*" means one or more written agreements (including LLC agreements), instruments, bye-laws, prospectuses, resolutions of directors or managers of a limited liability company, registers or other documents (including electronic records), setting out the rights, obligations and interests of account owners in respect of a segregated account"

25.     The SAC Act provides that the assets in the segregated accounts are deemed to be owned by the SAC and the SAC can act on behalf of or be sued in respect of its segregated accounts—

> "***Rights and obligations with respect to segregated accounts***

> *18(1) Notwithstanding any enactment or rule of law to the contrary, any asset of a segregated accounts company which is linked to a particular segregated account is deemed to be owned by the company as a separate fund which does not form part of the general account.*

> *(2) [Repealed]*

> *(3) To the extent provided in the governing instrument any person (including an account owner) may give directions to the segregated accounts company or other persons in the management of the segregated account and the managers shall have regard to such directions.*

> *(4) Except to the extent otherwise provided in the governing instrument but subject to subsection (7)(b), neither the power to give directions to the segregated accounts company or other persons nor the exercise thereof by any person (including an account owner) shall cause the person giving directions to be a trustee or officer of the company.*

> *(5) Except to the extent otherwise provided in the governing instrument, the account owners are entitled to the same limitation of personal liability as is enjoyed by members of companies limited by shares under section 158(d) of the Companies Act 1981 and by members of limited liability companies under section 105(c) of the Limited Liability Company Act 2016.*

*(6) [Repealed]*

*(7) A segregated accounts company may—*

> *(a) sue and be sued in respect of a particular segregated account, and service of process upon the company in accordance with subsection (9) shall be sufficient;*

> *(b) be sued for debts and other obligations or liabilities contracted or incurred by the company in respect of a particular segregated account, and for any damages to persons or property resulting from the negligence of the company acting in the performance of duties with respect to that account;*

> *(c) exercise the same rights of set-off (if any) as between accounts as apply under the general law in respect of companies, including, on an insolvent liquidation of the company, the same rights of set-off which arise in an insolvent liquidation of a company.*

*(8) The property of a segregated account is subject to orders of the court as it would have been if the segregated account were a separate legal person (and notwithstanding that it is not a separate legal person).*"

26.     An account owner's interest in a segregated account is beneficial in nature, although the SAC Act leaves open the possibility that an account owner might contract out of such beneficial interest:

> "*18(10) Except to the extent it may be agreed otherwise by virtue of the governing instrument or contract, as the case may be, an account owner of a segregated account and any counterparty who is a creditor in respect of a transaction linked to that segregated account shall have an undivided beneficial interest in the assets linked to a segregated account, and, after satisfying in full the claims of creditors of the segregated account, account owners shall share in the profits and losses of the segregated account in such proportions of the residual undivided beneficial interest in the segregated account owned by that account owner as may be specified in any governing instrument relating to such segregated account.*"

27.     The SAC therefore legally owns the assets in the segregated account but the account owners would generally (subject to the terms of the governing instrument) be the beneficial owners of those assets.

28.     By way of illustration, in *UBS & Tensor* an application for receivership over a segregated account linked to a particular investment fund share class was issued by its account owners. The Court described those account owners as "*beneficially own[ing]*" the shares in the segregated account.

29.     In *BNY* the Court considered in some detail the effect of section 18(10) (where an account owner had not contracted out of the provisions thereof):

> *"[A]ccount owners are entitled to expect that subject to satisfying the claims of creditors of the account, they are beneficially interested in all of the assets in the account. The legal connection between the account owner and the assets of the segregated account is therefore ordinarily far closer than the nexus between a shareholder and the assets of an ordinary company. Under the famous principle in Saloman v Saloman, a shareholder has no beneficial interest in the assets of a limited company."* [p. 86, *BNY*]

30.     Section 18(11) of the SAC Act, provides an account owner's beneficial interest in a segregated account is personal property. Under section 18(13), and subject to the governing instrument, an account owner's beneficial interest in the segregated account is freely transferable. However, unless provided for in the governing instrument, section 18(12) of the SAC Act states that an account owner of a segregated account does not have an interest in specific segregated account property:

> *"(11) An account owner's or counterparty's beneficial interest in a segregated account is personal property notwithstanding the nature of the property of the segregated account.*
>
> *(12) Except to the extent it may be agreed otherwise by virtue of the governing instrument or contract, as the case may be, an account owner or counterparty has no interest in specific segregated account property.*
>
> *(13) Except to the extent it may be agreed otherwise by virtue of the governing instrument or contract, as the case may be, but subject to the provisions of the Exchange Control Act 1972, an account owner's or counterparty's beneficial interest in the segregated account is freely transferable."*

**Bermuda Liquidations**

The Bermuda Liquidation Regime Generally

31.     Companies, in Bermuda, are statutory creations each with an independent legal personality. The entire life-cycle of a company, including its relationship with regulators, is dependent on the statutes governing its existence. In Bermuda, the principal source of company law is the Companies Act 1981 (**the 1981 Act**)

32.     A company ceases to exist as a legal entity once dissolved. Dissolution marks the point at which all of a company's business has been concluded and the company is no longer considered to be a legal entity. A company may be dissolved through inactivity but will generally undergo a formal process to prepare for its dissolution.

33.     That formal process is called *winding-up* or *liquidation:* the terms are interchangeable. Liquidation is a process governed by statute. The legislation governing the process of liquidation is

extensive and reflects the community interest in the process by which a company's activity is ended. Part XIII of the 1981 Act and the Companies (Winding-Up) Rules 1982 (**the 1982 Rules**) contain the bulk of Bermuda's legislation governing the liquidation of companies.

34.    A liquidator is appointed at the beginning of a liquidation. A liquidator is charged with collecting and realising a company's assets and applying the proceeds in discharging all its debts and liabilities. Shareholders can only be paid after all of the company's debts and liabilities have been paid in full.

35.    Liquidation is a process for the collective benefit of creditors. Once a company enters liquidation, creditors can no longer take action to enforce any debts owed. Each creditor's right to sue for a debt that they are owed is substituted for a right to participate in the statutory fund to be gathered and distributed by the liquidator. Each creditor will receive a share of the assets gathered by the liquidator in accordance with the statutory order of priorities.

36.    The liquidation process is compulsory. A company cannot agree with its creditors that it will not be subject to these provisions of the Bermuda company law regime. A company may have granted security to certain creditors, and that security will improve secured creditors' positions if the security is valid as a matter of Bermuda law. Generally, however, the prevailing principle of insolvency law is that assets of a company in liquidation will be paid to creditors of equal rank in equal proportions between themselves. This prevailing principle is referred to as the *pari passu* principle, from the Latin for *with equal step*. If two creditors have equal rights against the company, they must share equally in the company's assets during liquidation.

37.    If, in anticipation of the company's liquidation, the company has demonstrated a preference by paying one creditor to the disadvantage of another creditor, the Court will set aside that transaction in liquidation and the preferred creditor will be liable to repay the liquidator for the benefit of the creditors generally.

38.    A liquidator's principal duty is therefore to the creditors of the company in liquidation. Mrs Justice Subair Williams in the Bermuda Supreme Court, said that liquidators are—

> *"expected to consistently be guided by and act in accordance with the golden rule that the collective body of the unsecured creditors shall always be given priority and the greatest advantage…"[2]*

39.    As any person, whether an individual or a legal entity, may become a creditor of a company, liquidation has been described as a public act or process in which the public has an interest[3]. A liquidation is not a private process: the protection of creditors requires that the wider public is made aware of the liquidation.

40.    The conduct of all modes of liquidation reflect the public nature of the process. The public engagement required depends on the exact mode of liquidation.

---

[2] at [158] of *Re FDG Electric Vehicles Ltd* [2020] Bda LR 39

[3] *Per* Lord Scott at [32] of *Gamlestaden Fastigheter AB v Baltic Partners Ltd and others* [2007] Bus LR 1571: a decision of the Judicial Committee of the Privy Council (Bermuda's ultimate appeal court) on appeal from the Court of Appeal of the Bailiwick of Jersey.

Modes of Liquidation

41.    There are three principal modes of liquidation in Bermuda—

(a)    members' voluntary liquidation (**MVL**);

(b)    creditors' voluntary liquidation (**CVL**); and

(c)    compulsory winding-up.

42.    Each of these modes of liquidation is available in different circumstances and has different procedures that must be followed to commence the liquidation.

Members' Voluntary Liquidation

43.    An MVL is commenced by shareholders. It is only available where the majority of a company's directors have made a solemn declaration that the company is solvent[4]. The shareholders, voting together in a general meeting, must vote to approve the liquidation of the company and the appointment of a liquidator. If this vote passes at the general meeting, the company is in liquidation.

44.    A liquidator in an MVL must advertise their appointment in the Royal Gazette, Bermuda's daily newspaper of record. This serves as a notice to the public that the company has entered liquidation and will be wound up. A liquidator must also advertise a final meeting of the company at the end of the liquidation. These advertisements serve to protect the public and prevent a company conducting a liquidation in secret to the detriment of the public and, in particular, creditors.

45.    If the shareholders purport to commence an MVL without the directors having made a declaration of the company's solvency, or if the liquidator concludes that the company is not, in fact, solvent, the MVL will be converted into a CVL.

Creditors' Voluntary Liquidation

46.    A CVL begins in the same manner as an MVL - a vote of the shareholders, - however, the core feature of an MVL is solvency; the core feature of an CVL is insolvency.

47.    A CVL generally commences with a vote of the shareholders approving the liquidation of the company. On the same day, or at latest the day after, the meeting at which it is proposed the shareholders will vote to approve the liquidation, the company must call a meeting of its creditors to follow the meeting of the shareholders. The creditors' meeting must be advertised in the Royal Gazette at least twice before it takes place.

48.    If the CVL commences by conversion from MVL, it will be the duty of the liquidator to call the meeting of creditors.

49.    The creditors then have the opportunity to appoint a liquidator of their choosing at the meeting. The creditors may also appoint a committee of inspection, who will be responsible for

---

[4] i.e. that the company will be able to pay all of its liabilities within 12 months of entering liquidation.

authorising certain activities of the liquidator. The liquidator must call a meeting of creditors at the end of every year that the company is in CVL and must also advertise a final meeting of the company and creditors at the end of the liquidation.

50.     A CVL is perhaps the least common of the three modes of liquidation in Bermuda as, in the case of an insolvent company, before shareholders vote to approve a liquidation, creditors will often pursue the final mode of the liquidation: compulsory winding-up.

Compulsory winding-up

51.     As explained above, the key distinction between the two forms of voluntary liquidation: MVL and CVL, is solvency. The key distinction between voluntary liquidation and compulsory winding-up, is that the latter is compulsory. Voluntary liquidation means that the shareholders have voluntarily approved the liquidation of the company. Compulsory winding-up is a process that is imposed on the company by order of the Bermuda Supreme Court (**the Court**).[5]

52.     An order for compulsory winding-up is sought by a person who applies to the Court for a company to be wound-up (**the Petitioner**). The Petitioner is so called because the compulsory winding-up of a company is commenced by filing a petition with the Court setting out the basis on which the Petitioner is asking the Court to make an order winding up a company (**a Winding-Up Order**).

53.     A Petitioner must generally[6] be—

        (a)     the company itself,

        (b)     a creditor (including a contingent or prospective creditor), or

        (c)     a shareholder[7].

54.     There are special situations where a person other than those listed above may seek an order for compulsory winding-up, which I discuss further below.

55.     The Court cannot make a Winding-Up Order unless the Petitioner proves to the Court that it has the jurisdiction to do so. The Court does not have the jurisdiction to do so unless a specific statutory ground is established. Under the 1981 Act[8] the grounds for compulsory winding up are—

        (a)     the shareholders have voted to approve a liquidation;

        (b)     the company has committed breaches of company law by failing to hold required meetings, failing to place its financial statements before required meetings,

---

[5] The Bermuda Supreme Court is the court of first instance for cases involving liquidations. Very rarely, an appeal court in Bermuda (the Court of Appeal or the Privy Council) may wind up a company following an appeal but the vast majority of orders for compulsory winding-up are made by the Supreme Court.

[6] Section 163, 1981 Act

[7] The legislation refers to a shareholder as a *contributory* in the context of a liquidation.

[8] Section 161, 1981 Act

materially misstating the position when obtaining various consents under the 1981 Act or taking part in restricted or prohibited business activities;

(c)     the company is not carrying on any business;

(d)     the company is unable to pay its debts; or

(e)     the Court forms the opinion that it is just and equitable that the company should be wound up.

56.     The Petition must state the basis on which a Winding-Up Order is sought. The Petition must be filed with the Court (sometimes referred to as 'presentation of the Petition'). The Court will then *issue* the Petition by returning it to the Petitioner with the date of the first hearing of the Petition marked upon the face of the Petition[9]. The Petitioner is then obliged to advertise the first hearing of the Petition in the Royal Gazette.[10]

57.     At the first hearing of the petition, any person who gives notice to the Petitioner that they intend to appear, may appear and be heard[11], subject to only limited exceptions.

58.     The general rule is that any hearing of the Petition will take place in open court, i.e. any member of the public may attend to observe the proceedings.[12]

59.     If the Court forms the view that it has jurisdiction to make a Winding-Up Order, it will then go on to consider whether it *should* exercise its discretion to make a Winding-Up Order.

Effect of Order

60.     The effect of a Winding-Up Order is that the company shall immediately enter liquidation.

61.     The Petitioner or any other interested party may nominate a liquidator who has consented to act in the liquidation of the company. If no liquidator is nominated, the Court may appoint the Official Receiver[13] to act as liquidator.

62.     The Winding-Up Order will not, however, generally lead to the immediate appointment of a liquidator. The Court will instead appoint a *provisional liquidator* in most cases, pending the approval of the liquidator as permanent liquidator by the creditors, as described below.

63.     The Court generally appoints a *provisional liquidator*, as the decision on the identity of the permanent liquidator is one that should be made by creditors. The Winding-Up Order therefore appoints a liquidator on a provisional basis until that person is confirmed (or rejected as the case may be) by the Creditors and the Court makes a further order confirming the identity of the liquidator who will have conduct of the rest of the Compulsory Winding-Up.

---

[9] Rule 18, 1982 Rules

[10] Rule 19, 1982 Rules

[11] Rule 25, 1982 Rules

[12] Rule 4, 1982 Rules

[13] An official appointed by the Bermuda Government.

64.      Notwithstanding that, initially, the Winding-Up Order is only for a provisional liquidator, a provisional liquidator appointed under these circumstances will generally be given all the powers of a liquidator to manage the company, take possession of its assets, and investigate its affairs.

65.      As discussed in the following sections, there are two further situations in which the Court can appoint a provisional liquidator and the powers of the provisional liquidators in these situations vary.

Provisional Liquidation

66.      The power to appoint provisional liquidators is conferred by section 170(2) of the 1981 Act, which provides that—

> *"The Court may on the presentation of a winding-up petition or at any time thereafter and before the first appointment of a liquidator appoint a provisional liquidator who may be the Official Receiver or any other fit person."*

67.      There is also a companion provision in the 1982 Rules at rule 23(1) of which provides that—

> *"After the presentation of a petition for the winding-up of a company by the Court, upon the application of a creditor, or of a contributory, or of the company, and upon proof by affidavit of sufficient ground for the appointment of a provisional liquidator, the Court, if it thinks fit and upon such terms as in the opinion of the Court shall be just and necessary, may make the appointment."*

68.      The Court's practice is to appoint a provisional liquidator—

(a)      where a Petitioner has persuaded the Court that a Winding-Up Order should be made at the hearing of the Petition (with full-powers);

(b)      on a *light-touch* basis, in support of a restructuring (with limited powers); or

(c)      before the hearing of the petition, on an urgent, *ex parte* basis (generally with full-powers).

69.      I have described the first case, where a provisional liquidator is appointed on the making of a Winding-Up Order above at paragraphs 60 to 62. I will now discuss the second and third cases and their distinct features.

Light Touch Provisional Liquidation

70.      The appointment of a provisional liquidator on a light-touch basis (**a Light Touch PL**) is generally in support of restructuring efforts. Bermuda has no statutory restructuring or rescue procedure for insolvent companies. The Courts have therefore developed the practice of appointing an Light Touch PL on the Company's petition where a company needs to embark upon a restructuring, requires protection from its creditors (the appointment of an Light Touch PL stays civil proceedings against a company) and requires supervision by the Court and an officer of the Court (the Light Touch PL).

71.     An application for the appointment of a Light Touch PL is made by filing a petition for the Compulsory Winding-Up of a company and, simultaneously or subsequently, filing a summons for the appointment of a Light Touch PL.

72.     A Light Touch PL's powers will be tailored to the specific situation. Commonly, the role involves the supervision of the company's restructuring and liaison between creditors and management.

73.     Further powers can be granted to a Light Touch PL to meet the circumstances of the company but the general aim is to facilitate a consensual resolution between a company and its creditors.

Urgent _Ex Parte_ Provisional Liquidation

74.     The appointment of a provisional liquidator of a company on an urgent, _ex parte_ basis is reserved for cases where there is a suggestion of serious impropriety.

75.     An application for the appointment of a provisional liquidator on an urgent, _ex parte_ basis (**an Ex Parte PL**) is made by filing a petition for the Compulsory Winding-Up of a company and, simultaneously, filing an _ex parte_ summons, supported by an affidavit, for the appointment of an Ex Parte PL before the Petition is heard. The Petition will generally not be advertised until after the _ex parte_ hearing.

76.     The appointment of an Ex Parte PL immediately displaces and disempowers the management of the company and an Ex Parte PL has an immediate right to take possession of the property of the company. The power of the Court to appoint an Ex Parte PL has been described as the 'nuclear weapon of the Companies Court'[14] for good reason: it will more often than not cause a trading company to cease trading. The Court will only appoint an Ex Parte PL if such an appointment seems likely to cause the least irremediable prejudice to the relevant parties.

77.     The Court therefore generally limits such appointments to cases where—

    (a)    there are real questions at to the integrity of the company's management or quality of the company's accounts and record-keeping;

    (b)    there is a risk of dissipation of assets;

    (c)    there is a risk of destruction of records; or

    (d)    urgent inquiries into the conduct of the company's affairs are required.[15]

78.     Although the hearing is _ex parte_, this does not mean that other interested parties should not be notified of the hearing or that the hearing must take place in private. The presumption is the opposite: _ex parte_ applications should be on notice to interested parties and held in public.

---

[14] in re a Company 7070 of 1996

[15] _Re SED Essex Ltd_ [2013] EWHC 1583

79.    The Court has held that *ex parte* applications must be on notice unless the viability of the application depends on it being kept secret from other parties.[16]

80.    Equally, an *ex parte* hearing should be conducted in public unless secrecy is essential. *Ex parte* hearings are often heard *in chambers*. A hearing *in chambers* is often, by convention, held in private. These hearings may be of a purely administrative nature or may be a type of hearing that are held in private by convention, e.g. an application for ancillary relief in divorce proceedings or proceedings relating to the custody, care and control of children.

81.    Whether or not a hearing is held in chambers, the principle of public justice must prevail. The Constitution of Bermuda, at section 6, creates a statutory presumption that all civil proceedings in court shall be held in public. The Court has held that the principle of public justice is so important that, "*any departure from it must be to the extent and no more than the extent than the court reasonably believes to be necessary in order to serve the ends of justice*"[17].

82.    Whether or not an *ex parte* hearing is attended by any other parties, the fact that it is an *ex parte* hearing means that the Petitioner must give full and frank disclosure to the Court. The Petitioner must give the Court disclosure of all material facts. Any non-disclosure will generally result in any order made being set aside. The duty of full and frank disclosure applies to facts that are known, or should have been known, to the Petitioner.

83.    Full and frank disclosure arises because the court must be able to rely on the party who appears alone to present the evidence and argument in a way which is not merely designed to promote its own interests, but in a fair and even-handed manner, drawing attention to evidence and arguments which it can reasonably anticipate the absent party would wish to make. In a complex case with a large volume of documents, it is not enough that disclosure is made in some part of the material, even if amongst that which the judge is invited to read, if that aspect of evidence and its significance is obscured by an unfair summary or presentation of the case. It is the duty of the legal team to ensure that the lay client is made aware of the duty of full and frank disclosure and what it means in practice for the purposes of the application in question; and to exercise a degree of supervision in ensuring that the duty is discharged.

<u>Pre-Requisites for the Appointment of a Provisional Liquidator in All Cases</u>

84.    Whether a provisional liquidator is appointed on the making of a Winding-Up Order, on a light-touch basis or an urgent, *ex parte* basis, there is one jurisdictional pre-requisite: there must be a good *prima facie* case that, if a petition for the company's winding-up were to proceed, a Winding-Up Order would be made.

85.    If this test is not met, the Court lacks the necessary statutory jurisdiction to make an order appointing any provisional liquidator.

86.    In *Re CTRACK Ltd* [1994] Bda LR 37 Ground J (as he then was) said—

---

[16] *August v Gibbons* BM 2009 SC 52 at [8] to [10]

[17] *Ace Bermuda Insurance Ltd v Ford Motor Company* [2016] Bda LR 1

> "The modern criteria for the appointment, and discharge, of provisional liquidators are derived from Re Highfield Commodities Ltd.[1984] 3 All El1 884, and Re Union Accident Insurance Co. Ltd UNK[1972] 1 All ER 1105, and neither counsel dissents from the principles set out in those cases. They may be abstracted from the judgment of the Vice-Chancellor, Sir Robert Megarry, in the Highfield Commodities case at pp. 892 and 893, as follows—

>> 'At the outset let me say that I accept that the court will be slow to appoint a provisional liquidator unless there is at least a good prima facie case for saying that a winding-up order will be made …. counsel for HCL [the company] contended that if the company opposed the application for the appointment of a provisional liquidator, no appointment would be made (and any ex parte appointment would be terminated) unless either the company was obviously insolvent or it was otherwise clear that it was bound to be wound up, or else the company's assets were in jeopardy … Counsel for the Secretary of State on the other hand "retied strongly on Re Union Accident Insurance Co. Ltd…. [where] Plowman J refused to accept that the power to appoint a provisional liquidator was restricted in the manner for which counsel for HCL contended before me, and pointed out that s. 238 of the 1948 Act conferred a quite general power of appointing a provisional liquidator. He held that the department had made out a good prima facie case for the winding up of the company on the hearing of the petition, and then asked whether in the circumstances of the case it was right that a provisional liquidator should have been appointed …. I would respectfully express my complete agreement with the view taken by the judge. I do not think that the old authorities, properly read, had the effect of laying down any rule that the power to appoint a provisional liquidator is to be restricted in the way for which counsel for HCL contends. No doubt a provisional liquidator can properly be appointed if the company is obviously insolvent or the assets are in jeopardy; but I do not think that the cases show that in no other case can a provisional liquidator be appointed over the company's objection …. The section confers on the court a discretionary power, and that power must obviously be exercised in a proper judicial manner. The exercise of that power may have serious consequences for the company, and so a need for the exercise of the power must overtop those consequences."

87.    In *Discover Reinsurance v PEG Reinsurance Co Ltd* [2006] BDA LR 88, Mr Justice Kawaley (as he then was) said at [17]—

> "The English position is most germane, in terms of persuasive authority, because our winding-up regime is effectively identical to that contained in the English Companies Act 1948, which evolved out of the nineteenth century statutory antecedents which gave rise to the cases referred to above. Thus in the leading Bermudian case on the principles governing the appointment of provisional liquidators, In the Matter of CTRACK Ltd. et al [1994] Bda LR 37, Ground J. (as he

> > *then was) cited with approval the following dictum of Sir Robert Megarry (V-C) in Re Highfield Commodities Ltd. [1984] 3 All ER 884 at 892-893…"*

88.    In *re Up Energy Development Group Ltd* [2016] Bda LR 94, Chief Justice Kawaley said at [18] to [21]—

> > *"…the same general legal test for appointing JPLs applies whether one is displacing management altogether, appointing JPLs with 'soft' powers, and irrespective of whether it was a company or creditor petition […]*
>
> > *The main basic criterion for the appointment is that a prima facie case be made out for a winding-up. As Ground J observed in Re C Track Ltd et al [1994] Bda LR 37:*
>
> > > *'…I am most acutely aware that I am only considering whether or not there is at least a "good prima facie case" for the winding up of the respective companies, and not deciding whether or not they should be wound up*
>
> > *This demonstrates that in the restructuring context, the JPL applicant need only show that a good prima facie case for potentially winding-up the company exists…"*

89.    In *re Seadrill Limited* [2018] BDA 39, Chief Justice Kawaley said—

> > *"When a Bermudian company is placed into provisional liquidation for the purposes of pursuing an insolvent restructuring, this Court makes three central interlocutory findings:*
>
> > > *(1) a prima facie case for winding-up has been made out on the grounds of insolvency;*
>
> > > *(2) the creditors have displaced the shareholders as the key stakeholders in the company; and*
>
> > > *(3) an arguable case that a restructuring is where the best interests of the creditors lie have been made out."*

90.    Therefore, while the circumstances, powers and purpose for the appointment of different types of provisional liquidators varies, as described above, the appointment is under statutory powers and it is clear from the authorities that there must be a *prima facie* case that the company would be wound up before any type of provisional liquidator can be appointed.

Modifications of General Law

91.    The general principles outlined above are modified in certain circumstances. Two such circumstances are applicable in this case—

> (a)    where an order is sought in relation to a licensed and regulated entity, e.g. an insurance company; and
>
> (b)    where an order is sought in respect of a segregated accounts company.

Insurance Companies

92.    The Insurance Act 1978 (**the IA**) provides that the Authority may present a petition for the winding up of an insurance company where—

    (a)    the insurer is insolvent,

    (b)    the insurer is in breach of regulatory requirements, or

    (c)    it is expedient in the public interest that the insurer should be wound up.

93.    The Court will apply its discretion in the usual way where a Petition is presented on ground (a) or (b) above. Where a Petition is presented on ground (c), the Court must be satisfied that it is just and equitable for the company to be wound up.

94.    Sections 35(1) and 35(3) of the IA contain the provisions setting out the grounds on which the Authority may petition for the Compulsory Winding-Up of an Insurer.

95.    Section 35(1) of the IA provides—

> *"The Authority may present a petition for the winding up, in accordance with the Companies Act 1981, of an Insurer, being a company which may be wound up under that Act, on the ground—*
>
> > (a)    *that the insurer is unable to pay its debts within the meaning of sections 161 and 162 of the Companies Act 1981; or*
> >
> > (b)    *that the insurer has failed to satisfy an obligation to which it is or was subject by virtue of this Act; or*
> >
> > (c)    *that the insurer has failed to satisfy the obligation imposed upon it by section 15 as to the preparation of accounts or to produce or file statutory financial statements in accordance with section 17, and that the Authority is unable to ascertain its financial position."*

96.    Section 35(3) of the IA provides—

> *"If, in the case of an insurer, being a company which may be wound up under the Companies Act 1981, it appears to the Authority that it is expedient in the public interest that the insurer should be wound up, it may, unless the insurer is already being wound up by the Court, present a petition for it to be so wound up if the Court thinks it is just and equitable for it to be so wound up."*

Segregated Accounts Companies

97.    As set out above, an SAC has a general account and one or more segregated accounts. In the event of liquidation of the SAC the general account is the pool of assets to which the general creditors will have recourse. The assets and liabilities of each segregated account are separate from the assets and liabilities of the other segregated accounts.

98.     Therefore, in the event of a liquidation of the SAC, the position is fundamentally different to that of any other company. Where assets are linked to a particular segregated account, those assets can only be distributed to the creditors and owners of that segregated account, irrespective of the financial situation of any other segregated account or the SAC's general account.

99.     The Court has particular powers in the event of—

    (a)     the insolvency of a particular segregated account;

    (b)     a need for the orderly management, sale, rehabilitation, run-off or termination of the business of, or attributable to, a particular segregated account; or

    (c)     a need for the distribution of assets linked to a segregated account to those entitled to those assets.

100.     The power of the Court in the circumstances listed above is to make an order appointing a receiver to manage the business and assets of that segregated account. Section 19 of the SAC Act provides that—

> "(1) Subject to the provisions of this section, if, in relation to a segregated accounts company, the court is satisfied that—
>
> > (a) a particular segregated account is not solvent, the general account is not solvent, a liquidation has been commenced in relation to the company, or for other reasons it appears to the court just and equitable that a receiver should be appointed;
> >
> > the making of a receivership order under this section would achieve the purposes set out in subsection (3),
>
> the court may make a receivership order in respect of that segregated account.
>
> (2) A receivership order may be made in respect of one or more segregated accounts.
>
> (3) A receivership order shall direct that the business and assets linked to a segregated account shall be managed by a receiver specified in the order for the purposes of—
>
> > (a) the orderly management, sale, rehabilitation, run-off or termination of the business of, or attributable to, the segregated account; or
> >
> > (b) the distribution of the assets linked to the segregated account to those entitled thereto."

101.     There are therefore two requirements to appoint receivers over a segregated account:

(a)     it must be shown that either (i) the account is insolvent, (ii) the general account of the SAC is insolvent, (iii) that liquidation has commenced in relation to the SAC or (iv) that it would be just and equitable for a receiver to be appointed; and

(b)     that the receivership order would achieve the orderly management, sale, rehabilitation, run-off or termination of the business of, or attributable to, the segregated account.

102.    This two-part test for a receivership appointment is therefore more onerous than the test for a provisional liquidator appointment, which requires only a good prima facie case of insolvency.

103.    The SAC Act at section 20 provides that notice of any receivership application must be served upon the segregated accounts company, the ROC and such other persons (if any) as the Court may direct each of whom should be given an opportunity to make representations before the receivership order is made. From a review of the reported Bermuda authorities concerning SAC Act receivership applications, it appears notice is usually given to the account owners of the relevant segregated accounts.

104.    The Court does not however, under section 19 alone, have the power to order that the SAC itself be wound up – the jurisdiction is confined to the appointment of receivers over specified segregated accounts.

105.    Accordingly, an issue with a particular segregated account which might constitute grounds for appointing a receiver over that particular account is not grounds for the winding-up of the SAC itself. The legislation is clear that where there is an issue with a particular segregated account, the appropriate remedy is the appointment of a receiver.

106.    An application to appoint a receiver may be made by a SAC, a SAC's directors, a creditor, an owner of a segregated account or the Registrar of Companies.[18]

107.    If a SAC is ordered to be wound up, a provisional liquidator will be appointed under a Winding-Up Order and the process described at paragraphs 57 to 62, above, would apply. The Court's power to appoint a receiver under section 19, where issues with a particular segregated account have arisen, is exercisable notwithstanding that the SAC is in the course of being wound up.

**The 18 August 2023 White Rock Appointment**

108.    On 18 August 2023, it appears that the Court made an order (**the Order**) appointing Michael Morrison and Charles Thresh as the joint provisional liquidators (**JPLs**) of White Rock.

109.    Hannah Tildesley, a partner in Appleby (Bermuda) Limited's dispute resolution team, attended the Court on 18 August 2023. Ms Tildesley had been made aware that a hearing was taking place as the matter was listed in the Court's list that is circulated to court users. The Court list was circulated on 11 August 2023. The Court list stated—

---

[18] Section 20(1), SAC Act

**FRIDAY 18 AUGUST 2023**

| | Civil and Commercial Jurisdiction | Court Rm. | Assigned Judge | Approx. Duration |
|---|---|---|---|---|
| 10:30 2023/261 civ. | In the Matter of White Rock Insurance SAC Limited | CC 1. | Hon. Hargun CJ | 2.5 hrs. |

110.    While at Court, Ms Tildesley expressed her intention to observe the hearing but was excluded from the hearing without being given any proper explanation for her exclusion. I am informed by Miss Tildesley that she was told that the Authority was making an application.

111.    Subsequently on 18 August 2023, the Authority published a press release headed, "The Bermuda Monetary Authority and White Rock Bermuda Jointly Agree to Take Action to Address Alleged Fraud at Vesttoo" (**the Press Release**) which read (in its entirety)—

> The Bermuda Monetary Authority (Authority or Authority) and White Rock Insurance (SAC) Ltd. (White Rock Bermuda) today jointly agreed to a course of action in the Supreme Court of Bermuda that will focus on pursuing maximum recovery for the (re)insureds impacted by the alleged fraud involving Vesttoo related segregated accounts (Vesttoo Cells). Both parties have agreed for the Bermuda Supreme Court to appoint Charles Thresh and Michael Morrison of Teneo (Bermuda) Limited to act as Joint Provisional Liquidators (JPLs) for White Rock Bermuda with respect to the impacted Vesttoo Cells. The JPLs and the Board of Directors and management of White Rock Bermuda will bring their resources together to address the matter.
>
> This action applies only to the impacted Vesttoo Cells. White Rock Bermuda continues to operate in the ordinary course of business, and this action has no effect on any other cells or White Rock Bermuda clients.

112.    The reference to **the Vesttoo Cells** in the Press Release is to the segregated accounts owned by Vesttoo as described at paragraph 20 above and the definition is adopted.

Questions Arising

113.    Given the legal position set out above, the events at Court on 18 August 2023 and the contents of the Press Release, I consider the following questions arise—

(a)    Whether the Authority had standing to seek the appointment of a provisional liquidator;

(b)    Whether the Court had jurisdiction to appoint a provisional liquidator;

(c)    Whether full and frank disclosure was given to the Court.

114.    Issues relating to confidentiality, exclusion from the hearing and failure to advertise are discussed at paragraph 119, onwards, below.

The Authority's Standing

115.    The Authority can only present a petition against White Rock where one of the following requirements are met (as set out at paragraphs 92 to 94, above)—

      (a)     White Rock is insolvent;

      (b)     White Rock is in breach of regulatory requirements; or

      (c)     it is in the public interest that White Rock should be wound up.

116.    While I have not seen the documents in support of the application and any accompanying petition, it is difficult to see how any of these grounds could apply based on the contents of the Press Release, in particular where the Press Release states—

> *White Rock Bermuda continues to operate in the ordinary course of business, and this action has no effect on any other cells or White Rock Bermuda clients.*

117.    It does not appear from the Press Release that an application for receivers over the Vesttoo Cells has been made by the Authority. However, I note (as set out at paragraph 104, above) that the Authority would not have standing to appoint receivers over the Vesttoo Cells under the SAC Act.

The Court's Jurisdiction

118.    As set out at paragraphs 82 to 88 above, the Court can only appoint a provisional liquidator if there is a good *prima facie* that White Rock would be ordered to be wound up at a hearing of the Petition.

Full and Frank Disclosure

119.    On any *ex parte* application, the Court requires full and frank disclosure of all material facts from the applicant or petitioner.  The Court will be astute to ensure that any advantage arising from a failure to give full and frank disclosure is negated, which can be by discharge of the order where the non-disclosure is of sufficient materiality.[19]

**Confidentiality of Legal Proceedings**

120.    In general, all proceedings in Bermuda, with some limited exceptions, occur in public.

121.    The principle of open justice is enshrined in the Bermuda Constitution Order 1968 (**the Constitution**). In particular sections 6(9) and 6(10) of the Constitution stipulates that—

---

[19] Kensington Income Tax Commissioner's Case [1917] 1 KB 486 at 509, Brinks Mat Ltd v Elcombe [1988] 1 WLR 1350 at 1357D

"**Provisions to secure protection of law**

*(9) All proceedings instituted in any court for the determination of the existence or extent of any civil right or obligation, including the announcement of the decision of the court, shall be held in public.*

*(10) Nothing in subsection (9) of this section shall prevent the court from excluding from the proceedings persons other than the parties thereto and their legal representatives to such extent as the court—*

> *(a) may be empowered by law so to do and may consider necessary or expedient in circumstances where publicity would prejudice the interests of justice, or in interlocutory proceedings or in the interests of public morality, the welfare of persons under the age of eighteen years or the protection of the private lives of persons concerned in the proceedings; or*

> *(b) may be empowered or required by law to do so in the interests of defence, public safety or public order."*

122.    The importance of Bermuda's principle of open justice has also been articulated repeatedly in case law. The Supreme Court has commented that "Under the Constitution of Bermuda, the presumption is that all civil proceedings in court, including the announcement of the court's decision, shall be held in public" (*Ace Bermuda Insurance Ltd v Ford Motor Company* [2016] Bda LR 1, para 12).

123.    As per section 9(10) of the Constitution there are, of course, derogations from the general principle.  Chief Justice Kawaley (as he then was) summarised these requirements in *Bermuda Casino Gaming Commission v Richard Schuetz* [2018] SC (Bda) 24 Civ (12 March 2018) at paragraph 9—

> *"Section 6(10) imposes the following constraints on the Court if it wishes to dilute the umbrella principle of open justice:*
>
> > *(1) the Court must be empowered by law to conduct a hearing in private;*
> >
> > *(2) a private hearing must be "necessary or expedient";*
> >
> > *(3) the justification for the private hearing must fall within one of the limited categories specified in section 6(10)".*

124.    Furthermore, in respect of the Section 6(10)(a) gateway of "interlocutory proceedings" Kawaley CJ stated, at paragraphs 10-11 of *Schuetz*, that:

> *"The modern practice of this Court is not to treat the fact that an application is interlocutory in nature (that is to say, an application before the final hearing or trial) as sufficient, without more, to justify excluding the public. So the only potential*

> *gateway through which the Plaintiff could pass to secure a private hearing in the present case was prejudice to "the interests of justice"."*

125.    As set out at paragraphs 76 to 79, above, the presumption is that winding up proceedings and applications for the appointment of liquidators, even on an *ex parte* basis, should take place in public, unless there is some good reason for them to be held in private.

126.    The established process in Bermuda is that the party seeking to secure a private, confidential hearing is obliged to make an application to the Court for a confidentiality order. This is what happened in *Schuetz*, for example.

127.    I am not aware that any confidentiality order was made in over the Authority's Petition against White Rock. The circumstances described by my colleague Ms Hannah Tildesley in her declaration are, in my experience, very unusual. I would have expected Appleby's attendance at the hearing to have been permitted.


Executed on Pender Island, British Columbia, Canada on this Twentieth day of August 2023:

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury of the Laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information, and belief.

John Wasty