**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| Vesttoo Ltd., *et al.*,[1] | Case No. 23-11160-MFW |
| Debtors. | (Joint Administration Requested) |

**AMENDED AND RESTATED DECLARATION OF AMI BARLEV**
**IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS**

I, Ami Barlev, do hereby declare, as follows:

1.       I am the Interim Chief Executive Officer of Vesttoo Ltd., an Israeli company that has a number of affiliates (each, a "**Debtor**" and, collectively, the "**Debtors**," "**Vesttoo**" or the "**Company**"). I joined the Vesttoo board of directors in June 2021 and was appointed to serve as interim Chief Executive Officer on August 7, 2023. I am over the age of 18 and authorized to submit this declaration (this "**Declaration**") on behalf of the Debtors in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"). If called as a witness, I would testify competently to the facts set forth in this Declaration.

2.       I hold a Bachelor of Laws from Bar-Ilan University. I have been the Executive Chairman of several Companies (Internet Gold, B Communications Ltd., Cannomed Medical Cannabis Industries Ltd., Gilat Telecom, Axilion Smart Mobility) and have also been on the board of several companies (Walla! NEWS, Bezeq On Line, Pelephone, yes., Satcom Systems Ltd.,). In these roles, I manage business-development processes, create engines for growth, and determine strategies for crisis management. I also consult on strategic management and strategic planning;

---

[1]       Due to the large number of debtor entities in these chapter 11 cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent at https://dm.epiq11.com/vesttoo.

liaise with regulatory agencies; direct business-optimization processes; and oversee significant partnerships and projects.

3.    On August 14 and 15, 2023 (the "**Petition Date**"), the Debtors each filed a voluntary petition (the "**Petition**") for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**").  I submit this declaration (the "**Declaration**") to provide an overview of the Debtors' business, the Company's organizational and capital structure, and the Debtors' restructuring initiatives to assist the Bankruptcy Court and other parties in interest in understanding the circumstances and events that led to the commencement of these Chapter 11 Cases.  This Declaration also supports the Petitions and the Debtors' applications and motions for relief filed in these Chapter 11 Cases, each of which is discussed below (collectively, the "**First Day Motions**").

4.    As Interim CEO and Board member, I have been actively involved in preparing the Debtors' chapter 11 filings, developing the Debtors' business plans, and providing diligence to and negotiating with certain of the Debtors' key constituencies.

5.    Except as otherwise stated, the facts in this Declaration are based on my personal knowledge, my discussions with those reporting directly to me, my review of relevant documents, or my opinion, based on my experience and knowledge of the Debtors' operations and financial condition and my involvement in the preparation of these Chapter 11 Cases.  In making this Declaration, I have relied in part on information and materials that the Debtors' personnel, agents, and advisors have gathered, prepared, verified, and provided to me, in each case, under my supervision, at my direction, and for my use in preparing this Declaration.

## INTRODUCTION

### A.    Overview of Operations

6.    Vesttoo and its subsidiaries and affiliates are engaged in the development and construction of unique technology in the field of risk management, which allows insurance and reinsurance companies (as "cedents" or "retrocedents") to transfer their insurance risks to capital market investors through a technological reinsurance transaction platform and reinsurance-related financial instruments.

7.    Reinsurance is a transaction whereby an insurance company (called the "reinsured" or "cedent") cedes, "spreads" or transfers to another insurer (called the "reinsurer") a portion of the risk that the cedent underwrote under certain of its policies, along with a portion of the premium.  The two insurers thereby share the financial exposure resulting from the risks the cedent underwrote.  This spreading of risk permits a cedent to, among other things, reduce the amount of reserves it must hold for the protection of policyholders, and thereby increases the cedent's capacity to underwrite additional insurance.

8.    In this case, the assumed insurance risks are placed into segregated accounts or protective cells created under Bermudan law.  Our business has always operated under the umbrella of an international regulatory structure designed to facilitate our transactions and protect the parties who participate in them.

9.    Vesttoo uses proprietary AI-based technology to provide risk modelling, structuring and performance monitoring for non-catastrophe insurance risks.  For its cedent and retrocedent clients, the company aims to enhance risk transfer.  For its investor clients, the company enables institutional investors to invest in risk-remote, short-term, and  non-catastrophe insurance risks through several structures.

10.     Vesttoo became the owner of the accounts and cells and sold interests in such accounts or cells to capital markets investors.  As part of the agreements related to the segregated cells, there was an agreement for collateral security to be posted for the reinsurer's obligation. That security typically takes the form of letters of credit (LOCs).  The investors provided collateral security for the insurance risks placed in the segregated accounts and protective cells.

11.     Vesttoo recently became the subject of various allegations related to alleged issuing of fraudulent letters of credit in connection with its services that were focused on supporting reinsurance transactions through various entities organized and resident here in the US.  Vesttoo's only insurance company subsidiary Vesttoo Alpha P&C Ltd. ("**Alpha P&C**") has been placed in winding up proceedings in Bermuda.  Alpha P&C had only two reinsurance counterparties, and the few agreements with them have been resolved.  Vesttoo's other US entities continue to support reinsurance transactions through licensed reinsurance intermediaries and related companies, none of which operate as domestic insurance companies or are regulated foreign insurance companies engaged in the business of insurance in the United States.  Vesttoo intends to cooperate with all regulators of its business.

12.     The company's technological reinsurance transaction platform and its current capital structure remain stable and sustainable.  Vesttoo intends to use Chapter 11 to address all financial security issues arising from the fraud allegations and the Bermudan winding up, and to better position ourselves for the future.

13.     To familiarize the Bankruptcy Court with the Debtors and the relief that the Debtors seek in these Chapter 11 Cases, this Declaration is organized into four parts.  **Part I** introduces the Debtors, their corporate history and business operations.  **Part II** describes the Debtors' prepetition capital structure.  **Part III** describes the events that led to the commencement of these Chapter 11

Cases, including the Debtors' prepetition financing efforts. **Part IV** provides an overview of the relief requested in the First Day Motions, which I have reviewed and with which I am familiar.

## I.      VESTTOO'S HISTORY AND BUSINESS OPERATIONS

14.      In 2018, Yaniv Bertele, Ben Zickel, and Alon Lifshitz founded Vesttoo in Israel. The Company's offices were in Tel Aviv, and during a growth phase, it expanded to New York, London, Hong Kong, Seoul, Tokyo, and Dubai. At its height, Vesttoo employed hundreds of people, with a significant number of them based in Israel. A copy of the Company's corporate structure chart, which shows each of the debtors is attached to this Declaration as **Exhibit A**. In summary, Vesttoo Ltd. is the top company of Vesttoo. Vesttoo Ltd. owns 100% of Vesttoo Holdings Ltd., Vesttoo Hong Kong Limited, Vesttoo Ltd., Korea Branch, Vesttoo UK Ltd., Vesttoo US Inc., and Vesttoo Alpha Holdings Ltd. Vesttoo Holdings Ltd. is the general partner of several Israeli limited partnerships, each of which is a Debtor in these Chapter 11 Cases (the "**Vesttoo Bay Partnerships**"). As for the United States, Vesttoo US Inc. owns Vesttoo SPV Holdings LLC (US) which owns both Vesttoo Asset Management LLC (US), and Vesttoo Reinsurance Intermediary Services Inc. (US) ("**Vesttoo Reinsurance**").[2] Each of these entities other than Vesttoo Reinsurance is formed under Delaware law; Vesttoo Reinsurance was initially formed under Delaware law but changed its state of formation to New York and obtained a reinsurance intermediary license from the New York Department of Financial Services and is licensed to act as a reinsurance intermediary under New York's Insurance Law.

---

[2]      Additionally, upon information, Vesttoo US Inc. owns Vesttoo RT SPV LLC, which filed for bankruptcy on August 15, 2023, Case No. 23-11212. I understand that Vesttoo RT SPV LLC is a Delaware entity formed on December 7, 2022. As part of the Debtors' ongoing efforts in these Chapter 11 Cases, the Debtors will keep the Court and parties in interest apprised if the Debtors discover that this entity is not properly in their corporate structure and may seek to file an amended corporate structure chart in that evet.

15.     Vesttoo is a fintech platform built to connect global insurance markets with the global capital markets.  The Company's vision is to fuse insurance and capital markets so that they are globally accessible.  Vesttoo's proprietary AI-powered technologies analyze and build risk models from the large volumes of complex data associated with insurance liabilities to offer access to a wide range of products, such as property and casualty risks (auto and home and cyber risk) and life and health risks (mortality risk and longevity risk).  Vesttoo combines conventional actuarial models and proprietary machine-learning algorithms, relying on the large amounts of data associated with insurance liabilities. Our process analyzes hundreds of models, performs thousands of tests, and selects the optimal risk model.

16.     Vesttoo offered three basic categories of insurance risk transfer (1) aggregate stop-loss reinsurance, a type of reinsurance in which the reinsurer pays losses in excess of the attachment point, which is a total amount of covered loss paid by the cedent, (2) quota share treaties, which are pro-rata reinsurance contracts in which the insurer and reinsurer share premiums and losses according to a fixed percentage from the first dollar of loss (and is therefore said to be "proportional"), and (3) excess of loss reinsurance in which the reinsurer indemnifies–or compensates–the ceding company for losses that exceed a specified amount or limit of the cedent. Quota share reinsurance allows an insurer to retain some risk and premium while sharing the rest with an insurer up to a predetermined maximum coverage while excess of loss provides non-proportional reinsurance based on loss retention that is, the ceding company agrees to accept all losses up a predetermined level (similar to a deduction).

17.     As demonstrated in the sample Transaction Flow (figure 17.1), an insurance company cedes its risk as a cedent under a Reinsurance Agreement with a transformer entity. The transformer entity is a reinsurer that in effect converts the insurance risk into an investible form of

security or ownership interest.  In this case, the transformer then entered into agreements with one of the Vesttoo Bay Funds, such as a Shareholder Agreement, a Cell Management Agreement, and a Subscription Agreement.  Under these suites of agreements, the Reinsurance Agreement was transformed into an equity security in a segregated and protected cell created under the Bermuda Segregated Accounts Companies Act 2000, which equity security was sold to the Vesttoo Bay Funds that resulted in the Vesttoo Bay entity becoming the owner of the applicable segregated cell and any funds held on account for that entity.  Earlier today, notwithstanding these Chapter 11 Cases, the BMA jointly agree with White Rock White Rock Insurance (SAC) Ltd. ("**White Rock**") (whose lawyers had been informed that such action would violate the automatic stay) at a hearing in chambers at which our Bermudian lawyers were excluded, to have the Supreme Court of Bermuda to appoint the same joint provisional liquidators that are serving over Vesttoo P&C to act as Joint Provisional Liquidators for White Rock with respect to the segregated cells owned by the Debtors.  The Vesttoo Bay Funds are governed by a Limited Partnership Agreement, under which Vesttoo Holdings Ltd. is the general partner and identified investors in each limited partnership agreement are the limited partners.  The Limited Partner was generally obligated to contribute to the Vesttoo Bay Limited Fund (a) an account for fees and expenses, and (b) the LOC to provide collateral. The Letter of Credit was provided by the Investor to provide collateral security required to support the insurance assumed from, and for the benefit of, the Cedent.



Figure 17.1 (Source: Vesttoo Ltd.).

18.     In addition to the transactions above in which the Vesttoo Bay Partnerships were used, Vesttoo P&C, an entity formed under the laws of Bermuda, served as its own transformer entity.  In this capacity, it entered into one reinsurance contract, which was cancelled, and was in the process of negotiating a second insurance contract, which did not close.  These two reinsurance risk transfer agreements were structured in a similar way to those that utilized a third-party transformer entity between the Cedent and the Vesttoo Bay Partnerships.

## II.     PREPETITION CORPORATE AND CAPITAL STRUCTURE

19.     Vesttoo does not have any secured lenders and has not issued any funded debt.  They have trade debt owed to various vendors, consultants, and law firms of about $2.3 million.  The company was founded through venture capital financing.  In August 2021, Vesttoo raised $6 million in a Series A funding round led by Hanaco Ventures, as part a broader investment strategy in Vesttoo's Insurance-Linked Program.  Vesttoo raised another $15 million a few months later in November 2021 in a Series B funding round led by Mouro Capital and included investment from MS&AD Ventures, the corporate venture capital fund of Japan-based MS&AD Insurance Group Holdings, the fifth largest insurance conglomerate in the world.  In October 2022, Vesttoo

announced an $80 Million Series C financing round co-led by Mouro Capital, valuing the Company at $1 billion. Gramercy Ventures, Black River Ventures, and Hanaco Ventures also participated in the round.  In May 2023, Vesttoo embarked on a Series D funding round at a valuation of $1.5-2 billion.  The Series D round did not close.  As a result of these financing rounds and other equity investment activity, Vesttoo Ltd. is owned by the shareholders identified on the List of Equity Security Holders it filed with its voluntary petition.

20.     Vesttoo ended 2022 with revenues of approximately $110 million compared to $30 million the year prior. The company's EBITDA for 2022 was estimated at $60 million compared to $20 million in 2021.

### III.     EVENTS LEADING TO THE CHAPTER 11 CASES & CHAPTER 11 GOALS

21.     Based on the various rounds of financing and other investor's sales of their positions, Vesttoo's valuation earlier this year exceed $785 million.  The Company also engaged in major transactions with among others, renewal of more than a $120 million quota share reinsurance cover for a leading London Lloyd's syndicate and entering a partnership agreement with Clear Blue to supply the latter with reinsurance capacity sourced from capital markets investors, totaling a sum of $1 billion.

22.     But in mid-July of this year, the press reported that certain LOCs that were posted as collateral for the benefit of cedents were invalid as China Construction Bank reportedly denied all knowledge of the LOC presented by one of the cedents to pay claims arising under the insurance claims ceded into a Vesttoo transaction.  The press reports contended the LOCs were fraudulent. To address this situation, the Company engaged DLA Piper LLP (US), who together with Kroll Associates UK, Ltd., started to investigate these allegations and press reports.  That investigation is ongoing, and the Company expects it to continue during these Chapter 11 Cases.

23.     Soon after these reports, the press also reported that various regulators were trying to figure out what happened and that, according to an article in the Wall Street Journal on August 4, 2023, allegedly more than $2 billion of the alleged fraud occurred in the US.  But certain of Vesttoo's counterparties were able to replace the LOC collateral.

24.     The crises had a significant impact on Vesttoo, and the board acted decisively to protect the value of the Company's assets.  For example, on August 1, 2023, the Company announced it was laying off about 75% of its staff and closing some offices in Tokyo, Hong Kong, and Seoul, but would maintain staff in Tel Aviv, New York, London, Dubai, and Bermuda. Additionally, two of Vesttoo's founders, including one that was the Company's Chief Executive Officer, Mr. Bertle, were placed on paid leave during the pendency of the investigation.  The board then appointed me to act as interim CEO to assist it with completing the investigation and identifying the core positive assets and employees to take the business forward and maximize value.

25.     One consequence of this crises was that the Bermuda Monetary Authority appointed investigators to inquire into the operations of Vesttoo P&C and shortly thereafter applied for appointment of Joint Provisional Liquidators, which the Bermuda court granted, appointing Michael Morrison and Charles Thresh from Teneo to serve as joint provisional liquidator for Vesttoo P&C.

26.     Additionally, on August 10, 2023, one of the transformer entities in Bermuda, White Rock, filed a petition for a preliminary injunction in the District Court for the Southern District of New York seeking to freeze Vesttoo's US bank accounts and compel it to provide information about the nature and scope of alleged collateral fraud.  Later that night, the court in New York entered a TRO, freezing Vesttoo's assets except for $1 million for payroll and other

business expenses in the ordinary course.  The TRO order required Vesttoo to respond to the Petition for Preliminary Injunction by noon on Monday, August 14, 2023, and scheduled a hearing on the preliminary injunction petition for Tuesday, August 15, 2023.  Thereafter, White Rock served discovery on Vesttoo and demanded to take depositions of a number of its US based employees.  While Vesttoo did submit a response on August 14, 2023, White Rock's petition, and the related discovery, was stayed by the filing of these cases, and the TRO has been dissolved as reflected by an ordered entered by the District Court on August 15 after a brief hearing on the petition.

27.     In addition to the appointment of Joint Provisional Liquidators and the White Rock litigation, the Company has received correspondence from regulators, cedents, banks that issued LOCs, and fronting brokers that arranged reinsurance on their platform inquiring into the facts and circumstances around the press reports and the allegations regarding the LOCs.  In light of all of these events and the pressures created by the LOC crisis, Vesttoo's board decided to file these cases to obtain the benefits of the automatic stay to give it the breathing spell its needs to complete its investigation, take remedial action to ensure that wrongdoers, if any, within the Company are removed, and those outside the Company are identified and appropriate remedies pursued.

28.     In these cases, Vesttoo also intends to evaluate its business to ensure that the proprietary AI technology and the employees that have developed it and understand how to use it are reorganized or used to support a value maximizing transaction.  And, in pursuing this value-maximizing strategy, the Debtors intend to negotiate with its creditors, the cedents, and other parties in interest, including governmental regulators, to resolve this crisis and emerge a stronger and healthier company.  Moreover, to the extent the investigation results in systemic problems or discovery of wrongdoing within Vesttoo, it is our intent to resolve these problems and remove

these wrongdoers, all in collaboration with our stakeholders, customers, investors, and, importantly, any governmental authorities with regulatory oversight of Vesttoo's businesses.

## IV.    SUMMARY OF RELIEF SOUGHT IN THE FIRST DAY MOTIONS[3]

29.    Since filing these cases, the Debtors have filed a number of First Day Motions[4] in these Chapter 11 Cases seeking orders granting various forms of relief intended to stabilize the Debtors' business operations and facilitate the efficient administration of these Chapter 11 Cases. I believe that the relief requested in the First Day Motions is necessary to avoid immediate and irreparable harm and allow the Debtors to operate with minimal disruption during the pendency of these Chapter 11 Cases. A description of the relief requested in and the facts supporting each of the First Day Motions is set forth below.

### A.    Joint Administration Motion

30.    Through the Joint Administration Motion, the Debtors seek entry of an order directing the joint administration of these Chapter 11 Cases for procedural purposes only. I anticipate that many of the notices, motions, other pleadings, and orders in these Chapter 11 Cases will affect more than one Debtor. In addition, the Debtors share many of the same creditors. Therefore, I believe that joint administration will (i) save time and expenses for the Court and for the Debtors' estates, and (ii) avoid duplicative and potentially confusing filings by permitting counsel for all parties in interest to file all notices and pleadings on a single case docket, under a single caption. I understand that joint administration will also protect all parties in interest by ensuring that creditors in each of the Debtors' respective bankruptcy cases will be informed of the various matters before the Court in these Chapter 11 Cases.

---

[3]    Capitalized terms in this Part IV that are used but not defined in this Declaration have the meanings set forth in the applicable First Day Motion, and each of the First Day Motion is incorporated into this Declaration by reference.

31.     I do not think the rights of the Debtors' respective creditors and stakeholders will be adversely affected by the joint administration of these Chapter 11 Cases because, I understand the relief is procedural and not intended to affect substantive rights or permit substantive consolidation of the separate Debtors' estates.

32.     I believe that the relief requested in the Joint Administration Motion is in the best interest of the Debtors' estate, creditors, and all other parties in interest.  Accordingly, on behalf of the Debtors, I respectfully submit that the Joint Administration Motion should be granted.

**B.      Motion to Redact PII and Limit Equity Holder Disclosure**

33.     Through the PII Motion, the Debtors seek authority to (i) redact certain personally identifiable information of current and former employees and equity holders of the Debtors.

34.     Specifically, the Debtors seek authority to redact the personal information, including home addresses, of the Debtors' current and former employees, as well as individual equity holders, to avoid exposing these individuals to potential identity theft or jeopardizing their safety by publishing their home addresses.

35.     Redaction of personally identifiable information is appropriate under section 107(c)(1) of the Bankruptcy Code because such information can be used to perpetrate identity theft or locate survivors of domestic violence, harassment, stalking, or phishing scams.  Additionally, I believe that redacting the Debtors' current and former employees' and equity holders' home addresses from the Debtors' Creditor Matrix and Schedules and Statements is prudent under the circumstances and will protect the Debtors' current and former employees and equity holders from unnecessary disclosure of personally identifiable information.  Accordingly, on behalf of the Debtors, I respectfully submit that the PII Motion should be granted.

### C.    Epiq Retention Application

36.    Through the Epiq Application, the Debtors seek the appointment of Epiq as claims, noticing, balloting, and solicitation agent for these Chapter 11 Cases in accordance with the Engagement Agreement, effective as of the Petition Date.  In that role, Epiq would assume full responsibility for, among other tasks, the distribution of statutory notices to creditors and other parties in interest and the maintenance, processing, and docketing of proofs of claim filed in these Chapter 11 Cases.  Given the complexity of these Chapter 11 Cases and the number of creditors and other parties in interest involved, I believe that the appointment of Epiq will maximize the value of the Debtors' estates for all their stakeholders and will help facilitate the efficient administration of these Chapter 11 Cases while alleviating these burdens for the Clerk of the Court. Vesttoo solicited bids from three different claims agents and determined from these three requests for services that Epiq was well positioned to serve in this roll out of the four bids solicited. Accordingly, on behalf of the Debtors, I respectfully submit that the Application should be approved.

### D.    Motions for Orders for Entry of an Order Clarifying the Stay and Appointing Vesttoo Ltd. as a Foreign Officer under 1505 of the Bankruptcy Code

37.    Vesttoo Ltd. recently sought ancillary relief in Israel on behalf of the Debtors' estates under Part 9 of the Insolvency and Financial Rehabilitation Law 5778-2018 (the "**IFRL**"), which reflects Israel's adoption of the UNCITRAL Model Law on Cross Border Insolvency, in an administrative district of Israel to be determined (the "**Israeli Court**").  The purpose of the ancillary proceedings (the "**Israeli Proceedings**") is to request that the Israeli Court recognize these chapter 11 cases as foreign proceedings under the applicable provisions of the IFRL in order to, among other things, protect the Debtors' assets and operations in Israel as a means of aiding

and assisting this Court with the administration of these estates and to permit cooperation, if appropriate.

38.     In our initial motion for provisional relief submitted to the Israeli Court, the court appears to have misunderstood the request for a full insolvency proceeding and thus dismissed it as not having sufficient facts to support a plenary proceeding.   Entry of an order authorizing Vesttoo Ltd. to act as  entity to act as the foreign representative, referred to as the "foreign officer" under the IFLR, on behalf of all of the Debtors' estates (the "**Foreign Representative**"), would ensure the Israeli Court is aware that this Court has authorized Vesttoo Ltd. to act as the Foreign Representative.  That clarity would assist Vesttoo in obtaining a recognition order under the IFLR, which is important since we have significant operations in Israel.  With other operations in other locations around the globe, it will also be useful for us to have this order entered in case we need to seek recognition in other countries.  Therefore, the Debtors request entry of an order that reflects that Vesttoo Ltd., as debtor in possession, may act as a Foreign Representative in foreign proceedings, including any Israeli Proceeding.

39.     Similarly, with so many foreign operations and parties in interest, the Debtors have many foreign creditors, contract counterparties and other parties-in-interest in countries who may not be well versed in the protections and restrictions of the Bankruptcy Code. Creditors and parties-in-interest may be unfamiliar with the operation of the worldwide automatic stay involve upon the Petition Date and other provisions of the Bankruptcy Code.

40.     Upon the commencement of these Chapter 11 Cases, non-U.S. counterparties to certain leases and executory contracts could attempt to terminate such leases or contracts, even if not permitted under the Bankruptcy Code.

41.     Similarly, governmental units outside of the United States may, deny, suspend, terminate, or otherwise place conditions upon certain licenses, permits, charters, franchises, or other similar grants held by a Debtor that is required for the Debtors' ongoing business operations.

42.     I think that if the Court would grant the *Motion of the Debtors for Entry of an Order Enforcing Sections 362, 365(E)(1), 525 and 541 of the Bankruptcy Code* the Company could share that order with the Israeli Court in support of its application for recognition and also have it available to share with foreign parties, which should reduce the risk that foreign parties will violate the terms of the Bankruptcy Code, avoid litigation over these issues, and be in the best interest of the Debtors.

### E.     Cash Management Motion

43.     Through the Cash Management Motion, the Debtors seek entry of an order (i) authorizing the Debtors to maintain their current Cash Management System, existing bank accounts and business forms, including authorizing the Debtors to open and close bank accounts in the ordinary course of business, (ii) modifying certain requirements of section 345 of the Bankruptcy Code, (iii) authorizing all banks participating in the Case Management System to honor certain transfers and charge bank fees and certain other amounts, and (iv) permitting continued intercompany funding and granting administrative expense priority status to postpetition intercompany claims held by a Debtor against one or more of the other Debtors, and (v) scheduling a final hearing.

44.     The Debtors currently maintain 46 bank accounts (each, a "Bank Account" and, collectively, the "Bank Accounts") with the following banks and other financial institutions (each, a "Bank" and collectively, the "Banks"): (i) Bank Hapoalim; (ii) Truist Financial; (iii) HSBC; (iv) DBS Bank (Hong Kong) Limited; (v) Webster Bank; (vi) Hana Bank, Naejadong Branch; (vii) HSBC Bank Bermuda; and (viii) Israel Discount Bank.

45.     The Debtors also maintain two credit cards used to pay expenses that arise in the ordinary course, including office supplies, equipment, gasoline charges, among others.  Further, and in the ordinary course of business, the Debtors' main operating account transfers funds on behalf of certain of the Debtors on account of invoices due and payable for various operating expenses and obligations arising from customer contracts.

46.     I believe that the continuation of the Debtors' Cash Management System is essential to the Debtors' businesses, and the Debtors' operations would be hampered significantly if they were forced to discontinue using their existing Cash Management System, causing confusion to the Debtors' vendors, customers, and employees, among others.  I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11.  I also believe that there is cause under the circumstances to waive the requirements to close certain of the Debtors' Bank Accounts and open up new bank accounts at certain banks authorized by the Office of the United States Trustee.  As I understand such requirements, doing so would be both cost-prohibitive and practically impossible under the circumstances.  As set forth herein, the Debtors are the subject of investigations across numerous countries based on alleged prepetition conduct.  It follows that it is likely that the Debtors would not be able to open up new bank accounts in a timely manner; notably KYC and AML requirements would likely bar the Debtors from opening up new accounts at this time.

47.     Further, even if the above would not bar the Debtors from opening up new bank accounts, such an undertaking would distract the Debtors and their employees from the important task of continuing to operate the Debtors' businesses in the ordinary course of business and proceed through these Chapter 11 Cases.

48.    Accordingly, on behalf of the Debtors, I respectfully submit that the Cash Management Motion should be granted.[5]

### F.    Wage Motion

49.    Through the Employee Wage Motion, the Debtors seek authorization (i) to pay prepetition wages and other compensation, taxes and withholdings, and reimbursable employee expenses, (ii) to honor and continue benefit programs for employees, and (iii) for the Debtors' cash management banks and financial institutions at which the Debtors maintain disbursement and other accounts to receive, process, honor and pay all checks issued and electronic payment requests made related to such employee obligations.  Specifically, the Debtors seek authority to make the following interim and final payments:

| Summary of Relief Requested | | |
|---|---|---|
| | Interim | Final |
| Employee Benefit Programs[6] | $861,785 | $861,785 |
| Accrued and Unpaid Compensation | $500,000 | $500,000 |
| Credit Card Expenses | $30,000 | $30,000 |
| Independent Contractors | $25,000 | $50,000 |
| Out of Pocket Expenses | $10,000 | $10,000 |
| Withholding Taxes and Obligations | $1,333,110 | $1,333,110 |
| Payroll Service Fee | $5,000.00 | $5,000.00 |
| Termination Payments[7] | $2,184,334 | $2,196,564 |
| Total Relief Requested | $4,949,229.00 | $4,982,829.00 |

50.    The Debtors' workforce is composed of approximately 74 full-time employees (the "**Employees**"), who are full time and salaried.

---

[5]    As set forth in the Cash Management Motion, the Debtors and their professionals are conducting ongoing investigations to identify and verify additional bank accounts and cash positions.  To the extent the statements or descriptions set forth therein are inaccurate or incomplete, the Debtors will seek to either amend such statements or descriptions or provide further information to the Court and parties in interest during any hearings set to consider the Cash Management Motion.

[6]    This category includes the total amount owed on account of (i) the 401K Plan, (ii) the Group Health Plans, and (iii) the Time Off Policies.

[7]    This category includes the total amount owed to (a) terminated Employees on account of (i) statutory one-month notice payments under Israeli law; (ii) unused vacation days; and (iii) remaining payroll payments; and (b) termination payments owed to Independent Contractors.  The interim cap does not include termination payments owed to Independent Contractors while the final cap does.

51. As of the Petition Date, the Debtors believe that they owe $500,000.00 to the Employees in accrued and unpaid compensation. The most recent, regularly scheduled payroll cycle prior to the Petition Date for the Salaried Employees ended on July 31, 2023, which covered the period from July 1, 2023, through July 31, 2023. The most recent payroll cycle prior to the Petition Date for (i) the Employees located in Israel ended on August 3, 2023, which covered the period from July 1, 2023, through August 3, 2023, (ii) August 15, 2023 for the Employees located in the U.S, which covered the period from July 31, 2023 through August 15, 2023; (iii) July 30, 2023 for the Employees located in the United Kingdom, which covered the period from July 1, 2023 through July 30, 2023; (iv) August 15, 2023 for the Employees located in Bermuda, Dubai, and Hong Kong, which covered the period from July 15, 2023 through August 15, 2023; and (v) August 8, 2023 for the Employees located in Korea, Dubai, Japan, and Germany, which covered the period from July 8, 2023 through August 8, 2023.

52. Most Employees rely exclusively on their compensation and benefits to pay their daily living expenses and support their families and would be exposed to significant financial hardships were the Debtors unable or unauthorized to continue paying compensation, provide employee benefits, and maintain existing programs. The Debtors seek to minimize the personal hardship that their workforce would suffer if the Debtors' obligations were not honored when due or as expected.

53. Importantly, the Employee Wage Motion seeks to pay certain termination payments to terminated employees (the "**Terminated Employees**") consisting of their remaining payroll owed as well as termination notice payments. I understand that these payments are required to be made under Israeli law.

54.     Specifically, I have been informed that under the Prior Advance Notice for Dismissals and Resignations Law, the Debtors are required to provide prior notice to Terminated Employees, and that failure to pay a Terminated Employees' salary between the time they are notified of their termination and their termination date could lead to significant exposure to the Debtors in the form of significant, administrative fines from the Ministry of Economy.

55.     Further, I have been informed that under Sections 26(b) and (c) of the Wage Protection Law, if the Debtors fail to make these termination payments, the Debtors' directors and officers could be exposed to criminal fines.  Failing to pay these fines could result in imprisonment.  Additionally, Israeli law establishes a presumption that if a criminal offense is committed by a company or its employees, it is presumed that the management and officers of the company have neglected their responsibilities and are liable to face criminal charges.

56.     It is also my understanding that no insider of the Debtors, as that term has been defined under the Bankruptcy Code, will receive any termination payments as a result of granting the Wage Motion.  Nor will either of the founders of the Company receive any termination payments through the Employee Wage Motion.

57.     Additionally, a significant portion of the value of the Debtors' businesses is tied to their workforce, especially those skilled in the Company's AI technology and those that are versed in the complexities of the reinsurance and retrocession industries; these special skills cannot be replaced without significant efforts—which efforts may not be successful given the overhang of these Chapter 11 Cases.  If the Debtors are not authorized to pay the Prepetition Employee Obligations, the Debtors' workforce could lose morale and Debtors' operations could be jeopardized, especially in the face of the uncertainty created by the LOC issues.  As a result, I believe that payment of the Prepetition Employee Obligations is a necessary and critical element

of the Debtors' efforts to preserve value and will afford the Debtors the greatest likelihood of retention of their Employees as the Debtors seek to operate their businesses in these Chapter 11 Cases.

58.    Accordingly, on behalf of the Debtors, I respectfully submit that the Employee Wage Motion should be granted.

[*Signature Page Follows*]

DocuSign Envelope ID: 1EC6A065-E3DF-43ED-9DAB-A53F28DFE66C

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury of the Laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information, and belief.

Ami Barlev