IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| *In re*<br><br>VESTTOO LTD., *et al.*,[1]<br><br>　　　　　　　　　Debtors. | Chapter 11<br><br>Case No. 23-11160 (MFW)<br>(Jointly Administered)<br><br>Hearing Date: Nov. 8, 2023 at 10:30am Requested<br>Objection Deadline: November 8, 2023 at 10:30am Requested (Filed Objections Nov. 7, 2023 12:00pm) |

**MOTION OF THE UNITED STATES TRUSTEE FOR ENTRY OF AN
ORDER CONVERTING THE CASES TO CHAPTER 7 CASES**

Andrew R. Vara, United States Trustee for Regions Three and Nine (the "U.S. Trustee"), through his counsel, files this motion (the "Motion") for the entry of an order an order converting the cases to cases under chapter 7 pursuant to 11 U.S.C. § 1112 (b)(1). In support thereof, the U.S. Trustee respectfully represents:

**I.    PRELIMINARY STATEMENT**

In mid-July of this year, press reports identified that hundreds of millions of dollars that the Vesttoo Debtors were tasked with providing as collateral for obligations to many insurance counterparties were invalid, as the banks that purportedly issued the collateral (letters of credit ("LOC")) denied all knowledge of the LOCs. In their own interim investigation report, the Vesttoo Debtors acknowledge that those LOCs were fabricated by key employees of the Debtors while

---

[1]  Due to the large number of debtor entities in these chapter 11 cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent at https://dm.epiq11.com/vesttoo..

1

other managers failed to detect or take action to halt the fraudulent scheme. Consistent with the requirements of section 1102, the U.S. Trustee appointed an official committee of unsecured creditors, (the "Committee"), which acts a fiduciary on behalf of general unsecured creditors. The Committee, by moving to terminate exclusivity, seeks to file a liquidating plan, acknowledging in the Committee's judgment that there is no prospect of reorganization or rehabilitation for the Vesttoo Debtors. To spare the Court and the estates the cost of a lengthy contest between the Debtors and the Committee, the U.S. Trustee moves to convert these chapter 11 cases to chapter 7 cases so that an independent fiduciary can wind down the debtors' affairs and avoid significant administrative costs (namely, professional fees) that would be incurred if these cases remain in chapter 11. If the Committee prevails on its motion to terminate exclusivity and the Debtors continue to oppose further items sought by the Committee, the estates will suffer further diminution in value that conversion to chapter 7 would avoid entirely.

Cause under section 1112(b) exists for several reasons. First, fraud on this massive scale requires that an independent fiduciary, in the form of a chapter 7 trustee, be appointed to pursue causes of action against responsible parties, to investigate whether others were involved or bear liability for failing to take appropriate action, and to marshal the assets of these Debtors in an unbiased way to promote the greatest recovery to stakeholders. The continuity of management between those that perpetrated massive fraud as detailed in the First Interim Report and the current officers and directors of the Debtors is sufficient to establish cause for conversion. Testimony at the initial section 341 meeting of creditors identified that other than removing former CEO Yaniv Bertele and Chief Financial Engineer Alon Lifshitz (who are/were both co-founders and directors), the Debtors' proposed interim CEO (Ami Barlev) and the other members of the Vesttoo Ltd. Board of Directors held such positions while Messrs. Bertele and Lifshitz orchestrated a multi-billion dollar fraud on counterparties of the Debtors. This continuity of leadership creates a situation

where the current interim CEO and the rest of the Debtors' Board of Directors continue to manage the Debtors despite being present for actual fraud, dishonest dealings and/or criminal conduct, which is the root issue of the chapter 11 filings for these Debtors.  Converting these cases to chapter 7 and the appointment of an independent trustee is in the interests of the Debtors' creditors and other parties asserting an interest in the Debtors' estates, consistent with Code section 1112(b)(1) and (2).

A trustee should investigate: (i) the substantial and serious allegations of fraud, dishonesty, incompetence, misconduct, and mismanagement by the pre-petition Debtors; (ii) the circumstances surrounding the Debtors' failure to perform their obligations under the reinsurance contracts and agreements; (iii) identification of nonexistent LOCs; and (iv) whether colorable claims and causes of action exist to remedy losses.  Mr. Barlev, as Interim CEO, along with DLA Piper (US) LLP and Kroll Associates UK, Ltd., firms that Vesttoo employed in the wake of revelations of the fraudulent LOCs in press reports, have done some preliminary work in untangling some of these issues.  However, the questions at stake here are simply too large and important to be left to an internal investigation.  Mr. Barlev, as an officer and director of the debtors (and as an appointee of prior management, present during the conduct at issue), cannot act as a true neutral, especially as to parties whose objectives may conflict with those of the Vesttoo Debtors.

Second, cause for conversion exists based on the facts identified in the Committee's Motion to Terminate Exclusivity.  Separate sufficient grounds for conversion include: (i) substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation; (ii) gross mismanagement of the estate; and (iii) unauthorized post-petition payments made by the Debtors to professionals of almost $1 million – each of which on its own would be sufficient to enter an order converting these cases.  The Committee identifies in its filing (i) an absence of revenue-generating business, (ii) speculative prospects for a costly sales process, and

(iii) a lack of confidence in the Debtors' proposed business plan. The Committee's identified issues all contribute to substantial or continuing loss to, or diminution of, the estates and militate in favor of conversion to stem the ongoing cash burn. Gross mismanagement of the estate postpetition is established by the failure of the Debtors to maintain proper controls to prevent unauthorized professional fee payments of nearly $1 million dollars being made. The Motion should be granted.

## II.     JURISDICTION, VENUE AND STANDING

1. This Court has jurisdiction over the above-captioned cases pursuant to 28 U.S.C. § 1334. This Court is authorized to hear and determine the Motion pursuant to 28 U.S.C. § 157(a, b), and the amended standing order of reference issued by the United States District Court for the District of Delaware dated February 29, 2012. Venue of the cases is proper in this District pursuant to 28 U.S.C. § 1408(1).

2. Under 28 U.S.C. § 586, the U.S. Trustee is generally charged with monitoring the federal bankruptcy system. *See United States Trustee v. Columbia Gas Sys., Inc. (In re Columbia Gas Sys., Inc.)*, 33 F.3d 294, 295-96 (3d Cir. 1994) (noting that U.S. Trustee has "public interest standing" under 11 U.S.C. § 307 which goes beyond mere pecuniary interest); *Morgenstern v. Revco D.S., Inc. (In re Revco D.S., Inc.)*, 898 F.2d 498, 500 (6th Cir. 1990) (describing the U.S. Trustee as a "watchdog"). Specifically, the U.S. Trustee is charged with "monitoring the progress of cases under title 11 and taking such actions as the United States trustee deems to be appropriate to prevent undue delay in such progress." 28 U.S.C. § 586(a)(3)(G).

3. The U.S. Trustee has standing to be heard with respect to the Motion pursuant to 11 U.S.C. § 307.

## III.     FACTUAL BACKGROUND

A. **The Debtors' Business and General Background**

4. In his first day declaration, Mr. Barlev describes the Vesttoo Debtors as a "fintech platform built to connect global insurance markets with the global capital markets." *Amended and Restated Declaration of Ami Barlev in Support of Chapter 11 Petitions and First Day Pleadings* (D.I. 27) (the "Barlev First Day Declaration") at ¶ 15. The Barlev First Day Declaration identifies three "categories of insurance risk transfer" offered in the Debtors' businesses. These categories comprise:

> aggregate stoploss reinsurance, a type of reinsurance in which the reinsurer pays losses in excess of the attachment point, which is a total amount of covered loss paid by the cedent, (2) quota share treaties, which are pro-rata reinsurance contracts in which the insurer and reinsurer share premiums and losses according to a fixed percentage from the first dollar of loss (and is therefore said to be "proportional"), and (3) excess of loss reinsurance in which the reinsurer indemnifies–or compensates–the ceding company for losses that exceed a specified amount or limit of the cedent.

*Id.* at ¶ 16.

5. The value that the Vesttoo Debtors sought to drive involved using proprietary AI-powered technologies to analyze and interpret insurance liability data and connect capital market participants to insurance and reinsurance transactions. Barlev First Day Decl. at ¶¶ 6, 9, 15-17. Vesttoo and its affiliates are subject to international regulatory regimes. *Id.* at ¶ 8.

6. The Debtors became the subject of allegations related to issuing fraudulent LOCs in connection with its services. Barlev First Day Decl. at ¶ 11. Those services were focused on supporting reinsurance transactions, which required posting of collateral to comply with various insurance regulations that govern risk transfer. The Vesttoo Debtors arranged capital market investors that would provide collateral to support such transactions, typically in the form of an LOC. *See id.* at ¶¶ 9-11.

7.     The Vesttoo Debtors do not have any secured lenders and have not issued any funded debt. Barlev First Day Decl. at ¶ 19. Funding for operations was derived from venture capital financing, including three completed rounds of funding, generating an aggregate of $101 million. *Id.* A failed fourth round of funding sought financing with the Vesttoo Debtors valued at $1.5-2 billion, but that "Series D" round did not close. *Id.* Early in 2023, the Vesttoo Debtors' valuation exceeded $785 million. *Id*. at ¶ 21. They also obtained a renewal with a Lloyd's syndicate of $120 million and entered a partnership with Blue Clear to supply reinsurance totaling $1 billion. *Id.*

8.     On September 7, 2023, the Debtors filed a status report titled *Debtors' First Interim Report* (D.I. 118). The Debtors' First Interim Report, signed by proposed counsel to the Debtors at DLA Piper LLP (US) ("DLA Piper"), states that its filing is meant to "provide all key stakeholders with a transparent assessment of the situation . . . . [and] the Debtors expect to issue supplemental reports." Debtors' First Interim Report at p. 2.

9.     The U.S. Trustee commenced the initial session of the section 341 Meeting of Creditors on September 18, 2023 (the "Initial 341") and continued the meeting to a date to be determined. (D.I. 144). Bankruptcy Schedules and the Statement of Financial Affairs ("Schedules and SOFAs") are not on file as of the date this Motion was filed. The Debtors were granted an initial extension to file those items to October 16, 2023, without prejudice to seek further extensions. On October 23, 2023, the deadline to file Schedules and SOFAs was further extended to October 30, 2023. *See* (D.I. 154); (D.I. 274).

B. *Reported Misconduct of the Debtors' Management*

10.    According to press reports, in mid-July of 2023, LOCs arranged by Vesttoo that were posted as collateral under reinsurance transactions were determined to be invalid, as China

6

Construction Bank ("CCB") reportedly denied all knowledge of the LOCs identified by a cedent seeking payment arising under insurance claims ceded to the Vesttoo Debtors in one transaction. Barlev First Day Decl. at ¶ 22.  The Barlev First Day Declaration identifies that those same press reports contended the LOCs were fraudulent.  *Id.*

11.     As a result of this LOC crisis, the Debtors slashed their work force by 75%, closed their Asia offices and placed founder Alon Lifschitz and founder/CEO Yaniv Bertele on paid leave. *Id.* at ¶ 24.  Additional fallout identified by the Debtors included:

- The Bermuda Monetary Authority appointed investigators to examine the Debtors' operations.  *Id*. at ¶ 25.

- Joint Provisional Liquidators were appointed *Id.*

- A TRO was entered by the District Court for the Southern District of New York freezing Debtors' assets, but for payroll and benefits *Id.* at ¶ 26.

- Regulators, banks and brokers demanded explanations concerning the LOC's. *Id.*at ¶ 27.

12.     Based on these circumstances, Debtors' board decided to file the above-captioned cases in order to "complete its investigation [of the LOC crisis], take remedial actions to ensure that the wrongdoers, if any, within the Company are removed, and those outside the Company are identified and appropriate remedies pursued." *Id.*

### C. *Debtors' Admissions Regarding the Extent of the Fraud*

13.     Prior to the filing of the Debtors' petitions, DLA Piper assisted the Debtors in investigating the alleged unlawful activity.  In their First Interim Report, the Debtors stated the results of the investigation:  "The forensic and documentary evidence has confirmed that a conspiracy to perpetrate a fraudulent scheme relating to the LOC's existed.  It has also been confirmed that that conspiracy included two members of Vesttoo's senior leadership (Bertele and Lifshitz)."  First Interim Report at p. 9.

14. The complex conspiracy involved:

- the creation of fraudulent documents and forged signatures;
- the use of fictitious bank employees; and
- the use of three separate banks, CCB, Standard Chartered Bank ("SCB") and Santander Bank ("Santander") to issue the fraudulent LOCs.

*Id.* at p. 9-10.

15. As a result, since 2020, stand-by LOCs were issued by the foregoing banks as follows:

- CCB: $2.81 Billion;
- SCB: $362 Million;
- Santander: $186 Million

*Id.* at p.11.

16. These banks "confirmed **that the vast majority of these LOC's were fraudulent**." *Id.* (emphasis in original). The Debtors' First Interim Report details the fraud committed by upper management and their attempts to deceive the Debtors' banks, employees, issuing banks and the insurance industry. *See id.* at p. 9-15. During this time, Mr. Barlev was a member of the Debtors' board and part of the management team. At the Initial 341 Meeting, Mr. Barlev testified that, as of September 18, 2023, Mr. Lifshitz was still a board member along with five other directors. The Debtors state in the First Interim Report that an "Ad Hoc Special Committee" of the Board was formed, which is composed of two of those five directors, with Mr. Barlev acting as an observer. *See id.* at p. 19. The Debtors do not disclose much additional information regarding their corporate governance in the First Interim Report; the Report does not identify the current Board Members,

beyond noting that Mr. Bertele was terminated on September 6, 2023, and that the Debtors expect to take similar actions with respect to Mr. Lifschitz as well. *See id.* at p. 15.

### D. The Debtors' Chapter 11 Cases

17. On the Petition Dates, Vesttoo Ltd. and its debtor-affiliates filed the voluntary petitions which initiated the above-captioned cases. Mr. Barlev is identified as the "Authorized Signatory" of each Debtor entity as part of a "Joint Action By Unanimous Written Consent of the Board of Directors of Vesttoo Ltd. and the Authorized Signatory of Each of the Filing Subsidiaries" attached to the Debtors' petitions. (D.I. 1) at p. 8-20. Members of the Board that provided their unanimous written consent, are not identified in that document.

18. The U.S. Trustee has appointed an official committee of unsecured creditors, the Committee. *Notice of Appointment of Unsecured Creditors Committee* (D.I. 95).

19. The only documents the Debtors filed on the Petition Dates were their petitions. The Barlev First Day Declaration, which is traditionally filed on the petition date in large chapter 11 cases in this District, was not filed until three days thereafter, and was later amended and restated eight days later. *See* (D.I. 12); (D.I. 27). A Top 30 List of Creditors was not attached to the petitions, but was later filed as a standalone exhibit. (D.I. 106). Contested issues with respect to the Wages relief sought by the Debtors underscored the lack of clarity regarding the Debtors' employees and operational needs during the interim period of these cases. *See* (D.I. 101).

20. The petitions did not identify the number of creditors, the amounts for assets and the amount of liabilities. (D.I. 1).

21. On October 19, 2023, the Debtors filed the *Motion of the Debtors for Entry of an Order (I) Authorizing the Debtors to Retain, Employ, and Compensate Professionals Utilized in the Ordinary Course of Business Pursuant to Retention Procedures and (II) Granting Related Relief Filed by Vesttoo Ltd.* (the "OCP Motion"). (D.I. 263). The Debtors disclosed unauthorized

9

payments to certain Ordinary Course Professionals, and propose those unauthorized payments be retained by the Ordinary Course Professionals. OCP Motion at ¶¶ 17-18. Schedule 1 to the OCP Motion identifies that certain unauthorized payments to GK Advisory occurred on September 4, 2023 and September 13, 2023, for an aggregate of $190,429.20 in unauthorized professional payments. *Id.* at Schedule 1 (D.I. 263-2).

### *E. The Committee's Motion to Terminate Exclusivity and Viability of Reorganization*

22. On October 22, 2023, the Committee filed *The Motion of the Official Committee of Unsecured Creditors Pursuant to Section 1121(d)(1) of the Bankruptcy Code for Entry of an Order Terminating Exclusive Periods for Debtors to Propose and Solicit Acceptances of a Plan* (the "Committee Motion to Terminate Exclusivity" or "CMTE"), along with related items. *See* (D.I. 268, 269, & 270). The proposed redacted documents of the Committee Motion to Terminate Exclusivity are found at Docket Item 269. (D.I. 269).

23. The Committee Motion to Terminate Exclusivity highlights the following:

- The Debtors have had no meaningful business operations or revenue since the Petition Dates. CMTE at ¶ 26 (citing Newman Decl. at ¶ 7).

    The Debtors have made almost $1 million of unauthorized postpetition payments to certain professionals, including Kroll, and have not taken any decisive remedial action to address those unauthorized payments. CMTE at ¶ 30; *see also* Letter via Email from R. Craig Martin to Anthony W. Clark, Ex. B, at p. 4-5.

- The Debtors' admissions of extensive prepetition fraud and mismanagement, along with deficiencies in governance and institutional controls, coupled with the Debtors' insistence on its "Trade Forward" business plan, have eroded the confidence of creditors and the Committee and have prompted the need for an efficient liquidation. *See* CMTE at ¶¶ 57-59.

24. The Committee Motion to Terminate Exclusivity has been noticed for the November 8, 2023, hearing date. *See* (D.I. 269).

25. Contemporaneously with the filing of this Motion, the U.S. Trustee is filing a Motion to Shorten and Limit Notice so that the Court can consider conversion on the common issues of fact relevant to both the Committee Motion to Terminate Exclusivity and this Motion.

## IV.  GROUNDS/BASIS FOR RELIEF

### A. *Cause Exists to Convert These Cases to Chapter 7*

26. These cases should be converted to cases under chapter 7 of the Bankruptcy Code pursuant to 11 U.S.C. § 1112(b)(1), which provides:

> Except as provided in paragraph (2) and subsection (c), on request of a party in interest, and after notice and a hearing, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause unless the court determines that the appointment under section 1104(a) of a trustee or an examiner is in the best interests of creditors and the estate.

27. A nonexhaustive list of grounds constituting "cause" is provided in 11 U.S.C. § 1112(b)(4), including: "(A) substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation; (B) gross mismanagement of the estate;" because "cause" is nonexhaustive, the Court may look to other items that likewise establish a need to convert. *See In re Marvel Entm't Grp., Inc.*, 140 F.3d 463, 472 (3d Cir. 1998) ("Moreover, we are impressed by the persuasive reasoning in *In re Cajun Elec. Power Coop., Inc.*, 74 F.3d 599, 600 (5th Cir.) (adopting on rehearing the opinion of dissent in 69 F.3d at 751), *cert. denied,* 519 U.S. 808, 117 S.Ct. 51, 136 L.Ed.2d 15 (1996), in which the court upheld a trustee appointment based on a finding of acrimony.")  "Undoubtedly, there is a natural presumption that identical words used in different parts of the same act are intended to have the same meaning." *Official Comm. of Unsec. Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548, 559 (3d Cir. 2003) (quoting *Atlantic Cleaners & Dyers, Inc, v. United States*, 286 U.S. 427, 433 (1932)).

28. Both enumerated grounds in 11 U.S.C. § 1112(b)(4)(A) and (B) are satisfied under the facts and circumstances of the instant cases. Additionally, these cases should be converted to ones under chapter 7, as it is in the best interests of the creditors and other parties in interest to have the Debtors' assets liquidated and its causes of action against current and former management and professionals pursued by a chapter 7 trustee without ties or obligations to any of the Debtors' principals or agents, given the widespread and massive fraud admitted by the Debtors and the continuity of management between the time of the fraud and today.

   *i. Substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation is established on these facts.*

29. The purpose of 11 U.S.C. § 1112(b)(4)(A) is to "preserve estate assets by preventing the debtor in possession from gambling on the enterprise at the creditors' expense when there is no hope of rehabilitation." *In re Lizeric Realty Corp.*, 188 B.R. 499, 503 (Bankr. S.D.N.Y. 1995) (quoted in *Loop Corp. v. United States Trustee (In re Loop Corp.)*, 379 F.3d 511, 516 (8th Cir. 2004)). "Substantial or continuing loss to or diminution of the estate" is established where a debtor has continuing, negative cash flow post-petition. *See Loop Corp.*, 379 F.3d at 515-16.

30. "Rehabilitation," as the term is used in 11 U.S.C. § 1112(b)(4)(A), means "to put back in good condition; re-establish on a sound, firm basis." 5 COLLIER ON BANKRUPTCY § 1112.03(2) (15th ed. 1980) (quoted in *In re L.S. Good & Co.*, 8 B.R. 315, 317 (Bankr. N.D. W.Va. 1980)). To be clear, "rehabilitation" does not include or mean the ability to confirm a liquidating plan.

31. While the Committee Motion to Terminate Exclusivity identifies and dismisses conversion as a remedy to the situation in these cases, the Committee engages in overly optimistic thinking as to what would occur in the event the Court terminates exclusivity. The relief sought by the Committee does not prohibit the Debtors from asserting any opposition to the plan the

Committee would be authorized to file and solicit, but instead invites further pitched litigation that will continue to deplete and drain resources away from the payment of unsecured claims. Conversion to chapter 7 will avoid further litigation among the parties in these chapter 11 cases and preserve the greatest amount of estate resources for distribution on allowed claims.

32. Here, the Debtors are eating into their cash position to fund employee expenses in the hopes of achieving a speculative sale of intellectual property and the prosecution of their chapter 11 bankruptcy cases. Despite the formulation of the "Trade Forward" business plan, the Debtors are not generating any revenue from operations, and the cloud of the prepetition conduct will likely severely curtail any interest from counterparties in doing business with the Debtors in the near term. In short, there is a continuing loss to, or diminution of, the estates and the absence of a reasonable likelihood of rehabilitation. Accordingly, conversion of the cases to cases under chapter 7 is required.

33. Notwithstanding that conversion is mandatory where the "continuing loss/absence" prong of section 1112(b)(4)(A), it is also a desirable result here. At bottom, the size of the distribution made to general unsecured creditors in these cases will hinge on the estates' success in resolving issues among various constituencies, litigating where necessary, and taking expeditious, effective action to maximize value. Given the circumstances confronting the various estates and parties in interest, the appointment of an independent and disinterested fiduciary is necessary to lead that effort.

*ii. Gross mismanagement is established as cause for conversion.*

34. Gross mismanagement featured prominently in the Debtors' path to bankruptcy, and has not improved meaningfully in the postpetition period. Fraud on a massive scale goes beyond gross mismanagement, and notwithstanding adverse employment action against the Debtors' identified bad actors, current management was also in place throughout the relevant period. After

the Petition Dates, the Debtors have failed to appreciate the limitations imposed by the Bankruptcy Code and improperly paid almost $1 million in professional fees. In total, these facts require a responsible and independent steward to take control of the Debtors' assets so that value for stakeholders can be preserved and creditor concerns about mismanagement can be put to rest.

35. After the LOC crisis came to light, the Debtors chose Mr. Barlev as interim CEO. None of Mr. Barlev's fellow directors that provided their written consent for the bankruptcy filing, or implemented his selection as interim CEO have been disclosed in the Debtors' pleadings.[2] Further, Mr. Barlev served as a member of the board while Messrs. Bertele and Lifshitz and other Vesttoo employees were engaged in the LOC fraud scheme, which by the Debtors' own admission affects the vast majority of approximately $3.35 billion in collateral the Debtors were contractually obligated to arrange for various counterparties. While there is no evidence of any fraud by Mr. Barlev in any of the current pleadings, it is conceivable that there are present officers, directors and employees of Vesttoo with whom Mr. Barlev has served, worked and socialized who might be implicated in the fraud as the investigation unfolds, including those who decided to appoint him as interim CEO. The implication of Vesttoo's current management in the fraud scheme would raise issues of impartiality and direct conflicts of interest which would inhibit a transparent and fair examination of the Debtors' wrongdoing. The Debtors' Board could exert undue pressure on the CEO and other employees. In contrast, a duly-appointed chapter 7 trustee would displace the Board's control over the Debtors' estates and start from a position of independence, and be required as a fiduciary to proceed as facts develop.

36. The magnitude of the Debtors' fraudulent activity by upper management, its impact on the Debtors' client base and the insurance and banking communities, and the Debtors' inability

---

[2] While discussed during the Initial 341, until the Schedules and SOFAs are filed, the Debtors' Board has not been identified in writing on the Docket at the time of this Motion.

to detect this fraud and maintain quality control, all constitute "incompetence" or "gross mismanagement" warranting conversion of these cases. *See, e.g., In re Vascular Access Centers, L.P.*, 611 B.R. 742, 764 (Bankr. E.D. Pa. 2020) ("Accordingly, courts have found cause present pursuant to § 1104(a)(1) in circumstances demonstrating conflicts of interest; misuse of assets and funds; inadequate recordkeeping and reporting; failure to file required documents; lack of adequate disclosure; lack of appropriate cost controls; transgressions related to taxes; failure to make required payments; lack of credibility and creditor confidence; and breaches of fiduciary duties."); *Oklahoma Ref. Co. v. Blaik (In re Oklahoma Ref. Co.)*, 838 F.2d 1133, 1136 (10th Cir. 1988) ("There are many cases holding that a history of transactions with companies affiliated with the debtor company is sufficient cause for the appointment of a trustee where the best interests of the creditors require"); *see also In re PRS Ins. Grp.*, 274 B.R. 381, 387 (Bankr. D. Del. 2001) (Walrath, J.) (identifying evidence of diversion of assets, or the absence of accurate financial records, constitutes "incompetence or gross mismanagement"). The nonexhaustive list of "cause" in both section 1112(b)(4) and section 1104(a)(1) can be construed similarly, consistent with the Third Circuit's recognition of the natural presumption afforded to the same words in the statutory scheme as discussed in *Cybergenics*.

37. The factual representations made thus far in these cases has created an incredible atmosphere of mistrust of the Debtors and their management, who even under the most charitable reading were "asleep at the switch" as a complex $3 billion forgery and fraud conspiracy occurred subject to their oversight.

**B. Conversion of These Cases to Chapter 7 Is in the Best Interests of These Estates**

38. When read together, sections 1112(b)(1) and (2) of the Bankruptcy Code indicate that, if a movant establishes "cause," the Court "shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interest of creditors

15

and the estate," unless "the court finds and specially identifies unusual circumstances establishing that converting or dismissing the case is not in the best interest of the creditors and the estate." There are no such "unusual circumstances" here, and therefore conversion or dismissal is mandated.

39. Again, while the Committee seeks to proceed with its own chapter 11 plan, it acknowledges that such a plan will be a liquidating one. As noted above, termination of exclusivity does not restrict the Debtors' rights to propose a competing plan, or otherwise oppose relief sought by the Committee, and so instead of an efficient and value-maximizing liquidation, termination of exclusivity will likely only serve to increase chapter 11 administrative expenses. Conversion results in the appointment of an independent fiduciary that is experienced with the liquidation of debtor assets, and while the process may not provide distributions as quickly as some chapter 11 liquidating plans, the safeguards of chapter 7 and the elimination of further litigation between the Debtors and Committee will preserve estate resources and promote greater recoveries for stakeholders.

[Remainder of page left blank intentionally]

WHEREFORE the U.S. Trustee requests that this Court enter an order converting these cases to cases under chapter 7, or granting such other and further relief as the Court finds just and appropriate.

Dated: October 27, 2023
       Wilmington, Delaware

Respectfully submitted,

**ANDREW R. VARA**
**UNITED STATES TRUSTEE,**
**REGIONS 3 and 9**

By: */s/ Timothy J. Fox*
Timothy J. Fox, Jr. (DE Bar No. 6737)
Trial Attorney
United States Department of Justice
Office of the United States Trustee
J. Caleb Boggs Federal Building
844 King Street, Suite 2207, Lockbox 35
Wilmington, DE 19801
(302) 573-6491 (Phone)
(302) 573-6497 (Fax)
Timothy.Fox@usdoj.gov