## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| VESTTOO LTD., *et al.*,[1] | Case No. 23-11160 (MFW) |
| Debtors. | (Jointly Administered) |

## <u>DECLARATION OF ROBERTA A. KAPLAN</u>

I, Roberta A. Kaplan, make this declaration (this "<u>Declaration</u>") to the best of my knowledge, information, and belief:

1.     I am a partner in the law firm Kaplan Hecker & Fink LLP ("<u>Kaplan Hecker & Fink</u>" or "we"), located at 350 Fifth Avenue, 63rd Floor, New York, NY 10118, and am duly authorized to make this declaration on behalf of Kaplan Hecker & Fink. I am admitted in and in good standing to practice law in New York and Massachusetts.

2.     I make this Declaration in support of the *Final Fee Application or, Alternatively, Request for Allowance and Payment of Administrative Expense Claim of Kaplan Hecker & Fink LLP for Compensation for Professional Services Rendered and Reimbursement of Expenses Incurred as Special Counsel to the Debtors for the Period From August 25, 2023 Through and Including December 31, 2023* (the "Application").[2] The facts set forth in this Declaration are based upon my personal knowledge, discussions with other Kaplan Hecker & Fink attorneys, and the

---

[1] Due to the large number of debtor entities in these chapter 11 cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent at https://dm.epiq11.com/vesttoo.

[2] Capitalized terms not otherwise defined in this Declaration have the meaning given to them in the Application.

Firm's records that were reviewed by me or other Kaplan Hecker & Fink attorneys acting under my supervision and direction. If any information disclosed in this Declaration requires amendment or modification upon Kaplan Hecker & Fink's completion of further review or as additional information becomes available, Kaplan Hecker & Fink will submit a supplemental declaration to the Court reflecting such amended or modified information.

3.      On August 25, 2023, Kaplan Hecker & Fink was retained by Vesttoo Ltd., one of the Debtors, to assist the Debtors in developing affirmative litigation against China Construction Bank ("CCB"), a third party that was involved in the fraudulent schemes that led to the Debtors' bankruptcy filing. *See, e.g.*, Debtors' First Interim Report (Sept. 7, 2023), ECF No. 118 at 9-15 (describing involvement of CCB based on Debtors' investigation to that point). A copy of Kaplan Hecker & Fink's engagement letter with Vesttoo is attached as Exhibit A.

4.      We immediately began investigating, researching, and preparing a complaint against CCB and ultimately provided a draft complaint to Debtors and their counsel at DLA Piper in October 2023. We then worked with Debtors and DLA Piper to revise the complaint over the course of several weeks.

5.      On November 1, 2023, DLA Piper provided a copy of the draft complaint to Greenberg Traurig, counsel for the Official Committee of Unsecured Creditors (the "Committee"). A copy of the complaint that Kaplan Hecker & Fink provided to Greenberg Traurig is attached as Exhibit B. Shortly thereafter, Greenberg Traurig asked DLA Piper to confirm that the Debtors would not file the complaint until after the Committee could discuss the potential litigation. DLA Piper agreed to the request.

6.      Greenberg Traurig then requested a meeting with Kaplan Hecker & Fink to discuss the draft complaint and Kaplan Hecker & Fink's retention by the Debtors. While discussing

scheduling for that meeting over the month of November, we informed Greenberg Traurig that we intended to ask the Debtors to file its retention application so that Kaplan Hecker & Fink's retention could be addressed at the December omnibus hearing. Greenberg Traurig stated that it understood our position on retention and asked that we confirm that the complaint against CCB would not be filed until after we met. We agreed to not file the complaint until December 15, 2023 at the earliest. In addition, we shared our invoices for time billed to Vesttoo with the Committee.

7.      Kaplan Hecker & Fink's retention application was filed with this Court on November 28, 2023.

8.      On December 6, 2023, we met with five attorneys from Greenberg Traurig, including the Creditors' Committee's lead bankruptcy counsel and lead Delaware counsel in this case, at their New York office. During that meeting, we discussed the draft complaint and the plan for either the Debtors, the Committee, or another creditor fiduciary to pursue litigation against CCB to recover assets for the estate based on CCB's culpability for the fraudulent scheme that caused Vesttoo to file for bankruptcy. Greenberg Traurig stated that the Creditors' Committee's plan was to wait to sue CCB until after the Committee obtained discovery from CCB through the Bankruptcy Rule 2004 process.

9.      In addition, we discussed Kaplan Hecker & Fink's retention application at the meeting with Greenberg Traurig. The Committee's lead bankruptcy counsel and lead Delaware counsel both stated that Kaplan Hecker & Fink's invoices reflecting our time billed to Vesttoo to that point were entirely reasonable and that the terms of our retention represented good value for the estate. But Greenberg Traurig stated that the Committee would object to our retention application unless we agreed to adjourn it to a future omnibus hearing. Greenberg Traurig's stated

basis for objecting to our application was that the Committee could not agree to our retention without a better understanding of the estate's assets.

10. None of those concerns pertained to whether Kaplan Hecker & Fink was entitled to be retained as special counsel as a technical matter under section 327(e) of the Bankruptcy Code or Bankruptcy Rule 2014.

11. Shortly after the meeting, we agreed to adjourn our retention application from the December omnibus hearing. Upon the request of Greenberg Traurig, and with the understanding that the Committee was continuing to evaluate potential litigation against CCB based on materials received through the Rule 2004 process, we later agreed to adjourn our retention application from the January, February, and March omnibus hearings while the Committee and Debtor finalized the Plan, which went effective on April 11, 2024.

12. With the Plan effective, Kaplan Hecker & Fink intended to have its retention application heard at the omnibus hearing scheduled for April 23, 2024.

13. On April 17, 2024, less than one week prior to the April 23, 2024 omnibus hearing, we learned from DLA Piper that Greenberg Traurig would not be representing the Wind Down Committee and Liquidating Trust and that McGuireWoods would represent the Liquidating Trust going forward.

14. We promptly scheduled a call with McGuireWoods for April 19, 2024.

15. On April 18, 2024, in advance of our scheduled call, one of the Liquidating Trust's attorneys from McGuireWoods, Sarah Boehm, called Andrew Chesley, an attorney at our firm, to discuss the omnibus hearing scheduled for April 23, 2024. Ms. Boehm informed Mr. Chesley that the Court asked to cancel the April 23, 2024 omnibus hearing. McGuireWoods sought our agreement to cancel the hearing because our retention application was scheduled to be addressed

at the hearing. Mr. Chesley told Ms. Boehm that cancelling the hearing would be acceptable so long as an omnibus hearing date was scheduled for May on a date early enough to permit Kaplan Hecker & Fink's retention application to be heard prior to the deadline for professional fee claims, May 26, 2024. Ms. Boehm confirmed that the May omnibus hearing would be scheduled in time to permit Kaplan Hecker & Fink's retention application to be heard prior to May 26, 2024. The May omnibus hearing was ultimately scheduled for May 21, 2024.

16.     On April 19, 2024, we spoke with the Liquidating Trust's attorneys, Ms. Boehm and Dion Hayes, at McGuireWoods. On that call, Mr. Hayes and Ms. Boehm stated that the complaint that we drafted and sent to the Creditors was very impressive and that the Liquidating Trust would consider retaining Kaplan Hecker & Fink to bring affirmative litigation on behalf of the Trust against CCB and other parties responsible for the fraud that caused Vesttoo to collapse. Mr. Hayes and Ms. Boehm asked that we run conflicts to represent the Liquidating Trust against several intended litigation targets.

17.     We also discussed our outstanding invoices with Mr. Hayes and Ms. Boehm on the call. While they stated that the Liquidating Trust was not in a position to immediately step into the engagement that Kaplan Hecker & Fink had with Vesttoo, Mr. Hayes and Ms. Boehm stated that all professionals on the Creditors side were in favor of our invoices being paid. Mr. Hayes and Ms. Boehm asked that we send in our invoices and stated that our retention would be presented to the Wind Down Committee as soon as possible.

18.     On May 10, 2024, almost three weeks after we last communicated with McGuireWoods, we learned from press reports that one creditor and member of the Wind Down Committee, Porch Group, had sued CCB over its involvement in the fraudulent scheme that led to the Vesttoo bankruptcy.

19.      When we reviewed the complaint that Porch Group filed against CCB, we learned

that it copied verbatim multiple sections of the complaint drafted by Kaplan Hecker & Fink that

had previously been provided to the Committee. A copy of Porch Group's complaint is attached

as Exhibit C and a redline comparing that complaint with our draft complaint is attached as Exhibit

D. The sections that were repurposed in Porch Group's complaint appear on pages 5, 12-18, and

31-39 of Exhibit D and are reflected in the non-redlined text,

20.      We promptly emailed Mr. Hayes and Ms. Boehm to inquire as to the status of any

actions that the Liquidating Trust planned to bring against CCB or the other defendants we had

discussed on our call. We also informed them that we intended to appear in the bankruptcy case to

argue for our retention application at the May 21, 2024 omnibus hearing.

21.      In response, Mr. Hayes informed us that the Liquidating Trust intended to withdraw

Kaplan Hecker & Fink's retention application. A few hours later, Mr. Hayes provided us with a

copy of Docket No. 1081, the Wind Down Officer's notice of withdrawal of our retention

application.

22.      Until we received Mr. Hayes's email late in the day on Friday May 10, 2024, we

expected that we would be able to argue for our retention application at the May 21, 2024 omnibus

hearing. As a result, we did not have time to prepare a supplemental administrative claim by the

May 11, 2024 deadline for such claims.

23.      Additionally, I have reviewed Rule 2016-2 of the Local Rules of Bankruptcy

Practice and Procedure of the United States Bankruptcy Court for the District of Delaware and

believe that, with respect to the fees and expenses outlined therein, the Application complies with

Rule 2016-2.

To the best of my knowledge, I declare under penalty of perjury that the foregoing is true and correct.

Dated: May 24, 2024
       New York, NY

                                                     */s/ Roberta A. Kaplan*_____
                                                     Roberta A. Kaplan
                                                     KAPLAN HECKER & FINK LLP
                                                     350 Fifth Avenue, 63rd Floor
                                                     New York, New York 10118
                                                     Telephone: (212) 763-0883
                                                     rkaplan@kaplanhecker.com

# Exhibit A

# KAPLAN HECKER & FINK LLP

350 FIFTH AVENUE | 63ᴿᴰ FLOOR
NEW YORK, NEW YORK 10118

1050 K STREET NW | SUITE 1040
WASHINGTON, DC 20001

TEL (212) 763-0883 | FAX (212) 564-0883

WWW.KAPLANHECKER.COM

DIRECT DIAL      212-763-0883
DIRECT EMAIL     rkaplan@kaplanhecker.com

August 30, 2023

**PRIVILEGED & CONFIDENTIAL**

**BY EMAIL**

Mr. Ami Barlev, CEO
Vesttoo Ltd.
23 Menachem Begin Street
Tel Aviv, Israel 6618356
amib@gilat.net

> Re:    *Engagement as Counsel*

Dear Ami:

On behalf of Kaplan Hecker & Fink LLP (the "Firm"), we are pleased that Vesttoo Ltd. ("You") has retained us as counsel in connection with potential litigation against China Construction Bank (the "Matter"). We write to confirm our acceptance of Your engagement of us as counsel and to provide You with certain relevant information concerning our fees, billing, confidentiality, etc. As an ethical matter, we are required to establish a common understanding about the terms and conditions of our retention. We have begun work for You and our engagement is effective as of August 25, 2023.

1.    Nature & Scope of the Representation

We agree to provide You with legal services that are reasonably necessary and appropriate for the Matter. This Agreement does not require the Firm to perform services for You in any court, administrative, mediation or arbitration proceedings, appeals, bankruptcies, post-judgment proceedings, or other matters ancillary to the Matter. You agree that the Firm is not being retained for any other matter or litigation, and is being retained only by You and not by any persons or entities related to You, such as any parents, subsidiaries, affiliates, directors, officers, partners, employers, or employees.

You understand and agree to cooperate actively with the Firm in activities undertaken in connection with the Engagement, including, for example, providing complete and accurate information to the Firm on a timely basis, responding to telephone calls and emails from the Firm,

KAPLAN HECKER & FINK LLP                                                          2

assisting in preparing for litigation-related activities, and attending meetings and participating in conference calls with the Firm as requested.

If at any time You ask the Firm to perform additional work beyond the scope of this current engagement, and if the Firm agrees to perform such work, the work shall be performed on the same terms stated in this Agreement, and You authorize such services without the sending of a new engagement letter.

2.      Legal Fees & Expenses

We assign hourly rates to each of our lawyers and staff, and require each of them to maintain a record of the time spent and the services rendered on a particular matter.  Our time will be recorded in tenths of an hour, and charged at the following hourly rates:

| | |
|---|---|
| Roberta Kaplan & Sean Hecker | $1,750/hour |
| Senior Partner | $1,500/hour |
| Mid-Level Partner | $1,400/hour |
| Partner | $1,200/hour |
| Counsel / Of Counsel | $1,100-$1,700/hour |
| Senior Associate | $950/hour |
| Mid-Level Associate | $875/hour |
| Associate | $700/hour |
| Staff Attorney | $550-$600/hour |
| Staff | $325-$475/hour |

You agree that any estimates or projections of fees or expenses provided by the Firm, including any previously given and any given in the future, are not binding and do not amend in any way the provisions of this Agreement relating to fees and expenses.

We are pleased to provide You with a 25% discount on the foregoing rates.  We also agree to apply a cap of $2 million to hourly fees for legal work performed through trial in the above-referenced litigation.  You acknowledge and agree that the cap does not apply to any ancillary proceedings, appeals, or collection matters, any work on which will be performed at the 25% discounted hourly rates but not subject to any cap.  In addition to hourly fees, You agree that the Firm will receive a 7% contingency fee based on any total recovery collected in connection with this Matter, including amounts resulting from a judgment, settlement, or any other outcome.  For the avoidance of doubt, total recovery is the value of anything collected in connection with the Matter, including non-monetary and monetary recovery, and is calculated on a pre-tax basis.

You also agree to pay all out-of-pocket costs, including but not limited to filing fees, Westlaw and other research platform fees, e-discovery and other vendor fees, expert fees, etc.

You agree to seek approval of the foregoing fee arrangement by the U.S. Bankruptcy Court for the District of Delaware ("Bankruptcy Court"), where You have filed a Chapter 11 bankruptcy petition, at the soonest possible opportunity.  If for any reason the Bankruptcy Court fails to approve the foregoing fee arrangement and/or prescribes an alternative fee arrangement that is unacceptable to the Firm, the Firm has the right to immediately terminate this engagement.

KAPLAN HECKER & FINK LLP

Further, You agree to provide us with $50,000 as an advance payment retainer. This advance payment retainer is a prepayment of fees, which means it, along with any subsequent payments of fees You send, is the property of the Firm upon receipt. You agree to keep current with our bills, and understand that we will apply the retainer at the end of our engagement or to any bills that are not timely paid. You will be responsible for replenishing the retainer if it falls below the agreed amount at any time. At the conclusion of our representation, we will apply any unbilled fees and expenses to the retainer, and any remaining portion will be refunded.

3.      Expenses, Disbursements & Other Charges

We will include on our invoices separate charges for expenses incurred in connection with this engagement in an amount calculated to reflect certain costs and expenses outside of our fees (e.g., messenger service, Westlaw, etc.) in connection with providing services to You. We may also incur other costs from outside vendors or suppliers for which we charge only the amount billed to us by the vendor or supplier. We may forward the invoices from these outside sources directly to You, and You will be responsible to pay the invoices in accordance with their terms. Otherwise, our statements will separately bill You for these disbursements and other charges.

4.      Outside Experts

In the course of our representation it may be appropriate, with Your advance approval, to retain persons of special expertise to assist in the rendition of legal services (e.g., accountants, economists, investigators). In some cases, we may agree that the Firm will assume responsibility for hiring such experts. Notwithstanding that situation, You agree that You will bear the responsibility directly to pay the invoices for the fees and expenses incurred by these persons.

5.      Billing

Our practice is to send bills on a monthly basis for fees, disbursements, and related charges incurred in the preceding month. In some cases, we may agree that billing will be done on some other basis. While we make every effort to include all disbursements in the statements for the period in which they were incurred, some invoices (especially outside vendor expenses) may not be available at the time of billing and must therefore be included on a later statement. We invite You to raise with us any questions You have about our bills.

Payment of bills is due within thirty (30) days of receipt. The Firm reserves the right to charge interest at a rate of 2% per month on bills that remain unpaid for more than thirty (30) days. If invoices remain unpaid, the Firm reserves the right to cease performing services until arrangements have been made for payment of outstanding invoices, as well as payment of future fees and expenses.

6.      Arbitration

In the event that a dispute arises between You and the Firm arising from or relating to the Matter, the parties agree that such dispute shall be finally settled by binding, confidential arbitration with JAMS under the JAMS Comprehensive Arbitration Rules and Procedures in force at the time such arbitration is commenced and shall take place in New York, New York; provided, however, that

KAPLAN HECKER & FINK LLP

as an alternative to the arbitration provided for above, in certain circumstances, You may have the right to demand arbitration of a dispute arising over our legal fees in civil matters involving amounts between one thousand dollars ($1,000) and less than fifty thousand dollars ($50,000). In the event that such a dispute arises, we shall notify You in writing of Your rights, if any, to demand mediation or arbitration.

7.    No Guarantees

During the course of this engagement, You may seek the Firm's professional opinions or beliefs regarding the likely outcome of legal matters or the likely effectiveness of various courses of action. Any expressions (solicited or otherwise) on our part concerning such possible outcomes or courses of action are expressions of our best professional judgment and opinions, and are not guarantees. By signing this Agreement, You acknowledge that the Firm has made no guarantees regarding the outcome of this Matter.

8.    Confidentiality

For our representation of You to succeed, it is crucial that You provide us with all factual information reasonably relevant and material to the subject matter of our representation. We treat our duty to preserve Your confidences and secrets with the utmost gravity. Our attorney-client relationship is with You, and this duty of confidentiality is owed only to You, unless You instruct us or our representation of You requires otherwise. Thus, the confidence and secrets we obtain in the course of such representations belong to and may be waived by You.

9.    Conflicts of Interest

We will not assert any affirmative claim against You on behalf of another client without Your express written consent during the pendency of this Agreement. In the course of representing You, and in order to fully satisfy our professional obligations, we may need to consult with outside counsel who specialize in advising law firms on ethical issues. You acknowledge and agree that, notwithstanding this potential for conflict in consideration of our professional obligations, we are free to consult with counsel on such matters without Your consent and that such consultations nevertheless remain privileged and confidential.

It is possible that our firm may represent clients that have interactions with You in matters totally unrelated to this representation. You agree that this Firm may represent other clients in unrelated matters who may have interests adverse to You, provided such matters are not substantially related to the work that we have been engaged to handle for You, and so long as we believe our responsibilities to You would not be materially limited due to such other representation.

10.    Termination of Our Relationship

Either party shall have the right to terminate our representation of You at any time and for any reason. If judicial approval is required for us to withdraw, the parties agree to cooperate in seeking such approval. Upon completion of the Matter to which this engagement letter applies, or the earlier termination of the representation, our attorney-client relationship will end unless we agree

KAPLAN HECKER & FINK LLP

to continue the representation on other matters. We shall have no continuing obligation to advise You on any matter unless we otherwise agree beforehand in writing.

11.    Insurance Matters

It is possible that You may have insurance policies relating to the Matter. We urge You to contact Your insurer or broker promptly to determine the nature and extent of Your applicable coverage, if any. If You do not expressly request in writing that we notify Your insurance carrier(s) on Your behalf regarding any matter in which we may represent You, we will assume that You are taking responsibility for any such notification. We assume no duty to advise You of applicable insurance coverage, if any, with respect to this or any matter You engage us to handle, unless You supply us with copies of Your insurance policies, expressly and in writing request our advice on potential coverage available under such policies and receive our express written agreement to provide such advice.

12.    Indemnification

To the maximum extent permitted by law, You agree to indemnify and hold harmless the Firm and its owners, principals, agents, employees and successors from any claims threatened or asserted that arise from or relate in any way to the Firm's representation of You, including any judgments or settlements of such claims. This indemnification shall extend to motions for sanctions and costs and bar complaints brought by third parties. You further agree to pay all expenses and costs of counsel incurred in defending any such actions, which the Firm may select in its sole discretion. The Firm shall have the right and ability to control its defense in any such Matter.

***This provision does not apply to claims brought by You for legal malpractice or other professional malfeasance arising from this representation.***

13.    Governing Law

Any controversy, dispute, or claim of any kind between us shall be governed by and interpreted in accordance with the law of the state of New York, without regard to any provisions governing conflicts of laws.

14.    Privacy

Our privacy policy describes our practices with regard to our collection and use of personal information in the course of our business, including in the course of performing legal services for You. In particular, our privacy policy describes, among other things: the types of personal information we collect; how we collect, use and share that information; how long we keep personal information; how we protect personal information; and the rights of individuals regarding their personal information. The policy is described on our website and available at https://www.kaplanhecker.com/privacy-policy. Please note that this policy may be updated, so we encourage You to review it regularly.

By signing this Agreement, You agree to give us reasonable notice of any proposed transfer to us of data that contains personal information, and, to the extent necessary to comply with applicable

KAPLAN HECKER & FINK LLP                                                         6

law, to provide a copy of our privacy policy to any third party whose personal information is transferred by You to us.

15.    Entire Agreement

These terms set out the entire agreement between You and the Firm concerning our provision of legal services.  Any modifications of or amendments to these terms must be in writing and agreed to by both parties.

16.    Records Management & Retention

We will maintain all paper and electronic records related to our representation of You securely. Those records will include legal pleadings, transactional documents, substantive correspondence and other documents reasonably necessary to our representation of You (the "Client File").  The Client File is Your property.  The records may also include purely internal Firm documents prepared for the purpose of facilitating performance of our legal services in the form of research memoranda, outlines, emails, handwritten notes and mark-ups of documents, as well as new matter intake forms and internal conflicts checking records.  These records are our property.  At the close of a specific matter, we will return to You Your original documents, if any, related to the matter. At Your request, any remaining records in the Client File will be returned to You at Your expense. You agree that we may make physical or electronic copies if we choose at our own expense.  You agree and understand that any materials left with us after the engagement has terminated may be retained or destroyed at our discretion without further notice to You and in a manner which preserves the confidential and secret nature of their contents.  In the event we are required to respond to a subpoena or other formal request from a third party relating to services we have performed for You, You agree to reimburse us for our time and expense incurred in responding to such request.

17.    Consultation with Independent Counsel

We have recommended, and You have acknowledged Your understanding and agreement, that You should seek the advice of an independent lawyer of Your choice regarding the terms of this Agreement, and You acknowledge by Your signature below that You have had a reasonable opportunity to do so.

*        *        *

Please signify Your acceptance of the foregoing Terms of Engagement by signing a copy of this letter and returning it to me.  Please note that Your instructing us or continuing to instruct us on the Matter discussed above will constitute Your full acceptance of the terms set out above.

Very truly yours,

Roberta A. Kaplan

KAPLAN HECKER & FINK LLP                                          7

By signing below, You represent that You have the authority to bind Vesttoo Ltd., and that the foregoing terms are acknowledged, accepted and agreed to.

By: _____

Date: _____
                              AMI  BARLEV
                              CEO

                    31/8/2023

# Exhibit B

Exhibit filed under seal.

# Exhibit C

## Multiple Documents

| Part | Description |
|------|-------------|
| 1 | 1 |
| 2 | Exhibit A |
| 3 | Exhibit B |
| 4 | Exhibit C |
| 5 | Exhibit D |

© 2024 Bloomberg Industry Group, Inc. All Rights Reserved. Terms of Service

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| HOMEOWNERS OF AMERICA INSURANCE COMPANY, HOMEOWNERS OF AMERICA HOLDING CORPORATION, PORCH.COM, INC., and PORCH GROUP, INC. | Civil Action No. 1:24-cv-3591 |
| Plaintiffs, | |
| v. | **COMPLAINT** |
| CHINA CONSTRUCTION BANK CORPORATION, CHINA CONSTRUCTION BANK (ASIA) CORPORATION LIMITED, and CHINA CONSTRUCTION BANK NEW YORK BRANCH, | **JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiffs Homeowners of America Insurance Company ("HOA"), Homeowners of America Holding Corporation ("HOAHC"), Porch.com, Inc. ("Porch"), and Porch Group, Inc. ("Porch Group"), for their Complaint against Defendants China Construction Bank Corporation ("CCBC"), China Construction Bank (Asia) Corporation Limited ("CCB Asia"), and China Construction Bank New York Branch ("CCBNY") (together, "Defendants" or "CCB"), allege as follows:

**NATURE OF THE ACTION**

1.      Plaintiffs bring this action to recover from China Construction Bank—one of the largest banks in the world—for enabling its personnel to perpetrate a colossal fraud that has upended the reinsurance industry and imposed monumental losses on Plaintiffs.

2.      Over decades, CCB built itself into a global financial institution. Publicly traded on both the Hong Kong S.A.R. and Shanghai stock exchanges, CCB provides a broad array of financial services to hundreds of millions of individual and corporate clients worldwide. Not

1

limited to Asia, CCB maintains substantial operations in the U.S. through its New York branch office.

3.      Despite CCB's outward assurances to regulators and the public that it prioritizes financial security and fraud prevention, CCB affirmatively enabled its employee Chun-Yin Lam, a Relationship Manager in CCB's Hong Kong S.A.R. office, to issue billions of dollars in false letters of credit purportedly made on behalf of CCB and originating from its New York branch.

4.      In a fraudulent conspiracy with employees of the now-bankrupt company Vesttoo Ltd. (together with its affiliates, "Vesttoo"), a self-described "insurance marketplace," Lam leveraged the authority CCB bestowed on him to issue dozens of purported letters of credit for reinsurance transactions. These letters of credit falsely guaranteed insurance companies, including Plaintiffs, access to critical reinsurance funds to help pay policyholders' insurance claims in the event of a major catastrophe.

5.      The conspirators' scheme worked for years. Plaintiffs and other insurance companies paid tens of millions of dollars in premiums for non-existent reinsurance until news broke in July 2023 that certain letters of credit backstopping Vesttoo's reinsurance transactions were fake.

6.      Plaintiffs—which operate a property and casualty insurance business across 21 U.S. states—were among the fraud's biggest victims. Plaintiff HOA lost tens of millions of dollars when its reinsurance facility, backed by a purported $300 million letter of credit from CCB, suddenly proved worthless. HOA had to quickly replace its reinsurance coverage at significantly higher cost, and has since paid over $80 million out-of-pocket to cover insurance claims that should have been reinsured. HOA's sudden financial uncertainty caused its regulator to place it under temporary supervision, leading to additional costs, regulatory burdens, and

reputational damage—and compelling HOA's parent company, Porch, to pour $57 million into HOA to stabilize its balance sheet. Not only did HOA incur colossal losses, but news of its exposure to the fraud perpetrated by Vesttoo and CCB shocked the market and imposed severe losses on Porch Group's shareholders as its stock price plummeted.

7.      Plaintiffs bring this action to recover from CCB for affirmatively enabling its employees to commit their massive fraud and for negligently allowing their misconduct to continue unabated for years—to Plaintiffs' extreme detriment.

## PARTIES

8.      Plaintiff Porch Group, Inc. ("Porch Group") is a Delaware corporation with its principal place of business in Seattle, Washington.

9.      Plaintiff Porch.com, Inc. ("Porch") is a Delaware corporation with its principal place of business in Seattle, Washington. Porch is a wholly-owned subsidiary of Porch Group.

10.     Plaintiff Homeowners of America Holding Corporation ("HOAHC") is a Delaware corporation with its principal place of business in Irving, Texas. HOAHC is a wholly-owned subsidiary of Porch Group.

11.     Plaintiff Homeowners of America Insurance Company ("HOA") is a Texas property and casualty insurance company, and a wholly-owned subsidiary of HOAHC, with its principal place of business in Irving, Texas.

12.     In September 2023, Porch.com, Inc. acquired all right, title, and interest in claims against CCB arising out of or in connection with the Quota Share Reinsurance Agreement, dated January 1, 2022, between HOA and White Rock Insurance (SAC) Ltd on behalf of its Segregated Account T96 - Homeowners, and the CCB letter of credit issued in connection with that reinsurance agreement.

3

13.     Defendant China Construction Bank Corporation ("CCBC") is a foreign bank headquartered in China that maintains substantial operations in the U.S., including at its New York branch office at 1095 Avenue of the Americas, New York, NY 10036. CCBC itself applied to the Board of Governors of the Federal Reserve System ("Federal Reserve") to establish a branch in New York. CCBC periodically submits a resolution plan for its U.S. operations to the Federal Reserve and the Federal Deposit Insurance Corporation ("FDIC"), including in 2022. CCBC's 2022 resolution plan makes clear that it "operates in the United States primarily through CCBNY, a full branch of CCB licensed by the New York State Department of Financial Services ('NYSDFS') and regulated by both the NYDFS and the Federal Reserve Bank."

14.     Defendant China Construction Bank (Asia) Corporation Limited ("CCB Asia") is a foreign bank with a main address of 28/F, CCB Tower, No. 3 Connaught Road, Central, Hong Kong, S.A.R., China. CCBC's 2020 annual report makes clear CCBC's authority and control over CCB Asia, including by stating that CCB Asia is wholly owned by CCBC and that "CCB Asia is the Group's service platform for retail and small and medium-sized enterprises in Hong Kong" S.A.R.

15.     Defendant China Construction Bank New York Branch ("CCBNY") is a branch office of CCBC that has operated in New York since July 2009. CCBNY is licensed and supervised by the New York State Department of Financial Services, with a main address of 1095 Avenue of the Americas, New York, NY 10036. CCBNY is also registered as a Foreign Banking Organization with the Federal Reserve and a Foreign Branch with the New York State Department of Financial Services, and it is listed by the National Association of Insurance Commissioners (NAIC) as a qualified U.S. financial institution that may issue letters of credit as collateral in reinsurance arrangements.

16.    CCBNY is a branch office directly operated and controlled by CCBC. As detailed in CCBC's 2020 annual report, CCBNY is an overseas branch of CCBC:

### BRANCHES OUTSIDE THE MAINLAND OF CHINA

| | |
|---|---|
| **Astana Branch** | 26th Floor, Talan Towers, 16 Dostyk street, Esil district, Nur-Sultan City, The Republic of Kazakhstan<br>Telephone: 007-7172738888<br>Facsimile: 007-7172736666 |
| **Macau Branch** | 5th Floor, Circle Square, 61 Avenida de Almeida Ribeiro, Macau<br>Telephone: 00853-82911880<br>Facsimile: 00853-82911804 |
| **DIFC Branch** | 31th Floor, Tower 2, Al Fattan Currency House, DIFC, P.O.Box: 128220, Dubai, UAE<br>Telephone: 00971-4-5674888<br>Facsimile: 00971-4-5674777 |
| **Tokyo Branch** | 13F/1F, West Tower, Otemachi First Square, 5-1, Otemachi 1-chome Chiyoda-ku, Tokyo 100-0004, Japan<br>Telephone: 0081-3-52935218<br>Facsimile: 0081-3-32145157 |
| *Osaka Branch* | *1/F, Itoh Building, 3-6-14 Minamihonmachi, Chuo-ku, Osaka-shi, Osaka, 541-0054, Japan*<br>*Telephone: 0081-6-61209080*<br>*Facsimile: 0081-6-62439080* |
| **Toronto Branch** | 181 Bay Street, Suite 3650, Toronto ON, Canada, M5J 2T3<br>Telephone: 001-647-7777700<br>Facsimile: 001-647-7777739 |
| **Frankfurt Branch** | Bockenheimer Landstrasse 75,60325 Frankfurt am Main, Germany<br>Telephone: 0049-69-9714950<br>Facsimile: 0049-69-97149588, 97149577 |
| **Ho Chi Minh City Branch** | 11th Floor Sailing Tower, 111A Pasteur Street, District 1, Ho Chi Minh City, Vietnam<br>Telephone: 0084-28-38295533<br>Facsimile: 0084-28-38275533 |
| **Luxembourg Branch** | 1 Boulevard Royal, L-2449 Luxembourg, Luxembourg<br>Telephone: 00352-28668800<br>Facsimile: 00352-28668801 |
| **London Branch** | 111 Old Broad Street, London, EC2N 1AP, U.K.<br>Telephone: 0044-20-70386000<br>Facsimile: 0044-20-70386001 |
| **Labuan Branch** | Level 13(E), Main Office Tower, Financial Park, Jalan Merdeka Labuan, Malaysia<br>Telephone: 006087-582018<br>Facsimile: 006087-451188 |
| **New York Branch** | 33rd Floor, 1095 Avenue of the Americas, New York, USA NY 10036<br>Telephone: 001-646-7812400<br>Facsimile: 001-212-2078288 |
| **Seoul Branch** | China Construction Bank Tower, 24 Myeongdong 11-gil, Jung-gu, Seoul 04538, Korea<br>Telephone: 0082-2-67303600<br>Facsimile: 0082-2-67303601 |

17.    CCBC's New York branch is directly managed and controlled by the President of CCBC. This direct oversight and control is shown in the following organizational structure chart excerpted from CCBC's 2020 Annual Report:



18.     That CCBNY is a branch office of CCBC is further illustrated by its website, which touts itself as a branch of China Construction Bank, proclaiming "We are now in America."[1]



19.     CCBNY's website further explains: "The opening of the NY branch marked the establishment of CCB's first branch in the Americas. . . . CCBNY provides extensive financial products and services to our customers and strives to achieve significant business development. . . . Based on the advantageous location of New York, the dominant financial markets in the world, and CCB's strong customer base in China, CCBNY offers various supports and products

---

[1] http://us.ccb.com/newyork/en/index.html (last viewed Jan. 31, 2024).

for our customers to expand business both into China and the US, playing a significant role in facilitating bilateral economic and trading activities."[2]



---

[2] http://us.ccb.com/newyork/en/gywm.html (last viewed Jan. 31, 2024).

20.    In U.S. tax filings, CCBC listed its office at 1095 Avenue of the Americas in New York as its own address—not that of a subsidiary or affiliate. For example, on November 23, 2021, CCBC filed a Form W-8ECI identifying its own New York address:[3]



_____
[3] Available at: http://us.ccb.com/newyork/en/gywm.html (last viewed Jan. 31, 2024).

21.      CCBC is also directly regulated by the New York State Department of Financial Services. NYSDFS's website lists "China Construction Bank Corporation" as a regulated entity.[4]



22.      Defendant CCB Asia has further purposefully availed itself of the privilege of conducting activities in New York State, and invoking the protections and benefits of New York's laws, by affirmatively filing its own legal action in this Court as recently as last year. *See In Re: China Construction Bank (Asia) Corporation Limited*, Case No. 1:23-mc-00017-JMF, Dkt. No. 1 (S.D.N.Y.). Indeed, through this action, CCB Asia has availed itself of this Court's enforcement authority to seek discovery from multiple financial institutions and financial advisors under 28 U.S.C. § 1782. *Id.*, Dkt. No. 4 at 1. On information and belief, CCB Asia continues to this day to purposefully avail itself of this Court's authority to obtain discovery from financial institutions. *See In re China Constr. Bank (Asia) Corp. Ltd*., No. 23-MC-17

---

[4] *See Who We Supervise*, DEP'T FIN. SERV. (last accessed Feb. 1, 2024), https://myportal.dfs.ny.gov/web/guest-applications/who-we-supervise.

(JMF), 2023 WL 3791711, at *1 (S.D.N.Y. June 2, 2023) (denying intervenors' motions to quash subpoenas issued to them by CCB Asia).

## JURISDICTION AND VENUE

23.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000 and the action is between citizens of different states or citizens of a state and citizens of a foreign state. Plaintiffs Porch Group and Porch are Delaware corporations with principal places of business in Washington. Plaintiff HOAHC is incorporated in Delaware and headquartered in Texas. Its wholly-owned subsidiary, Plaintiff HOA, is a Texas company headquartered in Texas. Defendant CCBC is a foreign bank headquartered in China. Defendant CCB Asia is headquartered in Hong Kong S.A.R. Defendant CCBNY is a branch office of CCBC located in New York, NY.

24.    The Court has personal jurisdiction over Defendants because they have purposely availed themselves of the privilege of conducting business in New York, including by operating and conducting business out of CCBC's branch office at 1095 Avenue of the Americas in New York City, thus purposefully availing themselves of New York's dependable and transparent banking system, the dollar as a stable and fungible currency, and the predictable jurisdictional and commercial law of New York and the United States. In tandem with their physical office presence in New York, Defendants have purposefully availed themselves of the protections of New York law by bringing suit in this District, including CCB Asia's initiation of the proceeding captioned *In Re: China Construction Bank (Asia) Corporation Limited*, Case No. 1:23-mc-00017-JMF (S.D.N.Y.).

25.    This Court further has personal jurisdiction over all Defendants because Plaintiffs' claims against Defendants arise out of Defendants' transaction of business within

New York, conferring personal jurisdiction under New York law. Fed. R. Civ. P. 4(k)(1)(A);

N.Y. C.P.L.R. § 302(a)(1). Defendants' fraud involved ostensible collateral for Plaintiffs'

reinsurance facility in the form of a falsified letter of credit which purportedly issued from

CCB's New York branch office (CCBNY). The falsified letter of credit constituted a

transaction within the state of New York, executed by Defendants. Under the NAIC's Credit for

Reinsurance Model Law, the letter of credit was required to be issued through CCBNY.

Defendants voluntarily subjected themselves to New York banking and FDIC regulations and,

in so doing, purposefully availed themselves of New York law. Defendants or their agents

leveraged the credibility and legitimacy of Defendants' New York operations subject to New

York law and regulatory oversight to support their fraudulent scheme.

26.     Each Defendant is transacting or has transacted substantial business in New

York; is contracting or has contracted to supply services or things in New York; has or does

derive substantial revenue in New York or engages in a persistent course of conduct in New

York; had or has interests in, used or uses, or possessed or possesses real property in New

York; and/or has intentionally engaged in conduct aimed at New York itself or through its

agents.

27.     Venue is proper under 28 U.S.C. § 1391(b)(1) because Defendants or their

agents reside or may be found in this District. Venue is also proper under 28 U.S.C.

§ 1391(b)(2) because a substantial part of the events giving rise to Plaintiffs' claims occurred in

this District. CCBC's New York branch office, CCBNY, is located within this District at 1095

Avenue of the Americas, 33rd Floor, New York, New York. As detailed further below, the

fraudulent $300 million letter of credit provided by CCB to Plaintiff HOA purported to issue

from CCBNY and bore CCBNY's address.

## FACTUAL ALLEGATIONS

**I.**     **HOA Obtained Reinsurance Purportedly Backed by a Letter of Credit from CCB**

28.     Plaintiff HOA is a licensed property and casualty insurance carrier headquartered in Irving, Texas. HOA operates in 21 U.S. states.

29.     In late 2021, HOA sought to obtain a new reinsurance contract. In a reinsurance transaction, an insurance company (known as a "cedent") cedes a portion of the risk that the insurer underwrote under specific policies to another insurer (the "reinsurer"), thereby spreading or transferring part of the risk to the reinsurer.

30.     The reinsurer shares the financial risk underwritten by the cedent and, in exchange, receives a portion of the premiums associated with the underlying insurance policies. The spreading of the risk then permits the cedent to, among other things, reduce the amount of financial reserves that it must hold for the protection of policyholders, which increases the cedent's capacity to underwrite additional insurance.

31.     HOA's reinsurance broker, Gallagher Re, introduced HOA to Vesttoo, an Israeli start-up company and self-described "insurance marketplace." Vesttoo provided reinsurance through specialized financial arrangements set up by another company, White Rock Insurance (SAC) Ltd. ("White Rock"), which is a subsidiary of the major international insurance services firm Aon plc.

32.     White Rock and Vesttoo set up a quota share reinsurance contract for HOA. Quota share reinsurance contracts are pro-rata reinsurance contracts in which the insurer and reinsurer share premiums and losses arising under a book of insurance policy business according to a fixed percentage from the first dollar of loss.

33.     In HOA's transaction, HOA ceded its risk to a "transformer entity" created by

13

White Rock. The transformer entity then converted (or "transformed") the insurance risk into an investible product: an equity security held in a "segregated cell account." The defining feature of a segregated cell account is that the assets linked to a particular account are available only to meet liabilities of that account's owners and creditors. Segregated cell accounts are commonly used in the insurance industry.

34.     In the case of Vesttoo's transactions, including the HOA transaction at issue here, once the transformer entity deposited the securitized reinsurance policy into a segregated cell, the transformer entity then entered into a series of agreements that transferred ownership in the segregated cell and any associated funds to a special purpose vehicle established by Vesttoo, known as a Vesttoo Bay Fund.

35.     In Vesttoo's transactions, the Vesttoo Bay Fund that acquired the ownership interest in the segregated cell then sold interests in the cell to investors by entering into limited partnership agreements between Vesttoo and the investors. Under the limited partnership agreements, the investors agreed to provide collateral verifying that sufficient financial reserves existed to cover the insurance risk held in the segregated cell.

36.     The collateral was typically a letter of credit ("LOC") for the benefit of the cedent insurer issued by a qualified U.S. financial institution. In exchange for posting adequate collateral, the investor received returns in the form of premiums associated with the insurance risk held in the segregated cell. Vesttoo was compensated with fees. This transaction structure is illustrated in the following diagram:

14



37.     In HOA's reinsurance transaction set up by Vesttoo and White Rock, and brokered by Gallagher Re, a third-party known as Yu Po Finance Limited ("Yu Po") was the investor and China Construction Bank was the financial institution issuing the letter of credit.

38.     A genuine and reliable letter of credit was critical to the adequacy of HOA's reinsurance transaction. It guaranteed that sufficient financial reserves would be available to support HOA's insurance risk obligations, thereby enabling HOA to reduce its financial reserves in accordance with HOA's reduced risk, or so it believed. Without a valid letter of credit in place, the reinsurance provided by the quota share reinsurance contract—and for which HOA paid substantial premiums as the cedent—was completely illusory.

## II.     CCB Affirmatively Established Itself as a Letter of Credit Issuer in the U.S.

39.     To expand its U.S. operations and profits, CCB affirmatively sought to engage in the lucrative business of establishing letter of credit facilities and issuing letters of credit in the U.S. market.

40.     Because of the critical role LOCs play in reinsurance transactions, their issuance is tightly regulated. The NAIC, an organization of state insurance regulators that governs the insurance industry in the U.S., maintains an exclusive list of U.S. financial institutions that are

15

qualified to issue LOCs as collateral in reinsurance arrangements.

41.     To be placed on the list, a financial institution must first apply to the NAIC. The NAIC's Securities Valuation Office then verifies whether the financial institution meets the eligibility standards. Specifically, the financial institution must be (1) a domestic institution authorized to issue or confirm LOCs that have been assigned a credit rating from a Nationally Recognized Statistical Rating Organization ("NRSRO") of "Baa/BBB" or better for its LOCs or long-term debt obligations; or (2) a U.S. branch or agency of a foreign institution that is (i) authorized to issue LOCs for reinsurance, (ii) part of a foreign institution that has attained a credit rating from an NRSRO of "Baa/BBB" or better for its LOCs or long-term debt obligations, and (iii) domiciled in a country with a sovereign debt rating of "Aa/AA" for long-term debt and/or "P1/A1" for short-term debt by an NAIC credit rating provider. Once a qualified institution is placed on the list, the NAIC continually monitors its credit quality on an ongoing basis and may, under certain conditions, remove the institution from the list.

42.     To qualify as a U.S. branch of a foreign institution, as required by the NAIC, a financial institution must first obtain approval to establish such a branch from the Federal Reserve Board, *see* 12 U.S.C. § 3105(d), and, in New York, from the New York State Department of Financial Services ("NYSDFS"), *see* N.Y. Banking Law §§ 200, 201. The Federal Reserve Board considers, among other things, whether the foreign bank (i) engages directly in the business of banking outside the U.S., (ii) has furnished the information needed to adequately assess the application, and (iii) is subject to comprehensive supervision on a consolidated basis by its home country supervisors.[5] NYSDFS considers, among other things, whether the proposed branch will promote the public convenience and advantage, and whether the business of the

---

[5] *See* Fed. Rsrv. Sys., *Order Approving Establishment of a Branch: China Construction Bank Corporation* 2-3 (Dec. 8, 2008), https://www.federalreserve.gov/newsevents/pressreleases/files/orders20081208a1.pdf.

foreign banking corporation will be honestly and efficiently conducted in accordance with the intent and purpose of the New York Banking Law.[6]

43.    CCB completed the application processes and obtained the requisite approvals such that, by January 2020, it appeared on the NAIC's official List of Qualified U.S. Financial Institutions authorized to issue letters of credit as collateral in reinsurance arrangements. By applying to the NAIC for official approval and public listing as a qualified issuer of letters of credit for reinsurance transactions, and by obtaining such approval and public listing, CCB affirmatively and intentionally communicated to the public and companies seeking reinsurance—including HOA—that CCB was a valid and reliable issuer of letters of credit and that its client-facing employees could issue such letters of credit. Further, by setting up its New York branch office and obtaining regulatory licenses and approvals to operate in the U.S., CCB affirmatively and intentionally created the impression that it was a reliable issuer of letters of credit and that its client-facing employees had the authority to issue such letters of credit on behalf of CCB out of its New York branch office.

44.    CCB's 2022 U.S. Resolution Plan, which CCB submitted to the Federal Reserve and FDIC, evidenced that its client-facing employees had authority to issue valid letters of credit on behalf of CCB out of its New York branch office. CCB was required to issue the Resolution Plan to maintain its regulatory status in the U.S., which is necessary for third parties to confidently do business with the bank. The Resolution Plan identified LOC issuance as one of CCBNY's "core business lines," stating that "CCBNY engages in underwriting commercial loans and participates in syndication lending, including **establishing letter of credit facilities,**

---

[6] *See* NYSDFS, *Foreign Banking Corporation: Foreign Branch/Agency Application*, https://www.dfs.ny.gov/apps_and_licensing/banks_and_trusts/foreign_branch_agency_application (last viewed Jan. 31, 2024) ("NYSDFS Application").

*letter of credit issuance*, negotiation, advising, payment, and other trade-related activities."[7]

## III.   HOA Obtained Purported Letters of Credit from CCB

45.    As coordinated by Vesttoo, and brokered by Gallagher Re, HOA entered a Quota Share Reinsurance Contract with White Rock on December 31, 2021, for reinsurance coverage beginning on January 1, 2022. To ensure the segregated cell account established by the contract would be adequately funded, the contract attached a collateral letter, purportedly signed by a CCB Senior Vice President named Xu Yingde, confirming that CCB would provide a letter of credit in the amount of $228 million. *See* Exhibit A.

46.    Before accepting CCB as the letter of credit issuer for the transaction, HOA reviewed documentation and communications that CCB affirmatively and intentionally made publicly available, and thus accessible to its potential clients and counterparties. HOA specifically reviewed CCB's 2020 Annual Report, which touted CCB's global prominence and financial fortitude. CCB's 2020 Annual Report lauded CCB's market capitalization "ranking fourth among all listed banks in the world" and stated that it "ranks second among global banks by Tier 1 capital." The 2020 Annual Report likewise noted CCB's maintenance of a branch office in New York at "33rd Floor, 1095 Avenue of the Americas, New York, USA NY 10036."

47.    CCB's Annual Report further substantiated CCB's status as a major issuer of letters of credit, creating the impression that a letter of credit issuance was routine and customary for CCB, and that CCB's client-facing employees had authority to issue and regularly did issue such letters of credit. The report noted CCB's active issuance of letters of credit, stating that its "[c]redit commitments take the form of undrawn loan facilities which are approved and

---

[7]   China Construction Bank, *2022 Reduced U.S. Resolution Plan Public Section Submission*, https://www.fdic.gov/resources/resolutions/resolution-authority/resplans/plans/ccbc-165-2207.pdf (last viewed Nov. 28, 2023).

contracted, unutilised credit card limits, financial guarantees, letters of credit, etc." The report stated that, as of December 31, 2020, CCB had issued over RMB 43 billion in "Sight letters of credit," representing approximately $6 billion.

48.     Before accepting CCB as its letter of credit issuer, HOA also reviewed CCB's status as an NAIC-approved issuer of letters of credit for reinsurance transactions. Specifically, HOA reviewed the NAIC's List of Qualified U.S. Financial Institutions, which identified the banks officially approved to issue letters of credit as collateral in reinsurance arrangements as of January 1, 2020. Because CCB had successfully applied to obtain the NAIC's approval, "China Construction Bank Corporation" was on that list, with its "New York, NY" branch office specifically identified. By affirmatively taking steps to secure its listing on the NAIC's list of qualified issuers of letters of credit for reinsurance transactions, CCB further created the impression that it was a reliable and regular issuer of letters of credit for reinsurance transactions, and that its employees were authorized to issue such letters of credit out of its New York branch office.

49.     As shown in the following excerpt of Exhibit A, the collateral letter attached to HOA's Quota Share Reinsurance Contract with White Rock, dated December 31, 2021, purported to be approved by "China Construction Bank Corp" with a red ink stamp affixed.

7. BANK APPROVAL – THE BANK HEREBY CONFIRMS THAT UPON A DEAL EVENT TRIGGERED, AS DEFINED IN THE REINSURANCE AGREEMENT SIGNED BY T96 – HOMEOWNERS, AND HOMEOWNERS OF AMERICA, FOR THE TRANSACTIONS DETAILED IN SCHEDULE A, AND UPON THE TRUSTEE, DEAL CALCULATION AGENT OR THE COUNTERPARTY'S EXPLICIT AND DIRECT ORDER, WILL ISSUE THE APPLICABLE AMOUNT OF IRREVOCABLE EVERGREEN LOC TO HOMEOWNERS OF AMERICA WITH RESPECT TO THE RIGHTS AND OBLIGATIONS OF T96 – HOMEOWNERS.

THE COUNTERPARTY                         APPROVED BY THE BANK

BY:    YU PO FINANCE LTD           BY:    CHINA CONSTRUCTION BANK CORP

NAME:    CHENG WEI                    NAME:    XU YINGDE

TITLE:    DIRECTOR                       TITLE:    Senior Vice President



STAMP: _____           STAMP: _____

50.     This letter was accepted by Gallagher Re, HOA's reinsurance broker knowledgeable of the customs and practices of the reinsurance industry, as valid and reliable collateral for the reinsurance transaction.

51.     Subsequently, in December 2022, HOA received an updated version of this letter by mail directly from CCB. The updated version of the letter was identical in all respects to the first one, except the total amount committed by CCB under the letter of credit was increased to $229,272,824 from $228,000,000. This updated letter contained the same signature of approval by Xu Yingde of CCB and red ink stamp. *See* Exhibit B.

52.     HOA received this updated letter directly from CCB by international UPS shipment. The UPS package came from China Construction Bank's offices at 499 Hennessy Road in Causeway Bay, Hong Kong, S.A.R., China. As shown in the following excerpt of

20

Exhibit B, the package was sent to HOA's corporate offices at 1400 Corporate Drive in Irving, Texas on or about December 22, 2022.



53.     The package's labels further identified the specific CCB employee who sent the package as "Yin Lam" of China Construction Bank.



54.     At all relevant times before and after entering the 2021 Quota Share Reinsurance

Contract with White Rock, HOA believed that it was supported by a valid and reliable letter of

credit commitment from CCB. HOA had reviewed CCB's latest annual report, which detailed its

status as a substantial letter of credit issuer, and had confirmed CCB's listing as an NAIC-

approved issuer of letters of credit for reinsurance contracts. It received hard copies of the formal

documents directly from a client-facing CCB employee by mail. Neither HOA's experienced

reinsurance broker at Gallagher Re nor White Rock expressed any skepticism or hesitation about

the validity of the letter of credit documentation received from CCB. When HOA received the

documentation directly from Lam at CCB's Hong Kong S.A.R. branch office, HOA reasonably

understood the official mailing to be valid and reliable based on CCB's outward communication,

22

through its annual report and regulatory filings, that its employees were authorized to issue letters of credit on its behalf. That Gallagher Re and White Rock, entities familiar with the customs and practices of securing collateral for reinsurance transactions, raised no issue with the validity of CCB's financial commitment or Lam's authority on behalf of CCB, further supported HOA's reasonable reliance.

55.     On December 30, 2022, HOA received a further updated letter of credit from CCB through HOA's reinsurance broker, Gallagher Re. *See* Exhibit C.

56.     On CCB letterhead bearing the address of CCB's New York branch at 1095 Avenue of the Americas in New York (matching the New York branch address in CCB's 2020 annual report), this new letter of credit stated that CCBC had established a "clean, irrevocable, and unconditional Standby Letter of Credit No. CCB462122X in your favor as beneficiary for drawings up to USD 300,000,000."

57.     As shown in the following excerpt of Exhibit C, the letter of credit further provided: "This Standby Letter of Credit is issued, presentable and payable at our office located at 1095 Avenue of the Americas, 33rd Floor New York, NY 10036, USA and expires with our close of business on Four -years-From-Issuance."

23


China Construction Bank

**BANK**                                                       December 30th, 2022

China Construction Bank Corp.
1095 Avenue of the Americas
33rd Floor New York
NY 10036
USA

**Irrevocable**
**Standby Letter of Credit No. CCB462122X**

| **Beneficiary:** | **Applicant:** |
|---|---|
| Homeowners Of America Insurance Co. | Vesttoo Bay XVII ("VB") on behalf of |
| 1333 Corporate Dr Ste 260 Irving, TX, 75038- | White Rock Insurance (SAC) Ltd. |
| 2568 United States | Acting in respect of its segregated account. |
| | Designated as "T96 – Homeowners". |
| | c/o Aon Insurance Managers (Bermuda) Ltd. |
| | 6 Front Street, Hamilton, HM11 Bermuda |

| **Date of Issue:** | **Date and Place of Expiry:** |
|---|---|
| December 30th ,2022 | Four-years-From-Issuance office of Issuing Bank or any |
| | automatically extended date, as herein defined. |

**Amount:**
USD 300,000,000 (USD Three hundred million).

We hereby establish this clean, irrevocable, and unconditional Standby Letter of Credit No. CCB462122X in your favor as beneficiary for drawings up to USD 300,000,000 (USD Three hundred million). effective immediately. This Standby Letter of Credit is issued, presentable and payable at our office located at 1095 Avenue of the Americas, 33rd Floor New York, NY 10036, USA and expires with our close of business on Four -years-From-Issuance. Except when the amount of this Standby Letter of Credit is increased, this Standby Letter of Credit cannot be modified or revoked without your consent.

58.     As shown in the following additional excerpt of Exhibit C, this letter of credit bore the same signature and red ink stamp as the previous letters from CCB.

All drafts must be marked: "Drawn under China Construction Bank Corp Standby Letter of Credit No. CCB462122X".

This Standby Letter of Credit is subject to and governed by Article V of the Uniform Commercial Code and the International Standby Practices ISP98 International Chamber of Commerce Publication No. 590. If this Standby Letter of Credit expires during an interruption of business as described in Article 3.14 of said publication 590, we hereby specifically agree to effect payment if this Standby Letter of Credit is drawn against, in compliance, within 30 days after the resumption of business.

Without any responsibility or liability on our part, it is our understanding from the Applicant that this Standby Letter of Credit covers collateral obligations as of January 1st, 2023 incurred by the applicant as respects the reinsurance agreement with the beneficiary.

Regards,



Authorized Signature(s)

59.     Shortly thereafter, in January 2023, HOA received a hard copy of this letter of credit by mail directly from CCB.

60.     As shown in the following excerpt of Exhibit D, like the previous letter, this new letter of credit was sent from "Yin Lam" at CCB's Causeway Bay branch directly to HOA at its offices in Texas.



61.     Upon receiving this letter of credit directly from CCB, in a package sent from CCB directly to HOA by an employee of CCB, bearing CCB letterhead and the CCB New York branch's address (matching the address listed in CCB's annual report), HOA reasonably understood CCB to have undertaken the letter of credit risk for HOA's reinsurance facility. Indeed, the reason that CCB sent HOA new letters—first increasing the amount of the letter of credit from $228 million to $229.3 million, and then further increasing it to $300 million—was to fit the scale of HOA's specific reinsurance needs, which grew with HOA's success in underwriting new policies for consumers. Likewise, none of the sophisticated and experienced reinsurance intermediaries coordinating the transaction—Gallagher Re and White Rock—who had extensive knowledge of the common practices and customs of obtaining collateral for reinsurance contracts, questioned the validity of the CCB letter of credit or Lam's authority to issue it.

**IV.   HOA Suffered Severe Harm After Discovering the CCB Letter of Credit Was Fraudulent**

62.     In July 2023, media outlets began reporting that certain letters of credit used in Vesttoo reinsurance transactions were invalid.

63.     On July 19, 2023, HOA delivered a Sight Draft to the New York branch office of CCB seeking to draw on its letter of credit. Later that day, HOA's Head of Reinsurance emailed three CCB employees—Chun-Yin Lam, Philip Ohara, and Allison Lee—to notify them of the Sight Draft, using their official CCB email addresses.

64.     HOA included Lam on the email, addressing the email to his official CCB email address of Chun-Yin.Lam@asia.ccb.com, because Gallagher Re sent HOA the signature block Lam had used in email correspondence regarding CCB letters of credit:

> **LAM CHUN YIN** 林俊賢
> Relationship Manager, Causeway Bay Branch 客戶經理 – 銅鑼灣分行
> Consumer Banking Division 零售銀行業務部
> Tel: (852) 37187684 l Email: Chun-Yin.Lam@asia.ccb.com

65.　　As the excerpt above shows, Lam's signature block conveyed his status as a CCB employee and Relationship Manager in CCB's Consumer Banking Division and Causeway Bay branch. Of course, Lam's name and address on the signature block also matched the sender information on the physical letters CCB had sent directly to HOA via international mail.

66.　　Lam did not respond to HOA's email. Instead, CCB's lawyers did.

67.　　On July 25, 2023, in a response to HOA's email notifying Lam and other CCB employees of the Sight Draft, counsel at Sullivan & Cromwell LLP wrote to HOA and denied that CCB had issued the letter of credit to HOA. CCB's counsel wrote: "CCBNY has reviewed the beneficiary, reference number, and other information you have provided for the LOC. The reference number and the other information do not match against CCBNY's records. Accordingly, CCBNY has concluded that it has not issued the LOC."

68.　　In a subsequent phone call on August 2, 2023, CCB's counsel at Sullivan & Cromwell suggested that the letterhead and red ink stamp on HOA's purported letter of credit from CCB were inauthentic and that CCB could provide HOA with a sworn statement certifying as much.

69.　　But CCB's counsel subsequently backtracked from that offer. When HOA requested the sworn statement from a CCB representative, CCB's counsel declined to provide any sworn statement at all, writing by letter on August 4, 2023, that "CCB does not see a need to provide any attestations at this time."

70.　　Facing sudden risk of loss and dramatic undercapitalization, HOA immediately

began taking steps to protect its business. HOA had no choice but to terminate its reinsurance contract with Vesttoo because, without a valid letter of credit to ensure adequate reinsurance funding in a major claims event, it offered no actual reinsurance at all. Plaintiffs recognized a charge of $48.2 million in their Q2 2023 financials to account for this loss. HOA then had to replace its reinsurance coverage at significantly higher cost, and further recognized a loss of surplus capital of $25 million corresponding to a $25 million withdrawal Vesttoo had taken out of the segregated cell account (purportedly to offer its investors liquidity). But for CCB's fraudulent letter of credit, Vesttoo never would have been authorized to make this withdrawal.

71.     HOA's losses extended beyond this immediate financial impact. HOA's sudden loss of reinsurance caused its regulator, the Texas Department of Insurance, to place HOA under temporary supervision, leading to additional costs, regulatory burdens, and reputational damage—which in turn led to lost revenues for HOA. Additionally, since discovering that its reinsurance facility was worthless—given the absence of valid collateral—HOA has paid over $80 million out-of-pocket to cover insurance claims that should have been reinsured.

72.     The crisis also inflicted material damage on the public stock price of Porch Group, Inc., which dropped over 40% in the weeks after news of the Vesttoo scandal broke and it became public information that HOA's reinsurance facility was arranged by Vesttoo and backed by a CCB letter of credit.



**V.    CCB Employees Conspired to Defraud HOA**

73.    Through the investigations that followed the breaking news of the scandal, one thing has become clear—a cabal of bad actors perpetrated a massive conspiracy to defraud insurance companies, including Plaintiffs, to the tune of billions of dollars—and ***CCB personnel were at the epicenter of the illicit scheme***. CCB, through its employees and agents, was a central participant in the conspiracy to defraud HOA, and other insurance company cedents, through the issuance of falsified letters of credit.

74.    CCB employee Chun-Yin Lam, the Relationship Manager based in CCB's Causeway Bay Branch in Hong Kong S.A.R., China, who was responsible for CCB's direct correspondence to HOA, was directly involved in CCB's issuance of fraudulent letters of credit. He did this using authority CCB bestowed on him. On information and belief, other employees and agents of CCB were also involved in CCB's issuance of fraudulent letters of credit in conjunction with Lam.

75.     Lam and, on information and belief, other CCB employees and agents, conspired with employees and agents of Yu Po and Vesttoo to execute fraudulent LOCs on behalf of CCB.

76.     In executing the scheme, Lam repeatedly utilized the authority CCB had conferred upon him, including by mailing official correspondence from CCB's offices in Hong Kong S.A.R., sending communications from his CCB email account, hosting meetings at CCB's offices in Hong Kong S.A.R., and issuing letters of credit on CCB letterhead with a CCB stamp in red ink.

77.     Lam had actual authority to enter into transactions on behalf of CCB. Per job descriptions that CCB has publicly posted for its Relationship Manager positions, Lam's responsibilities included acquiring and cultivating high-net-worth clients, maintaining client relationships, and providing a "full range of wealth management products and services in order to increase Investment and Insurance penetration."[8] Likewise, CCB Relationship Managers have a responsibility to "[a]ctively solicit new business and deepen existing and new relationships within the high net worth market segment."[9] Further, Relationship Managers are responsible for credit approvals, including "us[ing] analytical skills and knowledge of credit policies required to evaluate the financial condition of the clients and make recommendations for credit approval."[10]

78.     Lam's conduct here fell squarely within these responsibilities. Lam approved collateral letters and a $300 million letter of credit for HOA's benefit. On information and belief,

---

[8]   China Construction Bank (Asia), *Job Description for Relationship Manager, Intelligence Banking,* https://online.asia.ccb.com/PersonalHKWeb/careeropportunity/actGetCareerJobList.do?lang=english&posno=CBD-IBRM (last accessed Jan. 31, 2024).

[9]   China Construction Bank (Asia), *Job Description for (Senior) Relationship Manager, Consumer Branch,* https://online.asia.ccb.com/PersonalHKWeb/careeropportunity/actGetCareerJobList.do?lang=english&posno=CB-ARM-20 (last accessed Nov. 28, 2023).

[10]   China Construction Bank (Asia), *Job Description for Relationship Manager (PRC Corporates)*, https://online.asia.ccb.com/PersonalHKWeb/careeropportunity/actGetCareerJobList.do?lang=english&posno=RM/CBDI/23 (last accessed Nov. 28, 2023).

Lam did this as a service to CCB's client Yu Po. By providing this service, Lam ensured that Yu Po relied on CCB's banking products to acquire its investment returns.

79.     On information and belief, Lam also worked with other CCB employees to organize the fraudulent execution of the collateral letters and letter of credit he sent to HOA as an agent of CCB. Working with other parts of CCB to execute LOCs as a service to investor clients would be exactly the type of action Lam had authority to take on behalf of CCB as a Relationship Manager.

80.     As the individual transmitting the executed LOCs outside of CCB, Lam would also have been directly involved in, or at least aware of, the creation of "Xu Yingde" as a signatory.

81.     Lam also acted with apparent authority from CCB to execute, distribute, and confirm LOCs for CCB. As discussed above, the language and face of the letters at issue here conveyed Lam's apparent authority. The letter of credit distributed by Lam to HOA in December 2022 (i) used CCB letterhead, (ii) identified CCB as the issuer, (iii) claimed to be "presentable and payable" at CCB's New York branch office, (iv) affirmed CCB held the obligation under the LOC, irrespective of CCB's ability to perfect any lien, security interest or other reimbursement, (v) affixed a CCB stamp in red ink alongside the signature of a seemingly authorized signatory, and (vi) was sent by Lam directly to HOA from CCB's Hong Kong S.A.R. office, where Lam was based as a CCB employee.

82.     Lam emphasized his apparent authority through his communications and conduct. Lam communicated using a genuine CCB e-mail address, including a signature block which identified him as a Relationship Manager for the Causeway Bay Branch of CCB (as shown above). When he mailed documents directly to HOA, he did so from CCB's Causeway Bay

Branch address.

83.     On information and belief, Lam's fraudulent scheme involved other CCB employees at various levels of seniority, who provided support to Lam and oversaw the fraudulent execution of the LOCs.

84.     On information and belief, as revealed through Vesttoo counsel's post-bankruptcy investigation, Lam hosted meetings with Vesttoo employees in the CCB Hong Kong S.A.R. office, and during one such meeting specifically identified the groups within CCB that were responsible for the execution and management of reinsurance LOCs: (1) the Shanghai Credit Committee; (2) a final approval team in Beijing, the headquarters for CCBC; and (3) a team in New York responsible for confirmation. On information and belief, the execution of LOCs was within these groups' respective job duties. On information and belief, individuals in these groups, in coordination with Lam, were ultimately responsible for affixing the "Xu Yingde" signatures and coordinating with individuals at CCB that provided final approval for the fraudulent LOCs.

85.     CCB also communicated its employees' authority to issue letters of credit to prospective beneficiaries by affirmatively publicizing its active issuance of letters of credit in public communications, and publicly marketing and promoting itself as a valid and reliable issuer of letters of credit, including in CCB's 2020 Annual Report and 2022 U.S. Resolution Plan.

86.     Defendants knew or should have known about the conduct Lam and other involved CCB employees were engaging in within the scope of their employment with CCB, or at the very least with apparent authority conveyed by CCB.

87.     Lam and the other CCB employees' participation in the fraudulent LOC scheme

32

came at the same time that CCB was working to grow its global LOC business, and its U.S. LOC business in particular.

88.     As one of the largest banks in the world, CCB should have had extensive protocols in place to protect against and detect the type of fraud perpetrated by its employees. CCB's 2022 U.S. Resolution Plan reported to the Federal Reserve that it "maintains a core banking system that seamlessly integrates with all other systems," including its "financial, accounting, risk management, operations, and regulatory reporting" systems.[11] CCB's integrated management information system purportedly "allows information recorded in other systems to flow into it, and sends out data necessary to operate peripheral systems and populate relevant reporting templates."[12]

89.     CCB's public reporting has lauded its robust efforts to prevent fraud. For example, CCB's 2020 Annual Report states that its "risk management committee" "repeatedly strengthened fraud case prevention, and continuously enhanced the compliance risk management of the Group, especially for the overseas institutions."

90.     CCB also touts its "Intelligent Risk Control System," which its 2020 Annual Report claims "is based on data, driven by technologies and supported by agile organisational structure and innovative mechanism to promote the integration of intelligent risk control into the four communities of Business, Customer, Government and internal Management to build four general capabilities for mobile risk control, robotic process automation (RPA), anti-fraud and anti-money laundering, enabling the extensive risk management for all channels, all institutions, all customers and all employees."

---

[11] *See* China Construction Bank, *2022 Reduced U.S. Resolution Plan Public Section Submission* 9 (July 1, 2022), https://www.federalreserve.gov/supervisionreg/resolution-plans/china-construction-bk-3g-20220701.pdf.

[12] *Id.*

33

91.     CCB has further reported that it significantly improved its operational risk detection systems in 2022, including by refining its "employee behaviour management system" and "enrich[ing] employee behaviour models" that use "intelligent technologies . . . to detect noncompliance." In other words, CCB represents to regulators and the public that it operates as a bank of its size would be expected to operate, with systems intended to detect the kind of fraud at issue here and ensure that its employees are not exceeding their authority.

92.     Nevertheless, under CCB's watch, Lam worked with other employees at CCB and co-conspirators at Vesttoo and Yu Po to defraud HOA—to Plaintiffs' severe detriment.

**VI.     HOA Was Deceived by the CCB Employees' Fraud**

93.     HOA reasonably relied on the collateral letters and letter of credit it received directly from CCB, given the actual and apparent authority bestowed by CCB on Lam and CCB's affirmative measures to project itself as a prominent banking institution issuing letters of credit in the U.S. from its New York branch office, including through CCB's statements in its annual reports and regulatory filings in the U.S.

94.     HOA understandably viewed the purported CCB letter of credit as a legally binding obligation of CCB, an NAIC-qualified bank that touted its substantial letter of credit issuance in its public communications. Based on CCB's own efforts, it was listed as an official NAIC-approved issuer of letters of credit in the U.S. CCB's annual report and resolution plans tout its financial strength and global banking preeminence.

95.     That HOA reasonably believed its letter of credit from CCB was valid and reliable is further evidenced by HOA's email correspondence addressed to Lam at CCB, and HOA's direct outreach to other CCB employees, in an effort to confirm the legitimacy of the letter of credit purportedly payable at CCB's New York branch office.

34

96.     Like HOA, other insurers, brokers, and auditors—including sophisticated and experienced reinsurance intermediaries Gallagher Re and White Rock—all accepted that HOA's reinsurance contract was backed by a valid letter of credit issued by CCB. Indeed, a number of other insurers likewise relied on purported letters of credit issued by CCB to secure their reinsurance facilities, just as did HOA. Moreover, HOA's reinsurance broker Gallagher Re, a specialist in reinsurance transactions as well as White Rock, repeatedly assured HOA that its letter of credit from CCB was a valid and reliable letter of credit.

## CAUSES OF ACTION

### Count 1: Fraud

97.     Plaintiffs incorporate by reference all preceding paragraphs and re-allege them as if set forth fully herein.

98.     Plaintiffs reasonably relied on material false representations that CCB had issued valid letters of credit for HOA's benefit made by CCB's employees and agents directly to HOA. HOA relied—substantially altering its financial position—by entering the Quota Share Reinsurance Contract with White Rock purportedly collateralized by CCB letters of credit, resulting in significant damages to HOA.

99.     At all times relevant to this complaint, Chun-Yin Lam was an employee of one or more of the Defendants or a subsidiary or affiliate of CCBC subject its control.

100.    In carrying out the fraudulent LOC scheme, Lam was acting within the scope of his employment by CCB as a client-facing Relationship Manager.

101.    Defendants held Lam out to be their agent with authority to issue LOCs on behalf of CCB. Defendants employed Lam, placed Lam in a position to interact with clients in the context of collateralizing reinsurance transactions, provided Lam with a CCB email address, and

provided letterhead and stamps necessary for Lam to create purportedly genuine LOCs. Moreover, CCB affirmatively made statements to the public, including U.S. companies and U.S. regulators, that affirmatively created the impression that CCB was a valid and regular issuer of reliable letters of credit in reinsurance transactions.

102.    In conjunction with CCB's affirmative statements and conduct establishing itself as a valid issuer of letters of credit for reinsurance transactions in the U.S., the specific authority and resources provided to Lam by Defendants allowed him to carry out the fraud against HOA. As a result, Defendants are responsible for creating the appearance that Lam and the apparently fictional "Xu Yingde" had the authority to distribute valid LOCs on behalf of CCB, and HOA reasonably believed that Lam and "Xu Yingde" had such authority.

103.    HOA reasonably and justifiably relied on the material misrepresentations and omissions of the Defendants' actual and apparent agents, as communicated to HOA directly by Lam through international mail.

104.    As a direct and proximate result of the fraudulent scheme conducted by Defendants, Plaintiffs are entitled to damages from Defendants under the doctrines of respondeat superior and apparent authority in an amount to be proven at trial.

### Count 2: Negligent Supervision and Retention

105.    Plaintiffs incorporate by reference all preceding paragraphs and re-allege them as if set forth fully herein.

106.    At all times relevant to this complaint, Lam was an employee of one or more of the Defendants or a subsidiary or affiliate of CCBC subject to its control.

107.    Defendants knew or should have known of Lam's propensity to carry out fraud against others using Defendants' names, reputations, and resources before the fraudulent scheme

36

even commenced, but at the very least, after the fraudulent collateral letters and letter of credit to HOA were issued. As a global bank, and one of the largest banks in the world, CCB should have implemented adequate controls to prevent or promptly discover Lam's fraudulent conduct.

108.    In spite of Lam's fraudulent conduct, Defendants continued to employ him, continued to give him the authority and access described above, and continually failed to adequately supervise him.

109.    Lam perpetrated the fraud on HOA using Defendants' premises and chattels, including Defendants' names, physical offices, electronic devices and systems, email accounts, and letterhead. The fraud conducted by Lam was closely connected to, and dependent upon, his employment relationship with Defendants.

110.    The fraud conducted by Lam proximately caused significant damages to HOA, and that harm was reasonably foreseeable to Defendants at all relevant times.

111.    Had Defendants adequately supervised Lam, he would not have been able to carry out the fraudulent letters of credit scheme and Plaintiffs would not have suffered the aforementioned harms.

112.    As a result of the fraudulent scheme carried out by Lam, Plaintiffs are entitled to damages from Defendants under the doctrines of negligent supervision and retention in an amount to be proven at trial.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court enter a final judgment awarding legal and equitable relief as follows:

A.    Judgment in Plaintiffs' favor and against Defendants on all causes of action alleged herein;

B.    Monetary damages in an amount to be determined at trial;

C.    Exemplary and punitive damages;

D.    Pre-judgment and post-judgment interest at the prevailing legal rate;

E.    Attorney's fees and costs; and

F.    Such other and further relief as this Court may deem just and proper.

### DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a trial by jury as to all issues so triable.

Dated this 9th day of May, 2024

SUSMAN GODFREY LLP

*/s/ Kemper P. Diehl*
Stephen E. Morrissey (*Pro Hac Vice Forthcoming*)
Kemper P. Diehl
401 Union Street, Suite 3000
Seattle, WA 98101
(206) 373-7382
smorrissey@susmangodfrey.com
kdiehl@susmangodfrey.com

Geng Chen
One Manhattan West, 50th Fl.
New York, New York 10001
(212) 336-8330
gchen@susmangodfrey.com

*Attorneys for Plaintiffs*

# General Information

| | |
|---|---|
| **Case Name** | Porch Group, Inc. et al v. China Construction Bank Corporation et al |
| **Court** | U.S. District Court for the Southern District of New York |
| **Date Filed** | Thu May 09 00:00:00 EDT 2024 |
| **Federal Nature of Suit** | Personal Property: Fraud [370] |
| **Docket Number** | 1:24-cv-03591 |
| **Parties** | Porch Group, Inc.; Porch.com, Inc.; China Construction Bank New York Branch; China Construction Bank (ASIA) Corporation Limited; Homeowners of America Holding Corporation; China Construction Bank Corporation; Homeowners of America Insurance Company |

© 2024 Bloomberg Industry Group, Inc. All Rights Reserved. Terms of Service

# Exhibit D

Exhibit filed under seal.